**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

---

**FORM 10-Q**

---

(Mark One)

x   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2012

OR

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from            to

Commission file number: 001-35629

---

# TILE SHOP HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

---

| Delaware | 45-5538095 |
|---|---|
| (State or other jurisdiction of incorporation) | (I.R.S. Employer Identification No.) |
| 14000 Carlson Parkway Plymouth, Minnesota | 55441 |
| (Address of principal executive offices) | (Zip Code) |

(763) 852-2901
(Registrant's telephone number, including area code)

---

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes  ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes  ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Not Confidential

Tile Shop 00001981
TSH000297_0001

Exhibit 11-1

**RFA Ex. 26.2**

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of November 7, 2012, there were 42,981,985 shares of the registrant's common stock, par value $0.0001 per share, outstanding.

_____

Tile Shop 00001982

Not Confidential

TSH000297_0002

Exhibit 11-2

**TILE SHOP HOLDINGS, INC.**
**Table of Contents**

|  |  | Page |
|---|---|---|
| **PART I. FINANCIAL INFORMATION** | | |
| Item 1. | Financial Statements (Unaudited) | 3 |
|  | Condensed Consolidated Balance Sheets as of September 30, 2012 and December 31, 2011 | 3 |
|  | Condensed Consolidated Statements of Income for the three months and nine months ended September 30, 2012 and 2011 | 4 |
|  | Condensed Consolidated Statements of Stockholders' Equity for the year ended December 31, 2011 and the nine months ended September 30, 2012 | 5 |
|  | Condensed Consolidated Statements of Cash Flows for the nine months ended September 30, 2012 and 2011 | 6 |
|  | Notes to Condensed Consolidated Financial Statements | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Item 3. | Quantitative and Qualitative Disclosure About Market Risks | 27 |
| Item 4. | Controls and Procedures | 28 |
| **PART II. OTHER INFORMATION** | | |
| Item 1. | Legal Proceedings | 29 |
| Item 1.A. | Risk Factors | 29 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 41 |
| Item 3. | Defaults Upon Senior Securities | 41 |
| Item 4. | Mine Safety Disclosures | 41 |
| Item 5. | Other Information | 41 |
| Item 6. | Exhibits | 41 |
| Signatures | | 43 |

Tile Shop 00001983
Not Confidential                    TSH000297_0003

Exhibit 11-3

**Tile Shop Holdings, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements
(unaudited)

**Note 1: Organization and Nature of Business**

The Tile Shop, LLC ("The Tile Shop") was formed on December 30, 2002, as a Delaware limited liability company (LLC) and began operations on January 1, 2003. Tile Shop Holdings, Inc. (the "Company") was incorporated under the laws of the state of Delaware in 2012 as a wholly-owned subsidiary of The Tile Shop. The Company was formed for the purpose of consummating the transactions contemplated by the Contribution and Merger Agreement (the "Contribution and Merger Agreement"), dated June 27, 2012, by and among JWC Acquisition Corp., a Delaware corporation ("JWCAC"), The Tile Shop, the member of The Tile Shop other than ILTS, LLC, a Delaware limited liability company ("ILTS"), Nabron International, Inc., a Bahamas corporation ("Nabron"), Tile Shop Merger Sub, Inc., a Delaware corporation ("Merger Sub"), and Peter J. Jacullo III, as representative ("Business Combination"), which was completed on August 21, 2012 and is fully discussed in Note 2 below. JWCAC was incorporated under the laws of the state of Delaware in 2010 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination involving JWCAC and one or more businesses.

The Company and subsidiaries are engaged in the sale of tile and flooring products. The Company also fabricates or manufactures certain products in Michigan and Wisconsin. The Company's primary market is retail sales to consumers; however, the Company does have sales to contractors. As of September 30, 2012, the Company had 62 stores and an on-line retail operation. The retail stores are located in Minnesota, Wisconsin, Kansas, Illinois, Michigan, Ohio, Indiana, Maryland, Missouri, Kentucky, New York, Virginia, Iowa, North Carolina, New Jersey, Tennessee, Nebraska, Delaware, Georgia, and Pennsylvania. The Company also has distribution centers located in Wisconsin, Michigan, and Virginia.

**Note 2: Business Combination**

On August 21, 2012, pursuant to the terms of the Contribution and Merger Agreement, the Business Combination was consummated. The members of The Tile Shop other than ILTS contributed their membership interests in The Tile Shop to the Company, and Nabron contributed its membership interest in ILTS to the Company (the "Contribution"), in exchange for (i) a cash payment of $75 million, (ii) 32,000,000 shares of the Company's common stock valued at $320 million, and (iii) promissory notes issued by the Company in the aggregate principal amount of $69.8 million. As a result of the Contribution, all ownership interests in The Tile Shop were contributed to the Company.

Prior to the Business Combination, certain JWCAC shareholders exercised their redemption rights with respect to 5.5 million shares of JWCAC public stock, which were redeemed at the closing of the Business Combination. Immediately thereafter and concurrently with the Contribution, Merger Sub merged with and into JWCAC, with JWCAC surviving (the "Merger"). In connection with the Merger, (i) each remaining outstanding share of JWCAC common stock was exchanged for one share of the Company's common stock and (ii) each outstanding JWCAC warrant (17,833,333) that was formerly exercisable for one share of JWCAC common stock became exercisable for one share of the Company's common stock.

In connection with the Business Combination, certain members of the JWC Acquisition LLC, an affiliate of JWCAC, purchased 1,500,000 shares of the Company's common stock from the Company in a private placement at a purchase price of $10.00 per share, and the members of The Tile Shop withdrew $12.9 million of cash from The Tile Shop by way of dividend.

As result of the Business Combination, the Company owns, directly or indirectly, all of the equity in The Tile Shop, ILTS, and JWCAC. Immediately following closing of the Business Combination, the former members of The Tile Shop and the former JWCAC stockholders hold 75.2% and 24.8%, respectively, of the issued and outstanding shares of common stock of the Company.

Not Confidential

Tile Shop 00001990
TSH000297_0010

Exhibit 11-4

**Tile Shop Holdings, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements
(unaudited)

### Note 2: Business Combination (continued)

The number of shares of common stock of the Company issued and outstanding immediately following the consummation of the Business Combination is summarized as follows:

|  | Number of Shares |
|---|---|
| JWCAC public shares outstanding prior to the Business Combination | 12,500,000 |
| JWCAC founder shares | 2,034,884 |
| Total JWCAC shares outstanding prior to the Business Combination | 14,534,884 |
| Less: redemption of JWCAC public shares | (5,500,000) |
| Total JWCAC shares outstanding immediately prior to the effective date of the Business Combination | 9,034,884 |
| Common shares issued as consideration to members of The Tile Shop | 32,000,000 |
| Common shares issued to sponsor of JWCAC | 1,500,000 |
| Total common shares outstanding at closing, August 21, 2012 | 42,534,884 |

### Basis of presentation and accounting treatment of Business Combination:

The Tile Shop is considered the acquirer for accounting purposes, and has accounted for the Business Combination as a recapitalization because it obtained effective control of JWCAC. The Tile Shop did not have a change in control since The Tile Shop's operations comprises the ongoing operations of the combined entity, its senior management became the senior management of the combined entity, and its former owners own a majority voting interest in the combined entity and are able to elect a majority of the combined entity's board of directors. Accordingly, the Business Combination does not constitute the acquisition of a business for purposes of Financial Accounting Standards Board's Accounting Standard Codification 805, "Business Combinations," (ASC 805). As a result, the assets and liabilities of The Tile Shop and JWCAC are carried at historical cost and the Company has not recorded any step-up in basis or any intangible assets or goodwill as a result of the Business Combination. All direct costs of the Business Combination are offset to additional paid-in-capital. The historical financial statements presented herein are that of The Tile Shop for all periods.

In the condensed consolidated financial statements, the recapitalization of the number of shares of common stock attributable to The Tile Shop members is reflected retroactive to January 1, 2011. Accordingly, the number of shares of common stock presented as outstanding as of January 1, 2011 totaled 32,000,000 consisting of the number of shares of common stock issued to The Tile Shop members other than ITLS and Nabron as consideration for the Contribution. This number of shares was also used to calculate the Company's earnings per share for all periods prior to the Business Combination.

8

Not Confidential

Tile Shop 00001991
TSH000297_0011

Exhibit 11-5

**Tile Shop Holdings, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements
(unaudited)

**Note 2: Business Combination (continued)**

The cash flows related to the Business Combination, as reported in the Condensed Consolidated Statement of Cash Flow is summarized as follows:

|  | Amount |
|---|---|
| Cash in trust at JWCAC | $ 124,950,000 |
| Add: proceeds from issue of shares | 15,000,000 |
| Less: redemption of JWCAC public shares | (54,960,400) |
| Less: cash paid to The Tile Shop members | (75,000,000) |
| Less: payment of deferred offering cost by JWCAC | (7,085,176) |
| Remaining cash received by the Company in the merger | $ 2,904,424 |

Because the former members of The Tile Shop retained a significant ownership interest in the Company following the Business Combination, a portion of the $69.8 million of notes payable issued to former members of The Tile Shop members as part of the Business Combination is treated as a leveraged dividend. Accordingly $52.5 million has been reflected as a distribution of retained earnings in the accompanying financial statements. The remainder of these notes payable have been deducted from additional paid in capital.

**Pro Forma Information:**

Actual results of operations are included in the unaudited condensed consolidated interim financial statements from the date of the applicable business combination. The unaudited pro forma computation related to the conversion to a C Corporation for income tax purposes assumes that such conversion occurred as of January 1, 2011. These amounts are not necessarily indicative of the consolidated results of operations for future years or actual results that would have been realized had the change in tax status occurred as of the beginning of each such year.

**Note 3: Summary of Selected Significant Accounting Polices**

**Basis of preparation:**

The accompanying condensed consolidated financial statements have been prepared on the accrual basis of accounting in accordance with United States generally accepted accounting principles ("US GAAP") to reflect the financial position, results of operations and cash flows of the Company. These financial statements have been prepared on a going concern basis, which assumes the realization of assets and satisfaction of liabilities in the normal course of business.

Tile Shop 00001992
Not Confidential                          TSH000297_0012

Exhibit 11-6

**Tile Shop Holdings, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements
(unaudited)

### Note 3: Summary of Selected Significant Accounting Polices (continued)

Certain information and footnote disclosures normally included in financial statements prepared in accordance with US GAAP have been condensed or omitted. These condensed consolidated financial statements should be read in conjunction with the Company's most recent audited consolidated financial statements and related notes for the fiscal year ended December 31, 2011, which are included in the Company's prospectus filed with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended, on August 3, 2012. The same accounting policies are followed in preparing nine month financial data as are followed in preparing annual data. See the notes in the audited financial statements for the year ended December 31, 2011 for those policies. In the opinion of management, all adjustments necessary for the fair presentation of nine month operating results are reflected herein and are of a normal, recurring nature.

#### Use of estimates:

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements. The Company bases its estimates and judgments on historical experience and on various other assumptions that it believes are reasonable under the circumstances. The amount of assets and liabilities reported on the Company's balance sheets and the amounts of income and expenses reported for each of the periods presented are affected by estimates and assumptions, which are used for, but not limited to, the accounting for revenue recognition and related reserves for sales returns, useful lives of property, plant and equipment, allowance for trade receivables, determining impairment on long-lived assets, valuation of inventory, determining compensation expense on stock based compensation plans and accruals for incentive compensation. Actual results may differ from these estimates.

#### Cash and cash equivalents:

The Company considers all highly liquid investments with initial maturities of three months or less to be cash equivalents.

#### Trade receivables:

Trade receivables are carried at original invoice amount less an estimate made for doubtful receivables. Management determines the allowance for doubtful accounts on a specific identification basis as well as by using historical experience applied to an aging of accounts. Trade receivables are written off when deemed uncollectible. Recoveries of trade receivables previously written off are recorded when received.

#### Inventories:

Inventories are stated at the lower of cost (determined on the first-in, first-out method) or market. Inventories consist primarily of merchandise held for sale. Inventories comprised of the following as September 30, 2012 and December 31, 2011:

|  | September 30, 2012 | December 30, 2011 |
|---|---|---|
| Finished goods | $ 36,978,269 | $ 38,380,074 |
| Raw materials | 1,061,169 | 1,219,951 |
| Finished goods in transit | 2,622,838 | 4,143,847 |
| Total | $ 40,662,276 | $ 43,743,872 |

10

Not Confidential

Tile Shop 00001993
TSH000297_0013

Exhibit 11-7

**Tile Shop Holdings, Inc. and Subsidiaries**
Notes to Consolidated Financial Statements
(unaudited)

**Note 5: Promissory Notes**

As part of the Business Combination, promissory notes were issued by the Company in the aggregate principal amount of $69.8 million (the "Promissory Notes"). The Promissory Notes had a three year term, could be prepaid at any time without penalty, and bore interest at a rate of 4% per annum, payable quarterly. Upon the issuance of senior indebtedness where the proceeds of such indebtedness were used to repay not less than 50% of the aggregate principal amount of the Promissory Notes, the term of the Promissory Notes would be extended to the date 180 days following the term of such senior indebtedness and the interest rate on the outstanding principal amount of the Promissory Notes will increase to 10% per annum. If the Promissory Notes were not repaid by the Company in full by the third anniversary of the consummation of the Business Combination, up to an aggregate of $20,000,000 of the then-outstanding principal amount of the Promissory Notes would have been convertible into shares of the Company's common stock at a conversion price of $10.00 per share.

Subsequent to the balance sheet date, the Company obtained a $100 million senior secured credit facility which was utilized, in part, to repay the Promissory Notes in full (See Note 10).

**Note 6: Fair Value of Financial Instruments:**

These condensed consolidated financial statements include the following financial instruments: cash and cash equivalents, trade receivables, accounts payable, accrued expenses, capital leases, notes payable and debt. At September 30, 2012 and December 31, 2011, the carrying amount of the Company's cash and cash equivalents, trade receivables, approximated their fair values due to their short maturities. The carrying value of the Company's borrowings and capital lease obligation approximates fair value based upon the market interest rates available to the Company for debt and capital lease obligations with similar risk and maturities.

**Note 7: Related Party Transactions**

The Special Cash Distribution Units issued by The Tile Shop were owned by Mr. Robert Rucker, the President and CEO. The units received annual payments of $300,000 for a term of 10 years through 2012 and were fully paid as of June 30, 2012.

The Tile Shop had a note receivable from Robert Rucker, the President and CEO. The note was due in annual installments of $300,000 of principal and interest at a rate of 2.6% per annum with a final installment due in 2012 which was fully received as of June 30, 2012.

The Company has issued Promissory Notes to members of The Tile Shop for an aggregate principal amount of $69.8 million in connection with the Business Combination which were outstanding at September 30, 2012. The Company has recorded interest expense of $305,846 for the three and nine months ended September 30, 2012 related to these notes.

During the three months ended September 30, 2012, the Company obtained an unsecured short term loan of $5.5 million from Nabron. The loan was obtained to provide short term working capital and liquidity for the Company. The loan was paid off during the three months ended September 30, 2012 with interest of $20,777.

13

Not Confidential

Tile Shop 00001997
TSH000297_0017

Exhibit 11-8

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our condensed consolidated financial statements and related notes appearing elsewhere in this Quarterly Report on Form 10-Q and our prospectus filed with the Securities and Exchange Commission pursuant to Rule 424(b)(3) under the Securities Act of 1933, as amended, on August 3, 2012.*

**Forward-Looking Statements**

*This Quarterly Report on Form 10-Q contains "forward-looking statements" that involve risks and uncertainties, as well as assumptions that, if they never materialize or prove incorrect, could cause our results to differ materially from those expressed or implied by such forward-looking statements. The statements contained in this Quarterly Report on Form 10-Q that are not purely historical are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, or Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended, or Exchange Act. Forward-looking statements are often identified by the use of words such as, but not limited to, "anticipate," "believe," "can," "continue," "could," "estimate," "expect," "intend," "may," "will," "plan," "project," "seek," "should," "target," "will," "would," and similar expressions or variations intended to identify forward-looking statements. These statements are based on the beliefs and assumptions of our management based on information currently available to management. Such forward-looking statements are subject to risks, uncertainties and other important factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those identified below, and those discussed in the section titled "Risk Factors" included in this Quarterly Report on Form 10-Q. Furthermore, such forward-looking statements speak only as of the date of this report. Except as required by law, we undertake no obligation to update any forward-looking statements to reflect events or circumstances after the date of such statements.*

**Business Combination transaction**

We were incorporated in the State of Delaware in June 2012 in order to become the parent company of The Tile Shop, LLC ("The Tile Shop") following the consummation of a business combination (the "Business Combination") with JWC Acquisition Corp. ("JWCAC"), a blank check company incorporated in the State of Delaware in July 2010. On August 21, 2012, we consummated the Business Combination and, in connection therewith, became a successor issuer to JWCAC by operation of Rule 12g-3(a) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

**Overview**

We are a specialty retailer of manufactured and natural stone tiles, setting and maintenance materials, and related accessories in the United States. We offer a wide selection of products, attractive prices, and exceptional customer service in an extensive showroom setting. We operate 62 stores in 20 states, with an average size of 23,000 square feet. We also sell our products on our website.

We purchase our tile products and accessories directly from producers and manufacture our own setting and maintenance materials, such as thinset, grout, and sealers. We believe that our long-term producer relationships, together with our design, manufacturing and distribution capabilities, enable us to offer a broad assortment of high-quality products to our customers, who are primarily homeowners, at competitive prices. We have invested significant resources to develop our proprietary brands and product sources and believe that we are a leading retailer of stone tiles, accessories, and related materials in the United States.

We believe that the highly-fragmented U.S. retail tile market provides us with a significant opportunity to expand our store base. We have opened nine new stores in the U.S. in 2012 and plan to open an additional four stores during the remainder of 2012 and no fewer than 15 stores in 2013. We believe that there will continue to be additional expansion opportunities in the United States and Canada. We expect store base growth will drive productivity and operational efficiencies.

Not Confidential

Tile Shop 00002004
TSH000297_0024

Exhibit 11-9

**Key Components of our Consolidated Statements of Income**

*Net sales*

Net sales represent total charges to customers and include freight charged to customers. The increase in net sales in recent years has been a result of store base growth, increases in same store sales, expansion of product lines, and a gradually improving national economy. From 2009 to 2011, our net sales grew 31.4% to $152.7 million.

The table below sets forth information about our same store sales growth from 2009 to September 30, 2012. Our increase in same store sales growth is primarily attributable to increases in volume. Same store sale amounts include total charges to customers less any actual returns. We do not include estimated return provisions or sales allowances in the same store sales calculation, as return reserves are calculated at the consolidated level. In general, we consider a store comparable on the first day of the 13th month of operation.

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | | Years Ended December 31, | | |
|---|---|---|---|---|---|---|---|
|  | 2012 | 2011 | 2012 | 2011 | 2011 | 2010 | 2009 |
| Same store sales growth | 5.9% | 5.1% | 5.5% | 6.1% | 6.4% | 11.4% | (4.6)% |

We opened five, five, and one new stores in 2011, 2010, and 2009, respectively, as well as nine new stores in the nine months ended September 30, 2012. Net sales at new stores are generally lowest in the first few months after a location is opened and generally increase over time. We expect a store's net sales to increase faster during its first three years of operation than in its later years. Store locations opened in existing markets tend to have higher net sales in the first year of operation than store locations opened in new markets, as a portion of such net sales come from more mature stores in those markets.

*Cost of sales*

Cost of sales (excluding depreciation and amortization) consists primarily of costs associated with purchasing products and delivering them to customers, as well as costs associated with manufacturing of maintenance materials.

*Gross profit*

Gross profit is net sales less cost of sales. Gross margin is the percentage determined by dividing gross profit by net sales.

In 2011, 2010, and 2009 our gross margin was 73.6%, 73.3%, and 72.7%, respectively. For the nine months ended September 30, 2012 and 2011 our gross margin was 72.9% and 73.7%, respectively. We have been able to maintain stable gross margins as a result of product cost control and expect that our gross margin will continue in the same range.

*Selling, general, and administrative expenses*

Payroll costs and occupancy expenses have historically been our most significant selling, general, and administrative expenses. Payroll costs exclude costs associated with manufacturing labor costs, as those costs are included in cost of sales. In 2011, 2010, and 2009, our selling, general, and administrative expenses as a percentage of net sales was 52.2%, 50.7%, and 51.8%, respectively. For the nine months ended September 30, 2012 and, 2011 selling, general, and administrative expenses as a percentage of net sales was 50.3% and 50.6%, respectively. We expect to continue making investments in our corporate infrastructure commensurate with our growth strategy.

Since the consummation of the Business Combination, we have incurred, and expect to continue to incur, increased incremental general and administrative expenses attributable to operating as a publicly traded company. These costs include those associated with Securities and Exchange Commission reporting, Sarbanes-Oxley compliance, and listing on the Nasdaq Stock Market, as well as increased compensation to our financial personnel, professional fees, insurance costs, director compensation.

### Critical Accounting Policies and Estimates

Our financial statements are prepared in accordance with accounting principles generally accepted in the United States, or GAAP. The preparation of our financial statements and related disclosures requires us to make estimates, assumptions, and judgments that affect the reported amount of assets, liabilities, revenues, costs and expenses, and related disclosures. We base our estimates and assumptions on historical experience and other factors that we believe to be reasonable under the circumstances, but all such estimates and assumptions are inherently uncertain and unpredictable. We evaluate our estimates and assumptions on an ongoing basis. Actual results may differ from those estimates and assumptions, and it is possible that other professionals, applying their own judgment to the same facts and circumstances, could develop and support alternative estimates and assumptions that would result in material changes to our operating results and financial condition.

We consider the assumptions and estimates associated with recognition of revenue, stock-based compensation, and property, plant, and equipment to be our critical accounting policies and estimates. There have been no material changes to our critical accounting policies since December 31, 2011. For further information on our critical and other significant accounting policies, see the notes to the condensed consolidated financial statements appearing elsewhere in this Quarterly Report on Form 10-Q and our prospectus filed with the Securities and Exchange Commission pursuant to Rule 424(b)(3) under the Securities Act of 1933, as amended (the "Securities Act"), on August 3, 2012.

### Comparison of the Three Months Ended September 30, 2012 and the Three Months Ended September 30, 2011

The major components of sales, cost of sales, operating expenses and other income, and benefit (provision) for income taxes are discussed below.

|  | Three months ended September 30 | | | |
|  | 2012 | % of sales | 2011 | % of sales |
| --- | --- | --- | --- | --- |
| Net sales | $44,288,400 | | $37,083,846 | |
| Cost of sales | 12,196,858 | 27.5% | 9,872,598 | 26.6% |
| Gross profit | 32,091,542 | 72.5% | 27,211,248 | 73.4% |
| Selling, general and administrative expenses | 23,899,183 | 54.0% | 19,992,329 | 53.9% |
| Deferred compensation expense | 2,623,739 | 5.9% | 373,542 | 1.0% |
| Income from operations | 5,568,620 | 12.6% | 6,845,377 | 18.5% |
| Interest expense | 450,406 | 1.0% | 94,498 | 0.3% |
| Other income | 1,386 | 0.0% | 6,961 | 0.0% |
| Income before income taxes | 5,119,600 | 11.6% | 6,757,840 | 18.2% |
| Benefit (provision) for income taxes | 4,722,486 | 10.7% | (153,172) | -0.4% |
| Net income | $ 9,842,086 | 22.2% | $6,604,668 | 17.8% |

#### Net sales

Net sales increased by $7.2 million, or 19.4%, for the three months ended September 30, 2012 compared to the three months ended September 30, 2011. This increase is primarily due to net sales of $4.8 million from 11 new stores, and an increase of $2.4 million from same store sales growth.

#### Gross profit

Gross profit increased $4.9 million, or 17.9%, for the three months ended September 30, 2012 compared to the three months ended September 30, 2011, primarily due to the increase in net sales. Gross margin decreased 0.3% for the three months ended September 30, 2012 from the three months ended September 30, 2011, primarily due to slightly higher product related costs and transportation expenses.

Tile Shop 00002010
Not Confidential                    TSH000297_0030

Exhibit 11-11

Exhibits

32.2*    Certifications of Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

101.INS+  XBRL Instance Document.

101.SCH+ XBRL Taxonomy Extension Schema Document.

101.CAL+ XBRL Taxonomy Extension Calculation Linkbase Document.

101.DEF+ XBRL Taxonomy Extension Definition Linkbase Document.

101.LAB+ XBRL Taxonomy Extension Label Linkbase Document.

101.PRE+ XBRL Taxonomy Extension Presentation Linkbase Document.

(1)     Filed as Exhibit 3.1 to the Registrant's Registration Statement on Form S-4 filed with the Securities and Exchange Commission on July 2, 2012, and incorporated herein by reference.

(2)     Filed as Exhibit 3.2 to the Registrant's Registration Statement on Form S-4 filed with the Securities and Exchange Commission on July 2, 2012, and incorporated herein by reference.

*      These certificates are not deemed filed with the Securities and Exchange Commission and are not to be incorporated by reference in any filing we make under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, irrespective of any general incorporation language in any filings.

+       In accordance with Rule 406T of Regulation S-T, these XBRL (eXtensible Business Reporting Language) documents are furnished and not filed or a part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act of 1933, as amended, or Section 18 of the Securities Exchange Act of 1934, as amended, and otherwise are not subject to liability under these sections.

42

Tile Shop 00002041
Not Confidential                                      TSH000297_0061

Exhibit 11-12

RFA Ex. 26.62

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**TILE SHOP HOLDINGS, INC.**

Dated: November 9, 2012                    By: /s/ Robert A. Rucker
                                               Robert A. Rucker
                                               Chief Executive Officer

Dated: November 9, 2012                    By: /s/ Timothy C. Clayton
                                               Timothy C. Clayton
                                               Chief Financial Officer

43

End of Document © 2015 Thomson Reuters. No claim to original U.S. Government Works.

RFA Ex. 25.1

As filed with the Securities and Exchange Commission on June 3, 2013

File No. 333-188861

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

Amendment No. 1
to
FORM S-1
REGISTRATION STATEMENT
UNDER THE SECURITIES ACT OF 1933

# TILE SHOP HOLDINGS, INC.

(Exact name of Registrant as specified in its charter)

| **Delaware** | **5713** | **45-5538095** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

14000 Carlson Parkway
Plymouth, Minnesota 55441
(763) 852-2901

(Address, including zip code, and telephone number,
including area code, of registrant's principal executive offices)

Robert A. Rucker
Chief Executive Officer
14000 Carlson Parkway
Plymouth, Minnesota 55441
(763) 852-2901

(Names, address, including zip code, and telephone number,
including area code, of agent for service)

*Please send copies of all communications to:*

| | |
|---|---|
| John R. Houston, Esq. | Bernard S. Kramer, Esq. |
| Alexander Rosenstein, Esq. | Joel L. Rubinstein, Esq. |
| Fredrikson & Byron, P.A. | Eric Orsic, Esq. |
| 200 South Sixth Street | McDermott Will & Emery LLP |
| Suite 4000 | 340 Madison Avenue |
| Minneapolis, Minnesota 55402 | New York, New York 10173 |
| (612) 492-7000 | (212) 547-5400 |

**APPROXIMATE DATE OF COMMENCEMENT OF THE PROPOSED SALE TO THE PUBLIC:** As soon as practicable after this registration statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Not Confidential

Tile Shop 00002614
TSH000331_0001

Exhibit 12-1

**RFA Ex. 25.2**

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐      Accelerated filer ☒

Non-accelerated filer ☐      Smaller reporting company ☐

  (Do not check if a smaller reporting company)

Not Confidential

Tile Shop 00002615
TSH000331_0002

Exhibit 12-2

RFA Ex. 25.3

TABLE OF CONTENTS

The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the registration statement shall become effective on such date as the SEC, acting pursuant to said Section 8(a), may determine.

Not Confidential

Tile Shop 00002616
TSH000331_0003

Exhibit 12-3

**RFA Ex. 25.4**

TABLE OF CONTENTS

The information in this preliminary prospectus is not complete and may be changed. The selling stockholders may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and the selling stockholders are not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

**SUBJECT TO COMPLETION, DATED JUNE 3, 2013**

PRELIMINARY PROSPECTUS



**4,250,000 Shares**

# TILE SHOP HOLDINGS, INC.

## Common Stock

### $   per share

The selling stockholders named in this prospectus, which include certain members of our board of directors and management, are selling 4,250,000 shares. We will not receive any proceeds from the sale of the shares by the selling stockholders.

Our common stock is listed on The NASDAQ Global Market under the symbol "TTS". The last reported sale price of our common stock on The NASDAQ Global Market on May 31, 2013 was $25.96 per share.

On May 24, 2013, we entered into a Stock Purchase Agreement with Nabron International, Inc., whereby we agreed to repurchase a number of shares of our common stock having an aggregate value of $46.0 million, which we refer to as the "Post-offering Nabron Stock Purchase," at a price per share equal to the public offering price less the underwriters discount. The closing of the Post-offering Nabron Stock Purchase is conditioned upon the completion of this offering. The closing of this offering is not conditioned upon the completion of the Post-offering Nabron Stock Purchase. We expect to fund the purchase price for the Post-offering Nabron Stock Purchase with the proceeds from the warrant exercises as described in this prospectus. We cannot assure you that the conditions to the Post-offering Nabron Stock Purchase will be satisfied or that the share repurchase will take place on the terms described above or at all.

**Investing in our common stock involves risks. See "Risk Factors" beginning on page 10.**

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities to be issued under this prospectus or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

|  | Per Share | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriters discount[(1)] | $ | $ |
| Proceeds to the selling stockholders (before expenses) | $ | $ |

(1) We refer you to "Underwriting" beginning on page 78 for additional information regarding underwriting compensation.

To the extent that the underwriters sell more than 4,250,000 shares of common stock to the public, the underwriters have the option to purchase up to 637,500 additional shares from certain selling stockholders at the public offering price less the underwriters discount. We will not receive any proceeds from the sale of the additional shares by the selling stockholders.

The underwriters expect to deliver the shares to purchasers on or about         , 2013 through the book-entry facilities of The Depository Trust Company.

# Citigroup           Baird           Piper Jaffray

**Wedbush Securities**          **Telsey Advisory Group**          **CJS Securities, Inc.**

Not Confidential

Tile Shop 00002617
TSH000331_0004

Exhibit 12-4

RFA Ex. 25.73

TABLE OF CONTENTS

convertible into or exchangeable for our common stock for certain periods. On March 12, 2013, the early release provisions of the lock-up agreements entered at the time of the Business Combination were triggered and on March 12, 2013 the lock-up period under the lock-up agreements entered in connection with the December 2012 public offering expired. As a result, the Sellers, the Sponsor Members, our directors, officers and the selling stockholders in our December 2012 public offering may sell their shares at any time, subject to compliance with applicable securities laws and the restrictions described in the section entitled "Underwriting" below.

### Warrant Agreements

In connection with the Business Combination, the Sellers and an affiliate of the Sponsor entered into an agreement pursuant to which the Sellers or their assignees purchased from such affiliate an aggregate of 4,466,885 warrants, for an aggregate purchase price of $3,419,327. These warrants were among those sold in connection with JWCAC's initial public offering (collectively, the "Public Warrants") and were acquired by the affiliate following JWCAC's initial public offering for an aggregate purchase price of $3,419,327. These Public Warrants were all exercised in March and April 2013.

In connection with the Business Combination, we entered into an agreement with the Sponsor and the Sponsor Members under which (i) the Sponsor Members waived their rights and the rights of their permitted transferees to exercise warrants to purchase an aggregate of 5,333,333 shares of common stock, which were issued in a private placement, (the "Sponsor Warrants") for cash and agreed that such Sponsor Warrants may only be exercised on a cashless basis. These Sponsor Warrants were all exercised in March and April 2013.

In connection with the Business Combination, we entered into a letter agreement with The Tile Shop, Inc., a Minnesota corporation ("TS, Inc.") and an entity controlled by Mr. Rucker, pursuant to which TS, Inc. and its affiliates agreed (i) to exercise Public Warrants only on a cashless exercise basis and (ii) that the maximum number of shares of our common stock issuable upon exercise of Public Warrants is the lesser of (A) 434,968 shares of common stock or (B) the number of shares of common stock that may be issued without Mr. Rucker's beneficial ownership of shares of our common stock exceeding 20 percent.

### The Tile Shop Related Person Transactions

In June 2011, TS, Inc., a holder of 5% of the membership interests of The Tile Shop prior to the Business Combination and an entity controlled by Mr. Rucker, sold (i) an aggregate of 1,710,000 Common Units of The Tile Shop to ILTS, LLC, a Delaware limited liability company ("ILTS"), a holder of 5% of the membership interests in The Tile Shop prior to the Business Combination and an entity of which Mr. Jacullo was a manager and (ii) an aggregate of 290,000 Common Units of The Tile Shop to three trusts that are now stockholders of JWTS, Inc., a Delaware corporation ("JWTS"), a holder of 5% of the membership interests in The Tile Shop and an entity controlled by Mr. Jacullo, in each case for $4.4434 per unit. The Common Units purchased by the three trusts were contributed to JWTS and were contributed to the Company in connection with the Business Combination in exchange for the cash, Promissory Notes and shares described above, under the subheading "Business Combination." Immediately prior to the consummation of the Business Combination, TS Inc. sold an additional 1,710,000 and 290,000 Common Units of The Tile Shop to ILTS and JWTS, respectively, for $4.7583 per unit. In connection with these transactions, The Tile Shop released a security interest in the Common Units that were the subject of these sales.

In January 2012, TS, Inc., ILTS and JWTS sold (i) an aggregate of 129,333 Common Units of The Tile Shop to Mr. Krasnow, (ii) an aggregate of 646,667 Common Units of The Tile Shop to the Peter H. Kamin Revocable Trust dated February 2003, the Peter H. Kamin Childrens Trust dated March 2007, and 3K Limited Partnership, entities of which Mr. Kamin is trustee or general partner, as applicable, (iii) an aggregate of 25,867 Common Units of The Tile Shop to Family Office Investors LLC, an entity in which Mark Riser, a member of the board of managers of The Tile Shop prior to the consummation of the Business Combination, is the sole member, and (iv) an aggregate of 19,400 Common Units of The Tile Shop to a third party, in each case for $7.732 per unit. In connection with these transactions, The Tile Shop made certain representations and warranties.

64

Tile Shop 00002686

Not Confidential

TSH000331_0073

Exhibit 12-5

RFA Ex. 25.74

TABLE OF CONTENTS

On each of December 31, 2011 and June 21, 2012, The Tile Shop made a $300,000 payment to TS, Inc. in connection with the final redemption of an aggregate of 3,000,000 special cash distribution units of The Tile Shop issued to TS, Inc., which were fully redeemed by The Tile Shop and no longer outstanding as of June 21, 2012. In lieu of paying such amounts to TS, Inc. in cash, The Tile Shop reduced the outstanding amount under a promissory note, dated December 30, 2002, made by TS, Inc. and payable to The Tile Shop. The original principal amount of this promissory note was $13,241,800 with simple interest accruing at a rate of five percent per annum on any unpaid balance. The largest aggregate outstanding principal amount under this promissory note since the beginning of 2011 was $1,468,291.75, as of January 1, 2011. On June 21, 2012, TS, Inc. made a final payment to The Tile Shop of $919,444.22 in full satisfaction of all obligations pursuant to this promissory note. Taken together, the aggregate payment of $1,519,444.22 made by TS, Inc. pursuant to this promissory note since the beginning of 2011 fiscal year consisted of a payment of $1,468,291.75 of principal and $51,152.47 of accrued interest.

In March 2013 we purchased 357,464 outstanding warrants from Adam Suttin and 324,969 outstanding warrants from William Watts at a purchase price of $8.41 per warrant. Since Messrs. Suttin and Watts are members of our board of directors, the independent directors considered and approved the transactions on terms which reflected a purchase price based on the public market price of the warrants.

In March 2013, Mr. Suttin exercised 357,464 warrants on a cashless basis, pursuant to which 230,301 shares were withheld to satisfy the exercise price and 127,166 shares were issued. In March 2013 Mr. Watts exercised 324,969 warrants on a cashless basis, pursuant to which 209,364 shares were withheld to satisfy the exercise price and 115,605 shares were issued. The terms of exercise were as provided in the warrant agreements, which were consistent with terms in warrants held by non-directors of the Company.

On May 24, 2013, we entered into the Stock Purchase Agreement with Nabron for the Post-offering Nabron Stock Purchase, whereby we agreed to repurchase a number of shares of our common stock having an aggregate value of $46.0 million at a price per share equal to the public offering price less the underwriters discount. The closing of the Post-offering Nabron Stock Purchase is conditioned upon the completion of this offering. The closing of this offering is not conditioned upon the completion of the Post-offering Nabron Stock Purchase. We expect to fund the purchase price for the Post-offering Nabron Stock Purchase with the proceeds from the warrant exercise as described above.

**Policies and Procedures for Related Person Transactions**

Effective upon consummation of the Business Combination, our board of directors adopted a written related person transaction policy that sets forth the policies and procedures for the review and approval or ratification of related person transactions. This policy is administered by our audit committee and will covers any transaction, arrangement, or relationship, or any series of similar transactions, arrangements, or relationships, in which we were or are to be a participant, the amount involved exceeds $50,000 and a related person had or will have a direct or indirect material interest. While the policy covers related person transactions in which the amount involved exceeds $50,000, the policy states that related person transactions in which the amount involved exceeds $120,000 are required to be disclosed in applicable filings as required by the Securities Act, Exchange Act, and related rules. Our board of directors determined to set the threshold for approval of related person transactions in the policy at an amount lower than that which is required to be disclosed under the Securities Act, Exchange Act, and related rules because we believe that it is appropriate for our audit committee to review transactions or potential transactions in which the amount involved exceeds $50,000, as opposed to $120,000. Pursuant to this policy, our audit committee will (i) review the relevant facts and circumstances of each related person transaction, including if the transaction is on terms comparable to those that could be obtained in arm's-length dealings with an unrelated third party and the extent of the related party's interest in the transaction, and (ii) take into account the conflicts of interest and corporate opportunity provisions of our code of business conduct and ethics. Each director, director nominee and executive officer will present to our audit committee each proposed related person transaction to which such director, director nominee or executive officer is a party, including all relevant facts and circumstances relating thereto, and will update the audit committee as to any material changes to any related person transaction. All related person transactions may only be consummated if our audit committee has approved or ratified such transaction in accordance with the guidelines set forth in the policy. Related party transactions do not include: (i) the payment of compensation by the company to an executive officer or director of the company;

65

Not Confidential

Tile Shop 00002687
TSH000331_0074

Exhibit 12-6

RFA Ex. 25.75

TABLE OF CONTENTS

(ii) indebtedness due from a related person for transactions in the ordinary course of business; (iii) a transaction in which the interest of the related person arises solely from ownership of a class of securities of the Company where all holders of that class of securities receive the same benefit, on a pro-rata basis, from the transaction; or (iv) a transaction in which the rates or charges involved are determined by competitive bids. Additionally, certain types of transactions have been pre-approved by our audit committee under the policy as not involving a material interest. These pre-approved transactions include transactions in the ordinary course of business where the related party's interest arises only: (a) from his or her position as a director of another entity that is party to the transaction, (b) from an equity interest of less than 5% in another entity that is party to the transaction, or (c) from a limited partnership interest of less than 5%, subject to certain limitations. No director will be permitted to participate in the approval of a related person transaction for which he or she is a related party.

Not Confidential

Tile Shop 00002688
TSH000331_0075

Exhibit 12-7

**RFA Ex. 25.134**

TABLE OF CONTENTS

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Plymouth, Minnesota on this 3rd day of June, 2013.

**TILE SHOP HOLDINGS, INC.**

By:/s/ Robert A. Rucker
Name: Robert A. Rucker
Title: Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Robert A. Rucker | Chief Executive Officer and Director | June 3, 2013 |
| Robert A. Rucker | (Principal Executive Officer) | |
| /s/ Timothy C. Clayton | Chief Financial Officer | June 3, 2013 |
| Timothy C. Clayton | (Principal Financial Officer; Principal Accounting Officer) | |
| * | Director | June 3, 2013 |
| Peter J. Jacullo III | | |
| * | Director | June 3, 2013 |
| Peter H. Kamin | | |
| * | Director | June 3, 2013 |
| Todd Krasnow | | |
| * | Director | June 3, 2013 |
| Adam L. Suttin | | |
| * | Director and Chairman of the Board | June 3, 2013 |
| William E. Watts | | |

\* By:/s/ Robert A. Rucker
   Robert A. Rucker, Attorney-in-fact

Not Confidential

Tile Shop 00002747
TSH000331_0134

Exhibit 12-8



## National Union Fire Insurance Company of Pittsburgh, Pa.®

*A capital stock company*

(the "**Insurer**")

**POLICY NUMBER:** *01-031-79-34*          **REPLACEMENT OF POLICY NUMBER:** *N/A*

# Executive Edge®

## Broad Form Management Liability Insurance Policy

NOTICES: This policy provides claims-made coverage. Such coverage is generally limited to liability for (i) **Claims** first made against **Insureds**, (ii) **Inquiries** that an **Insured Person** first received, and (iii) **Crises** first occurring, in each case, during the **Policy Period** or, if applicable, the **Discovery Period**. Coverage under this policy is conditioned upon notice being timely provided to the **Insurer** as required (see the Notice and Reporting clause for details).  Covered **Defense Costs**, **Pre-Claim Inquiry Costs** and **Derivative Investigation Costs** shall reduce the **Limits of Liability** available to pay judgments or settlements, and shall be applied against the retention amount. The **Insurer** does not assume any duty to defend. Please read this policy carefully and review its coverage with your insurance agent or broker.

# DECLARATIONS

1. **NAMED ENTITY:**          *THE TILE SHOP HOLDINGS, INC*

   **Named Entity Address:**     *14000 CARLSON PKWY*
   *MINNEAPOLIS, MN 55441-5300*

   **State of Formation:**       *Delaware*

2. **POLICY PERIOD:**     From: *August 20, 2012*          To: *August 20, 2013*
   The **Policy Period** incepts and expires as of 12:01 A.M. at the **Named Entity Address**.

3. **PREMIUM:**                                           *$146,040*
4. **LIMIT OF LIABILITY:**                                *$10,000,000*
5. **RETENTION:** Not applicable to: (i) **Non-Indemnifiable Loss**, (ii) **Crisis Loss** or (iii) **Derivative Investigation Costs**.

   (a) **Securities Retention:**                          *$250,000*

   (b) **Employment Practices Retention:**                *$250,000*

   (c) All other **Loss** to which a Retention applies :  *$250,000*

   If the **Organizations** fail or refuse to satisfy an applicable Retention, this policy shall advance the **Loss** of an **Insured Person** pursuant to the ADVANCEMENT Clause.

6. **PASSPORT :**   This policy ☐ serves, or ☒ does not serve, as a master Passport policy.

*1427168*

Exhibit 13-1
104122 (4/10)                                  1

© Chartis Inc. All rights reserved.

AW002458



**DECLARATIONS** (Continued)

**7.    INSURER**

(a) **INSURER ADDRESS** :    *175 Water Street*
*New York, NY 10038-4969*

(b) **CLAIMS ADDRESS** :    By E-Mail: c-claim@chartisinsurance.com
By Mail:    *Chartis, Financial Lines Claims*
*P.O. Box 25947*
*Shawnee Mission, KS 66225*

In either case, reference the Policy Number.

**8.    CONTINUITY DATES**

(a) **Outside Entity Executive** Coverage--The date on which the **Executive** first served
as an **Outside Entity Executive** of such **Outside Entity**.

(b) All other coverage:    *August 20, 2012*

**9.    TRIA PREMIUM, TAXES AND SURCHARGES**

(a) **TRIA Premium**    *N/A*

Coverage for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act 2002 was
rejected by insured. A copy of the TRIA disclosure sent with the original quote is attached hereto.

---

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President,
Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the
time of issuance by an authorized representative of the insurer.

| | | |
|---|---|---|
| PRESIDENT | AUTHORIZED REPRESENTATIVE | SECRETARY |

*RJF AGENCIES INC*
*7225 NORTHLAND DRIVE NORTH*
*SUITE 300*
*MINNEAPOLIS, MN 55428*
*1427168*

Exhibit 13-2

Ⓒ Chartis Inc. All rights reserved.

AW002459

Executive Edge



In consideration of the payment of the premium, and each of their respective rights and obligations in this policy, the **Insureds** and the **Insurer** agree as follows:

# 1. INSURING AGREEMENTS

All coverage granted for **Loss** under this policy is provided solely with respect to:  (i) **Claims** first made against an **Insured**, (ii) **Pre-Claim Inquiries** first received by an **Insured Person**, and (iii) **Crises** first occurring, in each such event, during the **Policy Period** or any applicable **Discovery Period** and reported to the **Insurer** as required by this policy. Subject to the foregoing and the other terms, conditions and limitations of this policy, this policy affords the following coverage:

*A. Insured Person Coverage*

This policy shall pay the **Loss** of any **Insured Person** that no **Organization** has indemnified or paid, and that arises from any:

**(1) Claim** (including any **Insured Person Investigation**) made against such **Insured Person** (including any **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**; or

**(2) Pre-Claim Inquiry**, to the extent that such **Loss** is either **Pre-Claim Inquiry Costs** or **Liberty Protection Costs**.

*B. Indemnification Of Insured Person Coverage*

This policy shall pay the **Loss** of an **Organization** that arises from any:

**(1) Claim** (including any **Insured Person Investigation**) made against any **Insured Person** (including any **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**; and

**(2) Pre-Claim Inquiry**, to the extent that such **Loss** is either **Pre-Claim Inquiry Costs** or **Liberty Protection Costs**;

but only to the extent that such **Organization** has indemnified such **Loss** of, or paid such **Loss** on behalf of, the **Insured Person**.

*C. Organization Coverage*

This policy shall pay the **Loss** of any **Organization**:

(1) arising from any **Securities Claim** made against such **Organization** for any **Wrongful Act** of such **Organization**;

(2) incurred as **Derivative Investigation Costs**, subject to a $250,000 aggregate sublimit of liability; or

(3) incurred by an **Organization** or on its behalf by any **Executives** of the **Organization** (including through any special committee) as **Defense Costs** in seeking the dismissal of any **Derivative Suit** against an **Insured**.

*D. Crisisfund® Coverage*

This policy shall pay the **Crisis Loss** of an **Organization**, up to the $100,000 **CrisisFund®**; provided that payment of any **Crisis Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law.

Exhibit 13-3

© Chartis Inc. All rights reserved.

AW002462

ENDORSEMENT# *10*

This endorsement, effective *12.01am*      *August 20, 2012*      forms a part of
policy number   *01-031-79-34*
issued to *THE TILE SHOP HOLDINGS, INC*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

**PRIOR ACTS EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured** alleging any **Wrongful Act** occurring prior to *August 20, 2012* or after the end of the **Policy Period**.  This policy only provides coverage for **Wrongful Acts** occurring on or after *August 20, 2012* and prior to the end of the **Policy Period** and otherwise covered by this policy.  **Loss** arising out of the same or related **Wrongful Act** shall be deemed to arise from the first  such same or related **Wrongful Act**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED  REPRESENTATIVE

© Chartis Inc. All rights reserved.
*END 010*
Exhibit 13-4
1

104139 (4/10)

AW002503



## ALLIED WORLD NATIONAL ASSURANCE COMPANY

---

### EXCESS DIRECTORS & OFFICERS LIABILITY INSURANCE
### FOLLOWING FORM POLICY

**POLICY NUMBER: 0307-7781**
**RENEWAL OF: 0307-7781**

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.**

**NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR DEFENSE COSTS. AMOUNTS INCURRED FOR DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE: THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND.**

---

### DECLARATIONS

**ITEM 1:**   NAMED INSURED: Tile Shop Holdings, Inc.

ADDRESS:   14000 Carlson Parkway
Plymouth, MN 55441

**ITEM 2:**   POLICY PERIOD:   From: August 20, 2013 To: August 20, 2014
(12:01 a.m. Standard Time at the address stated in Item 1)

**ITEM 3:**   LIMIT OF LIABILITY:   $10,000,000
aggregate for all coverages combined (including Defense Costs)

EXCESS OF TOTAL
UNDERLYING LIMITS OF:   $10,000,000

**ITEM 4:**   UNDERLYING POLICIES AND INSURERS:

**Primary Policy:**

| Insurer | Policy Number | Limits | Policy Period |
|---|---|---|---|
| National Union Fire Insurance Company of Pittsburgh, Pa. | 01-310-11-22 | $10,000,000 | August 20, 2013 to August 20, 2014 |

Exhibit 14-1

AW025088

**DECLARATIONS** (continued)                                              **POLICY NO.: 0307-7781**

**Excess Policy(ies):**

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|

**ITEM 5:**   PENDING OR PRIOR DATE:        August 20, 2012

**ITEM 6:**   PREMIUM:                    $95,025

**ITEM 7:**   A.   DISCOVERY PERIOD/EXTENDED
REPORTING PERIOD PREMIUM:    125% of premium set forth in Item 6 above

B.   DISCOVERY PERIOD/EXTENDED
REPORTING PERIOD:           12 months

**ITEM 8:**   ADDRESS OF INSURER FOR ALL NOTICES UNDER THIS POLICY:

A.   <u>Claim-Related Notices</u>:  <u>noticeofloss@awac.com</u>

B.   <u>All Other Notices</u>:

1690 New Britain Ave.
Farmington, CT 06032

In Witness Whereof, the Insurer has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative of the Insurer.

President                                              Asst. Secretary

**AUTHORIZED REPRESENTATIVE**

AW025089

Endorsement No.: 1
This endorsement, effective: August 20, 2013
(at 12:01 A.M. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Forms a part of Policy No.: 0307-7781
Issued to: Tile Shop Holdings, Inc.
By: Allied World National Assurance Company

## MINNESOTA AMENDATORY ENDORSEMENT

This endorsement modifies insurance coverage provided under the EXCESS DIRECTORS & OFFICERS LIABILITY INSURANCE FOLLOWING FORM POLICY.

A. It is understood and agreed that Paragraph B. PUNITIVE DAMAGES COVERAGE of Clause II. TERMS AND CONDITIONS is deleted in its entirety.

B. It is understood and agreed that Paragraph H. CANCELLATION CLAUSE of Clause II. TERMS AND CONDITIONS is deleted in its entirety and replaced by the following:

   H. CANCELLATION CLAUSE

   The Insured may cancel this Policy by mailing or delivering to the Insurer advance written notice of cancellation, stating when the cancellation will become effective.

   The Insurer may cancel this Policy by mailing or delivering to the Insured at the address shown in the Declarations written notice at least ten (10) days prior to the effective date of cancellation if the Insurer cancels for nonpayment of premium and at least thirty (30) days prior to the effective date of cancellation if the Insurer cancels for any other reason.

   Proof of mailing will be sufficient proof of notice. The effective date of cancellation stated in the notice will become the end of the Policy Period. If this Policy is cancelled, the Insurer will send the Insured any premium refund due. If the Insurer cancels, the refund will be pro rata. If the Insured cancels, the refund may be less than pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

C. It is understood and agreed that the following is added to Clause II. TERMS AND CONDITIONS:

   NONRENEWAL

   If the Insurer decides not to renew this Policy, the Insurer will mail or deliver to the Insured at the address shown in the Declarations written notice of nonrenewal at least thirty (30) days before the expiration date of the Policy. Proof of mailing of any notice shall be sufficient proof of notice.


ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.


_____
   **AUTHORIZED REPRESENTATIVE**


DO 00043 22 (03/07)                    1

Exhibit 14-3

AW025090

Endorsement No.: 2
This endorsement, effective: August 20, 2013
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Forms a part of Policy No.: 0307-7781
Issued to: Tile Shop Holdings, Inc.
By: Allied World National Assurance Company

## PRIOR ACTS EXCLUSION

It is understood and agreed that Clause II. TERMS AND CONDITIONS, is amended by adding the following exclusion:

PRIOR ACTS EXCLUSION

This Policy shall not cover any Loss in connection with any claim alleging, arising out of, based upon, or attributable to any wrongful act(s) committed, attempted, or allegedly committed or attempted prior to August 20, 2012.  This Policy shall provide coverage only with respect to wrongful acts occurring on or after August 20, 2012 and prior to the end of the Policy Period and otherwise covered under the terms and conditions of this Policy.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**AUTHORIZED REPRESENTATIVE**

DO 00035 00 (03/07)

Exhibit 14-4

AW025091

Endorsement No.: 3
This endorsement, effective: August 20, 2013
(at 12:01 a.m. Standard Time at the address as shown in Item 1 of the Declarations)
Forms a part of Policy No.: 0307-7781
Issued to: Tile Shop Holdings, Inc.
By: Allied World National Assurance Company

## EXCLUSION OF CERTIFIED ACTS OF TERRORISM

A.  It is agreed that this policy does not apply to loss arising out "injury or damage" caused directly or indirectly by, contributed to by, resulting from, or arising out of or in connection with a "certified act of terrorism". Such "injury or damage" is excluded regardless of any other cause or event that contributed concurrently or in any sequence to the "injury or damage".

This exclusion also applies to a "certified act of terrorism":

1.  That involves the use, release, or escape of nuclear materials, or that directly or indirectly results in a nuclear reaction or radiation or radioactive contamination; or

2.  That is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

3.  In which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

In the event a "certified act of terrorism" involves nuclear reaction or radiation, or radioactive contamination, this exclusion supersedes any Nuclear Hazard Exclusion.

B.  The following definitions are added:

1.  "Injury or damage" means any "injury or damage" covered under this policy  or any underlying policy  to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in this policy or any underlying policy.

2.  A "certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an "act of terrorism" pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

a.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

b.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed  by an  individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Exhibit 14-5

AW025092

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**AUTHORIZED REPRESENTATIVE**

AW025093

Endorsement No.: 4
This endorsement, effective: August 20, 2013
(at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Forms a part of Policy No.: 0307-7781
Issued to: Tile Shop Holdings, Inc.
By: Allied World National Assurance Company

## STATE AMENDATORY INCONSISTENCY

It is understood and agreed that in the event that there is an inconsistency between a state amendatory attached to this Policy and any term or condition of this Policy, then where permitted by law, the Insurer shall apply those terms and conditions of either the amendatory or the Policy which are more favorable to the Insured.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
**AUTHORIZED REPRESENTATIVE**

Exhibit 14-7

AW025094

Endorsement No.: 5
This endorsement, effective: August 20, 2013
 (at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Forms a part of Policy No.: 0307-7781
Issued to: Tile Shop Holdings, Inc.
By: Allied World National Assurance Company

## DELETE REPRESENTATIONS CLAUSE AND
## FOLLOW PRIMARY POLICY

It is understood and agreed that Clause II, TERMS AND CONDITIONS, is amended by deleting paragraph E., REPRESENTATIONS AND WARRANTY STATEMENTS, in its entirety.

It is further understood and agreed that this Policy shall follow any representations and warranty terms of the Primary Policy.

All other terms and conditions of this Policy remain unchanged.

_____
**AUTHORIZED REPRESENTATIVE**

DO 00252 00 (09/09)

Exhibit 14-8

AW025095

Endorsement No.: 6
This endorsement, effective: August 20, 2013
(at 12:01 a.m. Standard Time at the address stated in Item 1 of the Declarations)
Forms a part of Policy No.: 0307-7781
Issued to: Tile Shop Holdings, Inc.
By: Allied World National Assurance Company

## DELETE ALTERNATIVE DISPUTE RESOLUTION PROCESS CLAUSE

It is understood and agreed that Clause II., TERMS AND CONDITIONS, is amended by deleting paragraph I., ALTERNATIVE DISPUTE RESOLUTION PROCESS, in its entirety.

All other terms and conditions of this Policy remain unchanged.

_____
**AUTHORIZED REPRESENTATIVE**

DO 00253 00 (01/10)

Exhibit 14-9

AW025096

Endorsement No.: 7
This endorsement, effective: August 20, 2013
(at 12:01 a.m. Standard Time at the address stated in Item 1 of the Declarations)
Forms a part of Policy No.: 0307-7781
Issued to: Tile Shop Holdings, Inc.
By: Allied World National Assurance Company

## NOTICE OF CLAIM BY E-MAIL

It is understood and agreed that, in addition to the postal address set forth in Item 8 of the Declarations, notice of any claim-related matter may be provided to the Insurer by e-mail at the following e-mail address:

AWACUS.FinancialClaims@awac.com

All other terms and conditions of this Policy remain unchanged.

_____
**AUTHORIZED REPRESENTATIVE**

DO 00283 00 (01/10)

Exhibit 14-10

AW025097

Endorsement No.: 8
This endorsement, effective: August 20, 2013
 (at 12:01 a.m. Standard Time at the address of the Named Insured as shown in Item 1 of the Declarations)
Forms a part of Policy No.: 0307-7781
Issued to: Tile Shop Holdings, Inc.
By: Allied World National Assurance Company

## AMEND POLICY TO RECOGNIZE LOSS PAYMENT BY
## EXCESS DIC INSURER OR ANY OTHER PARTY

It is understood and agreed that Clause I, INSURING CLAUSE, is deleted and replaced with the following:

### I.  INSURING CLAUSE

The Insurer shall pay the individuals and entities insured under the Primary Policy (also referred to herein as the "Insured") for Loss after exhaustion by payments of all applicable underlying limits by either the Underlying Insurers as specified in Item 4 of the Declarations, the Insureds, any insurer under a difference-in-conditions policy written as specifically excess over the Limit of Liability provided by this Policy and/or any other party, subject to:

A.  the terms and conditions of the Primary Policy as in effect the first day of the Policy Period;

B.  the Limit of Liability as stated in Item 3 of the Declarations; and

C.  the terms and conditions of, and the endorsements attached to, this Policy.

Notwithstanding the above, this Policy shall not provide coverage broader than that provided by any Underlying Policy listed in Item 4 of the Declarations, or any policy issued by any participating quota share insurer, unless such broader coverage is specifically agreed to by the Insurer herein or in a written endorsement attached hereto.

It is further understood and agreed that paragraphs F. 2. and F. 3., FOLLOWING FORM, of Clause II, TERMS AND CONDITIONS, are deleted and replaced with the following:

2.  In the event of the depletion of the limits of liability of the Underlying Policy(ies) solely as a result of payment of losses covered thereunder, by the Underlying Insurers, the Insureds, any insurer under a difference-in-conditions policy written as specifically excess over the Limit of Liability provided by this Policy and/or any other party, this Policy shall, subject to the Limit of Liability set forth in Item 3 of the Declarations and to the other terms of this Policy, continue to apply for subsequent Losses as excess insurance over the amount of insurance remaining under such Underlying Policies. In the event of the exhaustion of all of the limits of liability of such Underlying Policy(ies) solely as a result of payment of losses as described in this paragraph, the remaining limits available under this Policy shall, subject to the Limit of Liability as set forth in Item 3 of the Declarations and to the other terms of this Policy, continue for subsequent Losses as primary insurance and any retention specified in the Underlying Policy shall be imposed under this Policy.

DO 00304 00 (06/11)

Exhibit 14-11

AW025098

3.   The Insurer's obligations under this Policy shall not be increased, expanded or otherwise changed, nor shall the Insurer drop down for any reason, including but not limited to the receivership, insolvency, or inability or refusal to pay of any Underlying Insurer, the cancellation of any Underlying Policy or the existence of a sub-limit of liability in any Underlying Policy. In the event of the receivership, insolvency, or inability or refusal to pay of any Underlying Insurer, or the cancellation of any Underlying Policy, the Insured, any insurer under a difference-in-conditions policy written as specifically excess over the Limit of Liability provided by this Policy and/or any other party, may pay any losses otherwise payable under such Underlying Policy and such payments shall be deemed to apply toward exhaustion of the limits of liability of the Underlying Policy for purposes of coverage under this Policy. In the event a sub-limit of liability exists in the Underlying Policy, any payments of Loss that are subject to such a sub-limit shall be deemed to apply toward exhaustion of the limits of liability of the Underlying Policy for purposes of coverage under this Policy.

All other terms and conditions of this Policy remain unchanged.

_____
**AUTHORIZED REPRESENTATIVE**

DO 00304 00 (06/11)

Exhibit 14-12

AW025099

## POLICYHOLDER DISCLOSURE STATEMENT
## UNDER THE
## TERRORISM RISK INSURANCE ACT

The Insured is hereby notified that under the federal Terrorism Risk Insurance Act, as amended, (the "Act"), the Insured has a right to purchase insurance coverage for losses arising out of an Act of Terrorism, which is defined in the Act as an act certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, (i) to be an act of terrorism, (ii) to be a violent act or an act that is dangerous to (A) human life; (B) property; or (C) infrastructure, (iii) to have resulted in damage within the United States, or outside of the United States in case of an air carrier or vessel or the premises of a U.S. mission and (iv) to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. The Insured should read the Act for a complete description of its coverage.  The Secretary's decision to certify or not to certify an event as an Act of Terrorism covered by the Act is final and not subject to review.

Coverage provided by this policy for losses caused by an Act of Terrorism may be partially reimbursed by the United States Government under a formula established by federal law.  Under this formula, the United States Government will generally pay 85% of terrorism losses exceeding a statutorily established deductible that must be met by the Insurer, and which deductible is based on a percentage of the Insurer's direct earned premiums for the year preceding the Act of Terrorism.

Be advised that there is a $100 billion cap on all losses resulting from Acts of Terrorism.  If aggregate insured losses attributable to Acts of Terrorism exceed $100 billion in a Program Year (January 1 through December 31), the United States Government shall not make any payment for any portion of the amount of such loss that exceeds $100 billion.  If aggregate insured losses attributable to Acts of Terrorism exceed $100 billion in a Program Year and the Insurer has met its deductible under the Act, the Insurer shall not be liable for payment of any portion of the losses that exceeds $100 billion, and in such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Coverage for "insured losses" as defined in the Act is subject to the coverage terms, conditions, amounts and limits in this policy applicable to losses arising from events other than Acts of Terrorism.

The Insured should know that under federal law, the Insured is not required to purchase coverage for losses caused by Acts of Terrorism.

Please indicate the selection of the Insured below.

_____ The Insured hereby elects to purchase coverage in accordance with the Act for a premium of $0.00.

_____ The Insured hereby rejects coverage and accepts reinstatement of the exclusion in accordance with the Act.

_____   Tile Shop Holdings, Inc.
Signature of Insured

_____   0307-7781
Print/Title

_____
Date



## ALLIED WORLD NATIONAL ASSURANCE COMPANY

## EXCESS DIRECTORS & OFFICERS LIABILITY INSURANCE
## FOLLOWING FORM POLICY

In consideration of premium paid and subject to the Declarations and Endorsements made a part hereof and the terms, conditions and limitations set forth herein and therein, ALLIED WORLD NATIONAL ASSURANCE COMPANY (herein referred to as the "Insurer"), agrees as follows:

**I.   INSURING CLAUSE**

The Insurer shall pay the individuals and entities insured under the Primary Policy (also referred to herein as the "Insured") for Loss after exhaustion by payments of all applicable underlying limits by either the Underlying Insurers as specified in Item 4 of the Declarations or the Insureds, subject to:

A.   the terms and conditions of the Primary Policy as in effect the first day of the Policy Period;

B.   the Limit of Liability as stated in Item 3 of the Declarations; and

C.   the terms and conditions of, and the endorsements attached to, this Policy.

Notwithstanding the above, this Policy shall not provide coverage broader than that provided by any Underlying Policy listed in Item 4 of the Declarations, or any policy issued by any participating quota share insurer, unless such broader coverage is specifically agreed to by the Insurer herein or in a written endorsement attached hereto.

**II.   TERMS AND CONDITIONS**

A.   DEFINITIONS

Terms defined in the Primary Policy are used in this Policy with the meaning assigned to them in the Primary Policy unless otherwise indicated.

"Defense Costs" shall have the same meaning as the following defined term in the Primary Policy: Defense Costs; Defense Expenses; or Claims Expenses.

B.   PUNITIVE DAMAGES COVERAGE

This Policy shall cover punitive damages to the same extent punitive damages are covered under the Primary Policy.

C.   PENDING OR PRIOR EXCLUSION

This Policy shall follow any exclusion in the Primary Policy regarding pending or prior litigation, administrative, regulatory or other proceedings, investigations, demands, suits, orders, decrees or judgments. The applicable date for determining whether any such matter is "pending or prior" for the purpose of such exclusion in this Policy shall be the Pending or Prior Date set forth in Item 5 of the Declarations.

Exhibit 14-14

AW025101

D.  LOSS PROVISIONS

1.  This Policy shall follow the notice of claim provisions of the Primary Policy, except as stated otherwise herein.

2.  Notice hereunder shall be given to the Insurer at the address indicated in Item 8 of the Declarations.

3.  The Insured shall provide the Insurer with such information, assistance and cooperation as the Insurer may reasonably request and as shall be in the Insured's power to provide and shall do nothing that may prejudice the Insurer's position or potential rights of recovery.

4.  The Insurer shall maintain full and complete claims control as respects its portion of any claims or Losses arising under this Policy. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer, which consent shall not be unreasonably withheld, shall be recoverable as Loss under the terms of this Policy. The Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any claim.

E.  REPRESENTATIONS AND WARRANTY STATEMENTS

It is a condition precedent to the Insurer's obligations under this Policy, and the Insured agrees, that all Applications, warranty statements, together with attachments and any other materials submitted for this Policy and any Underlying Policy, shall be deemed attached to and made a part of this Policy.  The Insurer has relied on all such materials, representations and information as being accurate and complete in issuing this Policy.

F.  FOLLOWING FORM

1.  This Policy, except as herein stated, is subject to all terms, conditions, agreements and limitations of the Primary Policy in all respects as in effect on the date hereof. The Insured shall furnish to the Insurer copies of all proposed rewrites or changes by endorsement or otherwise to the Primary Policy. The Insured agrees that should any change to the Primary Policy be made by rewrite, endorsement or otherwise, this Policy shall not be changed without the prior written consent of the Insurer, which consent shall be at the sole discretion of the Insurer. It is further agreed that  should any change of this Policy be consented to by the Insurer, then the premium hereon may be adjusted accordingly**.**

2.  In the event of the depletion of the limits of liability of the Underlying Policy(ies) solely as a result of payment of losses covered thereunder, by the Underlying Insurers and/or the Insureds, this Policy shall, subject to the Limit of Liability set forth in Item 3 of the Declarations and to the other terms of this Policy, continue to apply for subsequent Losses as excess insurance over the amount of insurance remaining under such Underlying Policy. In the event of the exhaustion of all of the limits of liability of such Underlying Policy(ies) solely as a result of payment of losses covered thereunder, by the Underlying Insurers and/or the Insureds, the remaining limits available under this Policy shall, subject to the Limit of Liability as set forth in Item 3 of the Declarations and to the other terms of this Policy, continue for subsequent Losses as primary insurance and any retention specified in the Underlying Policy shall be imposed under this Policy.

Exhibit 14-15

AW025102

3.  The Insurer's obligations under this Policy shall not be increased, expanded or otherwise changed, nor shall the Insurer drop down for any reason, including but not limited to the receivership, insolvency, or inability or refusal to pay of any Underlying Insurer, the cancellation of any Underlying Policy or the existence of a sub-limit of liability in any Underlying Policy. In the event of the receivership, insolvency, or inability or refusal to pay of any Underlying Insurer, or the cancellation of any Underlying Policy, the Insured may pay any losses otherwise payable under such Underlying Policy and such payments by the Insured shall be deemed to apply toward exhaustion of the limits of liability of the Underlying Policy for purposes of coverage under this Policy. In the event a sub-limit of liability exists in the Underlying Policy, any payments of Loss that are subject to such a sub-limit shall be deemed to apply toward exhaustion of the limits of liability of the Underlying Policy for purposes of coverage under this Policy.

## G.  CANCELLATION OF UNDERLYING POLICY

The Insured shall give notice to the Insurer as soon as practicable of the cancellation of any Underlying Policy.

In the event any Underlying Policy shall be cancelled by the insurer thereon (other than for non-payment of premium), this Policy shall continue in full force and effect for the remainder of the Policy Period and the Insurer shall be liable to the same extent that it would have been liable if such Underlying Policy had remained in effect.

## H.  CANCELLATION CLAUSE

This Policy shall follow the cancellation terms of the Primary Policy except that in the event the Insurer cancels this Policy for non-payment of premium, this Policy shall be void as of the inception date of the Policy Period.

## I.  ALTERNATIVE DISPUTE RESOLUTION PROCESS

Any and all disputes or differences which may arise under this Policy, whether arising before or after termination of this Policy, including any determination of the amount of Loss or the formation and validity of this Policy, shall be subject to the alternative dispute resolution process ("ADR") set forth in this clause.

Either the Insurer or the Insureds may elect the type of ADR discussed below; provided, however, that the Insureds shall have the right to reject the Insurer's choice of ADR at any time prior to its commencement, in which case the Insureds' choice of ADR shall control.

The Insurer and Insureds agree that there shall be two choices of ADR: (1) non-binding mediation administered by the American Arbitration Association, in which the Insurer and Insureds shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association under or in accordance with its then-prevailing Commercial Arbitration Rules, in which the arbitration panel shall be composed of three disinterested individuals. In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute.

The mediator(s) or arbitrators shall also give due consideration to the general principles of the

law of the state where the Named Insured is incorporated in the construction or interpretation of the provisions of this Policy; provided, however, that the terms, conditions, provisions and exclusions of this Policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the Policy.  In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys' fees or other costs.  In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least one-hundred-twenty (120) days shall have elapsed from the date of the termination of the mediation.  In all events, each party shall share equally the expenses of the ADR.

Either choice of ADR may be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations as the address for the Named Insured.  The first Named Insured shall act on behalf of all Insureds in selection of the ADR in accordance with this clause.

Exhibit 14-17

AW025104

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producercompensation or by calling 1-800-706-3102.

91222 (4/13)

Exhibit 15-1

AW000739

Executive Liability
175 Water Street
New York, NY 10038
http://www.aig.com



eDiscovery Solutions

Dear Insured:

Congratulations on purchasing your Executive Edge℠ policy from a member company of AIG Property Casualty Inc. (AIG), one of the premier writers of management liability insurance. Your policy offers many outstanding features, and as a AIG Insured you have the confidence of knowing that your claims will be handled by highly experienced claims professionals. In addition, our panel counsel is comprised of leading law firms throughout the country.

The purpose of this letter is to introduce you to eDiscovery Solutions, a value-added program providing e-discovery advantages to Executive Edge policyholders. The risks associated with not being prepared to handle requests to produce electronically stored information (ESI) are significant as companies are held accountable for missteps made along the way and the potential costs of e-discovery are exorbitant. eDiscovery Solutions provides Executive Edge policyholders with the advantage of assisting in the creation of an e-discovery plan before litigation commences and the development of a cost-effective strategy to address e-discovery when a claim does arise. As an Executive Edge policyholder, you have access to the following suite of optional eDiscovery Solutions benefits to minimize the risks and expense of e-discovery:

- Help in creating an effective e-discovery strategy before a claim arises.
  - 2.5 hour "boot camp" by Encore Discovery Solutions (an independent third party provider of e-discovery services) addressing the major components of e-discovery plus an additional 10 hours of expert e-discovery consultation with Encore to assess e-discovery readiness at no cost to insureds that remain on risk. These services are available at no cost to policyholders and favorable rates are available to those policyholders who wish to purchase additional services.

- Guidance and management through the process of responding to ESI requests.
  - Pre-approved independent experts assist in responding to requests to produce ESI through development of a cost-effective strategy.
  - Pre-approved independent consultants oversee the e-discovery process including assessment of information systems capabilities, locating and preserving relevant electronic data stores, vendor selection, defining scope of work and establishing metrics to evaluate and monitor efficient execution.
  - First $25,000 of consultants' fees covered with no retention and policyholders may choose to continue to benefit from the consultant's services at pre-negotiated favorable rates.

To take advantage of the services offered through eDiscovery Solutions, email ediscoverysolutions@AIG.com or contact your insurance broker or AIG underwriter.

Exhibit 15-2

AW000740



## National Union Fire Insurance Company of Pittsburgh, Pa.®
*A capital stock company*
(the "**Insurer**")

**POLICY NUMBER:** *01-310-11-22*          **REPLACEMENT OF POLICY NUMBER:** *01-031-79-34*

# Executive Edge®

### Broad Form Management Liability Insurance Policy

---

NOTICES: This policy provides claims-made coverage. Such coverage is generally limited to liability for (i) **Claims** first made against **Insureds**, (ii) **Inquiries** that an **Insured Person** first received, and (iii) **Crises** first occurring, in each case, during the **Policy Period** or, if applicable, the **Discovery Period**. Coverage under this policy is conditioned upon notice being timely provided to the **Insurer** as required (see the Notice and Reporting clause for details).  Covered **Defense Costs**, **Pre-Claim Inquiry Costs** and **Derivative Investigation Costs** shall reduce the **Limits of Liability** available to pay judgments or settlements, and shall be applied against the retention amount. The **Insurer** does not assume any duty to defend. Please read this policy carefully and review its coverage with your insurance agent or broker.

---

## DECLARATIONS

1. **NAMED ENTITY:**          *TILE SHOP HOLDINGS, INC*
   *14000 CARLSON PKWY*
   *MINNEAPOLIS, MN 55441-5300*

   **Named Entity Address:**    *14000 CARLSON PKWY*
   *MINNEAPOLIS, MN 55441-5300*

   **State of Formation:**      *Delaware*

2. **POLICY PERIOD:**      From: *August 20, 2013*          To: *August 20, 2014*
   The **Policy Period** incepts and expires as of 12:01 A.M. at the **Named Entity Address**.

3. **PREMIUM:**                                                                    *$154,901*

4. **LIMIT OF LIABILITY:**                                                         *$10,000,000*

5. **RETENTION:** Not applicable to: (i) **Non-Indemnifiable Loss**, (ii) **Crisis Loss** or
   (iii)   **Derivative Investigation Costs**.

   (a) **Securities Retention:**                                                   *$500,000*

   (b) **Employment Practices Retention:**                                         *$250,000*

   (c) All other **Loss** to which a Retention applies :                           *$250,000*

   If the **Organizations** fail or refuse to satisfy an applicable Retention, this policy shall advance the **Loss** of an **Insured Person** pursuant to the ADVANCEMENT Clause.

6. **PASSPORT:**    This policy ☐ serves, or ☒ does not serve, as a master Passport policy.

*1427168*

104122 (4/10)                                    1          Ⓒ All rights reserved.

Exhibit 15-3

AW000741



**DECLARATIONS** (Continued)

7.   **INSURER**

    (a) **INSURER ADDRESS**:    *175 Water Street*
                             *New York, NY 10038-4969*

    (b) **CLAIMS ADDRESS**:    By E-Mail: c-claim@AIG.com
                           By Mail:  *AIG, Financial Lines Claims*
                                           *P.O. Box 25947*
                                         *Shawnee Mission, KS 66225*

                                  In either case, reference the Policy Number.

8.   **CONTINUITY DATES**

    (a) **Outside Entity Executive** Coverage--The date on which the **Executive** first served
        as an **Outside Entity Executive** of such **Outside Entity**.

    (b) All other coverage:                            *August 20, 2012*

9.   **TRIA PREMIUM, TAXES AND SURCHARGES**

    (a) **TRIA Premium**                                 *N/A*

    Coverage for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act 2002 was
    rejected by insured. A copy of the TRIA disclosure sent with the original quote is attached hereto.

---

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.

          PRESIDENT                     AUTHORIZED REPRESENTATIVE               SECRETARY

*MARSH & MCLENNAN AGENCY LLC*
*7225 NORTHLAND DRIVE NORTH*
*SUITE 300*
*MINNEAPOLIS, MN 55428*
  *1427168*

104122 (4/10)                   2               Ⓒ All rights reserved.

Exhibit 15-4

AW000742

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE
### (APPLICABLE TO CERTIFIED AND NON- CERTIFIED ACTS)

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury- in concurrence with the Secretary of State, and the Attorney General of the United States- to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

### COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE

Insured Name: *TILE SHOP HOLDINGS, INC*
*14000 CARLSON PKWY*
*MINNEAPOLIS, MN 55441-5300*

Policy Number: *01-310-11-22*
Policy Period Effective Date From: *August 20, 2013*    To: *August 20, 2014*

Exhibit 15-5

AW000743



# Executive Edge®

## BROAD FORM MANAGEMENT LIABILITY INSURANCE POLICY

| | | |
|---|---|---|
| **1. INSURING AGREEMENTS** | | **1** |
| | A. Insured Person Coverage | 1 |
| | B. Indemnification Of Insured Person Coverage | 1 |
| | C. Organization Coverage | 1 |
| | D. Crisisfund® Coverage | 1 |
| **2. EXTENSIONS** | | **2** |
| | A. Executive Protection Suite | 2 |
| | B. First Dollar E-Discovery Consultant Services | 2 |
| | C. Worldwide & Cross-Border | 2 |
| **3. PROTECTIONS WHEN INDEMNIFICATION IS UNAVAILABLE** | | **3** |
| | A. Advancement | 3 |
| | B. Order of Payments | 3 |
| | C. Bankruptcy And Insolvency | 3 |
| **4. EXCLUSIONS** | | **4** |
| **5. RETENTION** | | **5** |
| **6. LIMITS OF LIABILITY** | | **6** |
| **7. NOTICE AND REPORTING** | | **6** |
| **8. DISCOVERY** | | **8** |
| **9. DEFENSE AND SETTLEMENT** | | **9** |
| | A. For Claims And Pre-Claim Inquiries | 9 |
| | B. Pre-Authorized Securities Defense Attorneys | 10 |
| | C. Pre-Approved E-Consultant Firms | 10 |
| | D. Allocation | 10 |
| **10. CHANGES TO INSUREDS** | | **10** |
| | A. Transactions | 11 |
| | B. Subsidiary Additions | 11 |
| | C. Former Subsidiaries | 11 |
| | D. Scope of Subsidiary Coverage | 11 |
| **11. APPLICATION AND UNDERWRITING** | | **12** |
| | A. Application And Reliance | 12 |
| | B. Renewal Application Procedure | 12 |
| | C. Insured Person Coverage Non-Rescindable | 12 |
| | D. Severability Of The Application | 12 |
| **12. GENERAL TERMS AND CONDITIONS** | | **13** |
| | A. Payments And Obligations Of Organizations And Others | 13 |
| | B. Cancellation | 14 |
| | C. Notice And Authority | 14 |
| | D. Currency | 14 |
| | E. Assignment | 14 |
| | F. Disputes | 15 |
| | G. Spousal, Domestic Partner And Legal Representative Extension | 16 |
| | H. Conformance To Law | 16 |
| | I. Headings | 16 |
| **13. DEFINITIONS** | | **17** |

104123 (04/10)

© All rights reserved.

Exhibit 15-6

AW000744

Executive Edge 

In consideration of the payment of the premium, and each of their respective rights and obligations in this policy, the **Insureds** and the **Insurer** agree as follows:

# 1. INSURING AGREEMENTS

All coverage granted for **Loss** under this policy is provided solely with respect to: (i) **Claims** first made against an **Insured**, (ii) **Pre-Claim Inquiries** first received by an **Insured Person**, and (iii) **Crises** first occurring, in each such event, during the **Policy Period** or any applicable **Discovery Period** and reported to the **Insurer** as required by this policy. Subject to the foregoing and the other terms, conditions and limitations of this policy, this policy affords the following coverage:

## A. Insured Person Coverage

This policy shall pay the **Loss** of any **Insured Person** that no **Organization** has indemnified or paid, and that arises from any:

**(1) Claim** (including any **Insured Person Investigation**) made against such **Insured Person** (including any **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**; or

**(2) Pre-Claim Inquiry**, to the extent that such **Loss** is either **Pre-Claim Inquiry Costs** or **Liberty Protection Costs**.

## B. Indemnification Of Insured Person Coverage

This policy shall pay the **Loss** of an **Organization** that arises from any:

**(1) Claim** (including any **Insured Person Investigation**) made against any **Insured Person** (including any **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**; and

**(2) Pre-Claim Inquiry**, to the extent that such **Loss** is either **Pre-Claim Inquiry Costs** or **Liberty Protection Costs**;

but only to the extent that such **Organization** has indemnified such **Loss** of, or paid such **Loss** on behalf of, the **Insured Person**.

## C. Organization Coverage

This policy shall pay the **Loss** of any **Organization**:

(1) arising from any **Securities Claim** made against such **Organization** for any **Wrongful Act** of such **Organization**;

(2) incurred as **Derivative Investigation Costs**, subject to a $250,000 aggregate sublimit of liability; or

(3) incurred by an **Organization** or on its behalf by any **Executives** of the **Organization** (including through any special committee) as **Defense Costs** in seeking the dismissal of any **Derivative Suit** against an **Insured**.

## D. Crisisfund® Coverage

This policy shall pay the **Crisis Loss** of an **Organization**, up to the $100,000 **CrisisFund®**; provided that payment of any **Crisis Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law.

104123 (04/10)        1        © All rights reserved.

Exhibit 15-7

AW000745

Executive Edge 

## 2. EXTENSIONS

### A. Executive Protection Suite

**Loss** shall also mean the following items, provided that they arise out of a **Claim**:

**(1) SOX 304 Costs**;

**(2) Extradition Costs**;

**(3) UK Corporate Manslaughter Act Defense Costs**;

**(4) Personal Reputation Expenses**, subject to a $100,000 per **Executive** and a $500,000 aggregate sublimit of liability; and

**(5) Asset Protection Costs**, subject to a $50,000 per **Executive** and a $250,000 aggregate sublimit of liability.

### B. First Dollar E-Discovery Consultant Services

For any **Securities Claim**, no Retention shall apply to the first $25,000 in **Defense Costs** incurred as **E-Discovery Consultant Services**.

### C. Worldwide & Cross-Border

| | |
|---|---|
| *Worldwide Territory* | The coverage afforded by this policy shall apply anywhere in the world. |
| *Global Liberalization* | For **Loss** from that portion of any **Claim** maintained in a **Foreign Jurisdiction** or to which the law of a **Foreign Jurisdiction** is applied, the **Insurer** shall apply the terms and conditions of this policy as amended to include those of the **Foreign Policy** in the **Foreign Jurisdiction** that are more favorable to **Insureds** in the **Foreign Jurisdiction**. This *Global Liberalization Clause* shall not apply to any provision of any policy that has worldwide effect, including but not limited to any provision addressing limits of liability (primary, excess or sublimits), retentions, other insurance, non-renewal, duty to defend, defense within or without limits, taxes, conformance to law or excess liability coverage, any claims made provisions, and any endorsement to this policy that excludes or limits coverage for specific events or litigation or that specifically states that it will have worldwide effect. |
| *Passport Master Policy Program* | If the Passport option box has been checked on the Declarations, then this policy shall act as a master policy and the coverage afforded by this policy shall be provided in conjunction with the Passport foreign underlyer policy issued in each jurisdiction selected by the **Named Entity**. The specific structure of the coverage provided by this master policy in conjunction with each Passport foreign underlyer policy is set forth in the Passport Structure Appendix attached to this policy. |

 © All rights reserved.

Exhibit 15-8

AW000746

Executive Edge



## 3. PROTECTIONS WHEN INDEMNIFICATION IS UNAVAILABLE

### A. *Advancement*

If for any reason (including but not limited to insolvency) an **Organization** fails or refuses to advance, pay or indemnify covered **Loss** of an **Insured Person** within the applicable Retention, if any, then the **Insurer** shall advance such amounts on behalf of the **Insured Person** until either (i) an **Organization** has agreed to make such payments, or (ii) the Retention has been satisfied.  In no event shall any such advancement by the **Insurer** relieve any **Organization** of any duty it may have to provide advancement, payment or indemnification to any  **Insured Person**.

Advancement, payment or indemnification of an **Insured Person** by an **Organization** is deemed "failed" if it has been requested by an **Insured Person** in writing and has not been provided by, agreed to be provided by or acknowledged as an obligation by an **Organization** within 60 days of such request; and advancement, payment or indemnification by an **Organization** is deemed "refused" if an **Organization** gives a written notice of the refusal to the **Insured Person**. Advancement, payment or indemnification of an **Insured Person** by an **Organization** shall only be deemed "failed" or "refused" to the extent such advancement, payment or indemnification is not provided, or agreed to be provided, or acknowledged by and collectible from an **Organization**.  Any payment or advancement by the **Insurer** within an applicable Retention shall apply towards the exhaustion of the  **Limits of Liability**.

### B. *Order Of Payments*

In the event of **Loss** arising from a covered **Claim(s)** and/or **Pre-Claim Inquiry(ies)** for which payment is due under the provisions of this policy, the  **Insurer** shall in all events:

(1)     First, pay all **Loss** covered under Insuring Agreement A.  *Insured Person Coverage*;

(2)     Second, only after payment of **Loss** has been made pursuant to subparagraph (1) above and to the extent that any amount of the **Limit of Liability** shall remain available, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of **Loss** covered under Insuring Agreement B. *Indemnification Of Insured Person Coverage*; and

(3)     Lastly, only after payment of **Loss** has been made pursuant to subparagraphs (1) and (2) above and to the extent that any amount of the **Limit of Liability** shall remain available, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of **Loss** covered under Insuring Agreement C. *Organization Coverage* and Insuring Agreement D.  *Crisisfund® Coverage*.

In the event the **Insurer** withholds payment pursuant to subparagraphs (2) and/or (3) above, then the **Insurer** shall, at such time and in such manner as shall be set forth in instructions of the chief executive officer of the **Named Entity**, remit such payment to an **Organization** or directly to or on behalf of an  **Insured Person**.

### C. *Bankruptcy And Insolvency*

Bankruptcy or insolvency of any **Organization** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations under this policy.

In such event, the **Insurer** and each **Organization** and **Insured Person** agree to cooperate in any efforts by the **Insurer** or any **Organization** or **Insured Person** to obtain relief for the benefit of the **Insured Persons** from any stay or injunction applicable to the distribution of the policy proceeds.

104123 (04/10)                    3                    © All rights reserved.

Exhibit 15-9

AW000747

Executive Edge



## 4. EXCLUSIONS

### A. *Full Severability Of Exclusions For Insured Persons*

In determining whether any of the following Exclusions apply, the **Wrongful Acts** of any **Insured Person** shall not be imputed to any other **Insured**. For Insuring Agreement C. *Organization Coverage*, only the **Wrongful Acts** of any chief executive officer, chief financial officer or general counsel (or equivalent position) of an **Organization** shall be imputed to such **Organization**.

### B. *Exclusions*

The **Insurer** shall not be liable to make any payment for **Loss**, other than **Crisis Loss**, in connection with any **Claim** made against an **Insured**:

| | | |
|---|---|---|
| (1) | *Conduct* | arising out of, based upon or attributable to any: |

      (a) remuneration, profit or other advantage to which the **Insured** was not legally entitled; or

      (b) deliberate criminal or deliberate fraudulent act by the **Insured**;

if established by any final, non-appealable adjudication in any action or proceeding other than an action or proceeding initiated by the **Insurer** to determine coverage under the policy;

provided, however:

      (i) Conduct Exclusion (a), above, shall not apply in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, to the portion of any **Loss** attributable to such violations; and

      (ii) with respect to Conduct Exclusion (b), for acts or omissions which are treated as a criminal violation in a **Foreign Jurisdiction** that are not treated as a criminal violation in the United States of America, the imposition of a criminal fine or other criminal sanction in such **Foreign Jurisdiction** will not, by itself, be conclusive proof that a deliberate criminal or deliberate fraudulent act occurred;

| | | |
|---|---|---|
| (2) | *Pending & Prior Litigation* | alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (a) litigation; or (b) administrative or regulatory proceeding or investigation of which any **Insured** had notice; or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation; |
| (3) | *Personal Injury* | for emotional distress or mental anguish of any person, or for injury from libel, slander, defamation or disparagement, or a violation of a person's right of privacy; provided, however, this exclusion shall not apply to an **Employment Practices Claim** or a **Securities Claim**; |
| (4) | *Bodily Injury & Property Damage* | for bodily injury (other than emotional distress or mental anguish), sickness, disease, or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, this exclusion shall not apply to **UK Corporate Manslaughter Act Defense Costs** or a **Securities Claim**; |

 © All rights reserved.

Exhibit 15-10

AW000748

Executive Edge



B. *Exclusions* (Continued)

(5) *Entity v. Insured*  that is brought by or on behalf of any **Organization** against any **Insured**, or by any **Outside Entity** against any **Outside Entity Executive**; provided, however, this exclusion shall not apply:

(a) to any **Defense Costs** which constitute **Non-Indemnifiable Loss** incurred by any **Insured Person** in defending any **Claim** against that **Insured Person**;

(b) to any **Derivative Suit** not brought, controlled or materially assisted by any **Organization**, any **Outside Entity** or any **Executive** of the foregoing; or

(c) if the **Organization** or **Outside Entity** is the subject of a bankruptcy case (or the equivalent in a **Foreign Jurisdiction**), unless the **Claim** is brought, controlled or materially assisted by any **Organization** or **Outside Entity**, the resulting debtor-in-possession (or foreign equivalent) of the debtor **Organization** or **Outside Entity** or any **Executive** of the foregoing;

(6) *ERISA*  for any violation of responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any similar provisions of any state, local or foreign statutory or common law; or

(7) *Compensation & Labor Liability*  for any violation of responsibilities, obligations or duties imposed by the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification (WARN) Act, the Consolidated Omnibus Budget Reconciliation Act (COBRA), the Occupational Safety and Health Act (OSHA), or any federal, state, local or foreign law, amendment to a law, or any rule or regulation, that imposes or expands responsibilities, obligations or duties relating to compensation, retirement, benefits, deductions, withholdings, breaks or the workplace; provided, however, this exclusion shall not apply to the extent that a **Claim** is for discrimination, sexual or other harassment, wrongful termination or hostile work environment, or for **Retaliation**, or to the extent that a **Claim** is a **Securities Claim**.

## 5. RETENTION

No Retention is applicable to the following: (i) **Non-Indemnifiable Loss**; (ii) **Derivative Investigation Costs**; or (iii) **Crisis Loss**.

Except as provided above and in the *First Dollar E-Discovery Consultant Services Extension*, for each **Claim** or **Pre-Claim Inquiry**, the **Insurer** shall only be liable for the amount of covered **Loss** arising from such **Claim** or **Pre-Claim Inquiry** which is in excess of the applicable Retention set forth on the Declarations or in any endorsement to this policy. Amounts within the Retention shall remain uninsured.

A single Retention shall apply to **Loss** arising from all **Related Claims** and all **Related Pre-Claim Inquiries**. In the event a **Claim** or **Pre-Claim Inquiry** triggers more than one Retention, then, as to such **Claim** or **Pre-Claim Inquiry**, the highest of such Retentions shall be deemed the Retention applicable to **Loss** arising from such **Claim** or **Pre-Claim Inquiry** unless this policy expressly provides otherwise.

104123 (04/10)  5  © All rights reserved.

Exhibit 15-11

AW000749

Executive Edge



## 6. LIMITS OF LIABILITY

The **Limit of Liability** stated in the Declarations is the aggregate limit of the **Insurer's** liability for all **Loss** (including **Defense Costs** and **Pre-Claim Inquiry Costs**) under this policy. The **Limit of Liability** and all sublimits of liability are collectively referred to in this policy as the **"Limits of Liability."**

Each aggregate sublimit of liability in this policy is the maximum limit of the **Insurer's** liability for all **Loss** under this policy that is subject to that aggregate sublimit of liability. Each per **Executive** sublimit of liability in this policy is the maximum limit of the **Insurer's** liability for all **Loss** of each **Executive** under this policy that is subject to that per **Executive** sublimit of liability. All sublimits of liability shall be part of, and not in addition to, the **Limit of Liability**. Each per **Executive** sublimit of liability shall be part of, and not in addition to, its corresponding aggregate sublimit of liability.

The **Limits of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Limits of Liability** for the **Policy Period**. Further, all **Related Claims** and all **Related Pre-Claim Inquiries** that are considered made or received during the **Policy Period** or **Discovery Period** pursuant to subparagraph (b) or (c) of Clause 7. *Notice And Reporting*, shall also be subject to the applicable **Limits of Liability** set forth in this policy.

**Defense Costs** are not payable by the **Insurer** in addition to the **Limits of Liability**. **Defense Costs** are part of **Loss** and as such are subject to the **Limits of Liability** for **Loss**.

## 7. NOTICE AND REPORTING

Notice hereunder shall be given in writing to the **Insurer** at the **Claims Address** indicated in the Declarations. If mailed or transmitted by electronic mail, the date of such mailing or transmission shall constitute the date that such notice was given and proof of mailing or transmission shall be sufficient proof of notice.

(a)  *Reporting a Claim, Pre-Claim Inquiry or Crisis*

An **Organization** or an **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this policy:

(1) notify the **Insurer** in writing of a **Claim** made against an **Insured** or a **Crisis**; or

(2) if an **Insured** elects to seek coverage for **Pre-Claim Inquiry Costs** in connection with any **Pre-Claim Inquiry**, notify the **Insurer** in writing of that **Pre-Claim Inquiry**;

as soon as practicable after (i) the **Named Entity's** Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim** or **Pre-Claim Inquiry**; or (ii) the **Crisis** commences. In all such events, notification must be provided no later than 60 days after the end of the **Policy Period** or the **Discovery Period** (if applicable).

                                    © All rights reserved.

Exhibit 15-12

AW000750

Executive Edge



(b) *Relation Back to the First Reported Claim or Pre-Claim Inquiry*

Solely for the purpose of establishing whether any subsequent **Related Claim** was first made or a **Related Pre-Claim Inquiry** was first received during such **Policy Period** or **Discovery Period** (if applicable), if during any such period:

(1) a **Claim** was first made and reported in accordance with Clause 7(a) above, then any **Related Claim** that is subsequently made against an **Insured** and that is reported in accordance with Clause 7(a) above shall be deemed to have been first made at the time that such previously reported **Claim** was first made; and

(2) a **Pre-Claim Inquiry** was actually first received by an **Insured Person** and reported in accordance with Clause 7(a) above, then:

(i) any **Related Pre-Claim Inquiry** that is reported in accordance with Clause 7(a) above shall be deemed to be a **Pre-Claim Inquiry** first received at the time that such previously reported **Pre-Claim Inquiry** was first received by an **Insured Person**; and

(ii) any subsequent **Related Claim** that is reported in accordance with Clause 7(a) above shall be deemed to be a **Claim** first made at the time that such previously reported **Pre-Claim Inquiry** was first received by an **Insured Person**.

With respect to any subsequent **Related Pre-Claim Inquiry**, this policy shall not cover **Loss** incurred before such subsequent **Related Pre-Claim Inquiry** is actually received by an **Insured Person**, and with respect to any subsequent **Related Claim**, this policy shall not cover **Loss** incurred before such subsequent **Related Claim** is actually made against an **Insured**. **Claims** actually first made or deemed first made prior to the inception date of this policy, **Pre-Claim Inquiries** first received or deemed first received by an **Insured Person** prior to the inception date of this policy, and **Claims** or **Pre-Claim Inquiries** arising out of any circumstances of which notice has been given under any directors and officers liability insurance policy in force prior to the inception date of this policy, are not covered under this policy.

(c) *Relation Back to Reported Circumstances Which May Give Rise to a Claim*

If during the **Policy Period** or **Discovery Period** (if applicable) an **Organization** or an **Insured Person** becomes aware of and notifies the **Insurer** in writing of circumstances that may give rise to a **Claim** being made against an **Insured** and provides details as required below, then any **Claim** that is subsequently made against an **Insured** that arises from such circumstances and that is reported in accordance with Clause 7(a) above shall be deemed to have been first made at the time of the notification of circumstances for the purpose of establishing whether such subsequent **Claim** was first made during the **Policy Period** or during the **Discovery Period** (if applicable). Coverage for **Loss** arising from any such subsequent **Claim** shall only apply to **Loss** incurred after that subsequent **Claim** is actually made against an **Insured**. In order to be effective, notification of circumstances must specify the facts, circumstances, nature of the alleged **Wrongful Act** anticipated and reasons for anticipating such **Claim**, with full particulars as to dates, persons and entities involved; however, notification that includes a copy of an agreement to toll a statute of limitations shall be presumed sufficiently specific as to the potential **Claims** described within that agreement.

7 © All rights reserved.

Exhibit 15-13

AW000751

Executive Edge 

## 8. DISCOVERY

*Bilateral Discovery Options*  Except as indicated below, if the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew or replace this policy, the **Insureds** shall have the right to a period of one to six years following the effective date of such cancellation or nonrenewal (the **"Discovery Period"**), upon payment of the respective **"Additional Premium Amount"** described below, in which to give to the **Insurer** written notice pursuant to Clause 7(a) and Clause 7(c) of the policy of: (i) **Claims** first made against an **Insured**; (ii) **Pre-Claim Inquiries** first received by an **Insured Person**; and (iii) circumstances of which an **Organization** or an **Insured** shall become aware, in any such case, during said **Discovery Period** and solely with respect to a **Wrongful Act** that occurs prior to the end of the **Policy Period**.

*Discovery Premium*  The **Additional Premium Amount** for: (a) one year shall be no more than 125% of the **Full Annual Premium**; (b) two to six years shall be an amount to be determined by the **Insurer**. As used herein, **"Full Annual Premium"** means the premium level in effect immediately prior to the end of the **Policy Period**.

*Transaction Option*  In the event of a **Transaction**, the **Named Entity** shall have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**). The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged is non-refundable in whole or in part. This *Discovery Clause* shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this *Discovery Clause* shall terminate unless written notice by any **Insured** of election of a **Discovery Period**, together with the additional premium due, is received by the **Insurer** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or   **Transaction**.

          © All rights reserved.

Exhibit 15-14

AW000752

Executive Edge



## 9. DEFENSE AND SETTLEMENT

### A. For Claims And Pre-Claim Inquiries

(1) *No Duty to Defend or Investigate*

The **Insureds** shall defend and contest any **Claim** made against them. The **Insurer** does not assume any duty to defend or investigate.

(2) *Advancement*

Once the **Insurer** has received written notice of a **Claim** or **Pre-Claim Inquiry** under this policy, it shall advance, excess of any applicable Retention, covered **Defense Costs** or **Pre-Claim Inquiry Costs**, respectively, on a current basis, but no later than 90 days after the **Insurer** has received itemized bills for those **Defense Costs** or **Pre-Claim Inquiry Costs**. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured Person** or **Organization**, severally according to their respective interests, in the event and to the extent that any such **Insured Person** or **Organization** shall not be entitled under this policy to payment of such **Loss**.

(3) *Claims Participation and Cooperation*

The **Insurer** shall have the right, but not the obligation, to fully and effectively associate with each and every **Organization** and **Insured Person** in the defense and prosecution of any **Claim** or **Pre-Claim Inquiry** that involves, or appears reasonably likely to involve the **Insurer**, including, but not limited to, negotiating a settlement. Each and every **Organization** and **Insured Person** shall give the **Insurer** full cooperation and such information as it may reasonably require.

The failure of any **Insured Person** to give the **Insurer** cooperation and information as required in the preceding paragraph shall not impair the rights of any other **Insured Person** under this policy.

The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment or incur any **Defense Costs** or **Pre-Claim Inquiry Costs**, without the prior written consent of the **Insurer**. Such consent shall not be unreasonably withheld.

(4) *Full Settlement Within Retention/ Consent Waived*

If all **Insured** defendants are able to dispose of all **Claims** and/or **Pre-Claim Inquiries** which are subject to one Retention (inclusive of **Defense Costs**) for an amount not exceeding the Retention, then the **Insurer's** consent shall not be required for such disposition.

(5) *Applicability*

This *Defense and Settlement Clause* is not applicable to **Crisis Loss** or **Personal Reputation Expenses**. Nevertheless the **Insurer** does not, under this policy, assume any duty to defend.

            © All rights reserved.

Exhibit 15-15

AW000753

Executive Edge 

### B. Pre-Authorized Securities Defense Attorneys

The list of approved panel counsel law firms (**"Panel Counsel"**) is accessible through the online directory at http://www.aig.com/us/panelcounseldirectory under the "Directors & Officers (Securities Claims)" link. The list provides the **Insureds** with a choice of law firms from which a selection of legal counsel shall be made to conduct the defense of any **Securities Claim** made against such **Insureds**. With the express prior written consent of the **Insurer**, an **Insured** may select a **Panel Counsel** different from that selected by another **Insured** defendant if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable. The list of **Panel Counsel** may be amended from time to time by the **Insurer**. However, if a firm is removed from the list during the **Policy Period**, the **Insureds** shall be entitled to select such firm to conduct the defense of any **Securities Claim** made against such **Insureds** during the **Policy Period**.

The **Insureds** shall select a **Panel Counsel** to defend the **Securities Claim** made against the **Insureds** in the jurisdiction in which the **Securities Claim** is brought. In the event the **Claim** is brought in a jurisdiction not included on the list, the **Insureds** shall select a **Panel Counsel** in the listed jurisdiction which is the nearest geographic jurisdiction to either where the **Securities Claim** is brought or where the corporate headquarters of the **Named Entity** is located. In such instance the **Insureds** also may, with the express prior written consent of the **Insurer**, which consent shall not be unreasonably withheld, select a non-**Panel Counsel** in the jurisdiction in which the **Securities Claim** is brought to function as "local counsel" on the **Claim** to assist the **Panel Counsel** which will function as "lead counsel" in conducting the defense of the **Securities Claim**. This *Pre-Authorized Securities Defense Attorneys Clause* does not apply to **Defense Costs** solely relating to **Extradition** even if the underlying **Wrongful Acts** relate to a **Securities Claim**.

### C. Pre-Approved E-Consultant Firms

The list of pre-approved e-discovery consulting firms (**"E-Consultant Firms"**) is accessible through the online directory at http://www.aig.com/us/panelcounseldirectory under the "e-Consultant Panel Members" link. The list provides the **Insureds** with a choice of firms from which a selection of an **E-Consultant Firm** shall be made. Any **E-Consultant Firm** may be hired by an **Insured** to perform **E-Discovery Consultant Services** without further approval by the **Insurer**.

### D. Allocation

An **Organization** is covered, subject to the policy's terms, conditions and limitations, only with respect to: (1) its indemnification of its **Insured Persons** as respects a **Claim** against or **Pre-Claim Inquiry** received by such **Insured Persons**; (2) a **Securities Claim** against such **Organization**; (3) **Crisis Loss**; and (4) **Derivative Investigation Costs**. Accordingly, the **Insurer** has no obligation under this policy for defense or other costs incurred by, judgments against or settlements by an **Organization** arising out of a **Claim** made against an **Organization** except as respects coverage for a **Securities Claim**, or any obligation to pay loss arising out of any legal liability that an **Organization** has to a claimant, except as respects a covered **Securities Claim** against such **Organization**.

With respect to: (i) **Defense Costs** jointly incurred by; (ii) any joint settlement entered into by; and/or (iii) any judgment of joint and several liability against any **Organization** and any **Insured Person** in connection with any **Claim** other than a **Securities Claim**, such **Organization** and such **Insured Person** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of the amounts as between such **Organization**, such **Insured Person** and the **Insurer**, taking into account the relative legal and financial exposures, and the relative benefits obtained by such **Insured Person** and such **Organization**. In the event that a determination as to the amount of **Defense Costs** to be advanced under this policy cannot be agreed to, then the

 © All rights reserved.

Exhibit 15-16

AW000754

Executive Edge



Insurer shall advance **Defense Costs** excess of any applicable Retention which the **Insurer** states to be fair and proper until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

## 10.   CHANGES TO INSUREDS

### A. Transactions

In the event of a **Transaction** during the **Policy Period**, this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any **Wrongful Act** alleged to have occurred after the effective time of the **Transaction**. This policy may not be canceled after the effective time of the **Transaction** and no portion of the premium paid for this policy shall be refundable. The **Named Entity** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in the *Transaction Option* paragraph of Clause 8. *Discovery*.

### B. Subsidiary Additions

In addition to the definition of **"Subsidiary"** set forth in Clause 13. *Definitions*, **Subsidiary** also means any for-profit entity: (i) that is not formed as a partnership, (ii) of which the **Named Entity** first had **Management Control** during the **Policy Period**, whether directly or indirectly through one or more other **Subsidiaries**, and (iii) whose assets amount to:

(1) less than 25% of the total consolidated assets of each and every **Organization** as reported in the **Named Entity's** most recent public filing; or

(2) 25% or more of those total consolidated assets, but such entity shall be a **"Subsidiary"** only: (i) for a period of sixty (60) days from the date the **Named Entity** first had **Management Control** of such entity; or (ii) until the end of the **Policy Period**, whichever expires or ends first (the **"Auto-Subsidiary Period"**);

provided that, with respect only to entities described in subparagraph (2) above, the **Named Entity** or any other **Insured** shall report such **Subsidiary** to the **Insurer**, in writing, prior to the end of the **Policy Period**.

The **Insurer** shall extend coverage for any **Subsidiary** described in subparagraph (2) above, and any **Insured Person** thereof, beyond its respective **Auto-Subsidiary Period** if during such **Auto-Subsidiary Period**, the **Named Entity** shall have provided the **Insurer** with full particulars of the new **Subsidiary** and agreed to any additional premium and amendment of the provisions of this policy required by the **Insurer** relating to such **Subsidiary**. Further, coverage as shall be afforded to any **Subsidiary** and any **Insured Person** thereof is conditioned upon the **Named Entity** paying when due any additional premium required by the **Insurer** relating to such **Subsidiary**.

### C. Former Subsidiaries

In the event the **Named Entity** loses **Management Control** of a **Subsidiary** during or prior to the **Policy Period**, coverage with respect to such **Subsidiary** and its **Insured Persons** shall continue until termination of this policy but only with respect to **Claims** for **Wrongful Acts** that occurred or are alleged to have occurred during the time that the **Named Entity** had **Management Control** of such entity either directly or indirectly through one or more of its **Subsidiaries**.

### D. Scope Of Subsidiary Coverage

Coverage as is afforded under this policy with respect to a **Claim** made against any **Subsidiary** and/or any **Insured Person** thereof shall only apply for **Wrongful Acts** committed or allegedly committed during the time that such **Subsidiary** and such **Insured Person** meet the respective definitions of **Subsidiary** and **Insured Person** set forth in this policy.

                 © All rights reserved.

Exhibit 15-17

AW000755

Executive Edge



# 11.  APPLICATION AND UNDERWRITING

### A.  Application And Reliance

The **Insurer** has relied upon the accuracy and completeness of the statements, warranties and representations contained in the **Application**. All such statements, warranties and representations are the basis for this policy and are to be considered as incorporated into this policy.

### B.  Renewal Application Procedure

A written renewal application form is not required in order to receive a renewal quote from the **Insurer**, although the **Insurer** reserves the right to require specific information upon renewal.

### C.  Insured Person Coverage Non-Rescindable

Under no circumstances shall the coverage provided by this policy for **Loss** under Insuring Agreement A. *Insured Person Coverage* be deemed void, whether by rescission or otherwise, once the premium has been paid.

### D.  Severability Of The Application

The **Application** shall be construed as a separate application for coverage by each **Insured Person**. With respect to the **Application**, no knowledge possessed by any **Organization** or any **Insured Person** shall be imputed to any other **Insured Person**.

If the statements, warranties and representations in the **Application** were not accurate and complete and materially affected either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then the **Insurer** shall have the right to void coverage under this policy, *ab initio*, with respect to:

(1) **Loss** under Insuring Agreement B. *Indemnification Of Insured Person Coverage* for the indemnification of any **Insured Person** who knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed; and

(2) **Loss** under Insuring Agreement C. *Organization Coverage* if any **Insured Person** who is or was a chief executive officer or chief financial officer of the **Named Entity** knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed.

The foregoing applies even if the **Insured Person** did not know that such incomplete or inaccurate disclosure had been provided to the  **Insurer** or included within the **Application**.

© All rights reserved.

Exhibit 15-18

AW000756

Executive Edge



## 12.   GENERAL TERMS AND CONDITIONS

### A. Payments And Obligations Of Organizations And Others

#### 1.   INDEMNIFICATION BY ORGANIZATIONS

The **Organizations** agree to indemnify the **Insured Persons** and/or advance **Defense Costs** to the fullest extent permitted by law. If the **Insurer** pays under this policy any indemnification or advancement owed to any **Insured Person** by any **Organization** within an applicable Retention, then that **Organization** shall reimburse the **Insurer** for such amounts and such amounts shall become immediately due and payable as a direct obligation of the **Organization** to the **Insurer**. The failure of an **Organization** to perform any of its obligations to indemnify the **Insured Persons** and/or advance **Defense Costs** under this policy shall not impair the rights of any **Insured Person** under this policy.

#### 2.   OTHER INSURANCE AND INDEMNIFICATION

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible directors and officers liability insurance, unless such other insurance is specifically written as excess insurance over the **Limit of Liability** provided by this policy. This policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**. Such insurance as is provided by this policy shall apply as primary to any personal "umbrella" excess liability insurance purchased by an **Insured Person**.

With respect to **Employment Practices Claims**, such insurance as is provided by this policy shall apply only as excess of any other valid and collectible employment practices liability insurance, unless such other insurance is specifically written as excess insurance over the **Limit of Liability** provided by this policy. If according to the terms and conditions of any employment practices liability insurance policy providing coverage for an **Employment Practices Claim** made against an **Insured**, an insurer issuing such policy is not liable for **Loss**, then the **Insurer** shall be liable for payment of the portion of such **Loss** constituting covered **Loss** under this policy (specifically excess of any other valid and collectible employment practices liability insurance providing coverage for such **Loss**).

In the event of a **Claim** made against an **Outside Entity Executive**, coverage as is afforded by this policy, whether under the *Insured Person Coverage* or the *Indemnification Of Insured Person Coverage*, shall be specifically excess of: (a) any indemnification provided by an **Outside Entity**; and (b) any insurance coverage afforded to an **Outside Entity** or its **Executives** applicable to such **Claim**.  Further, in the event such other **Outside Entity** insurance is provided by the **Insurer** or any other insurance company affiliate thereof (**"Other Policy"**) (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a claim as required), then the **Insurer's** maximum aggregate **Limit of Liability** for all **Loss** under this policy, as respects any such **Claim**, shall be reduced by the amount recoverable under such **Other Policy** for loss incurred in connection with such **Claim**.

#### 3.   SUBROGATION

To the extent of any payment under this policy, the **Insurer** shall be subrogated to all of the **Organizations'** and **Insureds'** rights of recovery. Each **Organization** and each **Insured Person** shall execute all papers reasonably required and provide reasonable assistance and cooperation in securing or enabling the **Insurer** to exercise subrogation rights or any other rights, directly or in the name of the **Organization** or any **Insured Person**.

In no event, however, shall the **Insurer** exercise its rights of subrogation against an **Insured** under this policy unless the Conduct Exclusion applies with regard to such  **Insured**.

© All rights reserved.

Exhibit 15-19

AW000757

Executive Edge



### 4. RECOVERY OF LIMITS

In the event the **Insurer** recovers amounts it paid under this policy, the **Insurer** will reinstate the **Limits of Liability** of this policy to the extent of such recovery, less its costs incurred in administering and obtaining such recovery. The **Insurer** assumes no duty to seek a recovery of any amounts paid under this policy. The **Insurer**, in its sole and absolute discretion, shall determine the amounts to be credited, if any, toward a reinstatement of the **Limits of Liability**.

### B. Cancellation

The **Named Entity** may cancel this policy at any time by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent. This policy may only be canceled by or on behalf of the **Insurer** in the event of non-payment of premium by the **Named Entity**. In the event of non-payment of premium by the **Named Entity**, the **Insurer** may cancel this policy by delivering to the **Named Entity** or by mailing to the **Named Entity**, by registered, certified, or other first class mail, at the **Named Entity Address**, written notice stating when, not less than 15 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect. If the **Named Entity** shall cancel this policy, the **Insurer** shall retain the *pro rata* proportion of the premium herein.

### C. Notice And Authority

The **Named Entity** shall act on behalf of its **Subsidiaries** and each and every **Insured** with respect to the giving of notice of a **Claim, Pre-Claim Inquiry**, **Crisis** or circumstance, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, and the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining of any right to a **Discovery Period**; provided, however, that the foregoing shall not limit the ability of an **Organization** or **Insured** to provide notice of a **Claim, Pre-Claim Inquiry**, **Crisis** or circumstance in accordance with Clause 7. *Notice And Reporting*, or to elect discovery and pay the **Additional Premium Amount** (as defined in Clause 8. *Discovery*).

### D. Currency

All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Entity**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

### E. Assignment

This policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**.

14 © All rights reserved.

Exhibit 15-20

AW000758

# Executive Edge



### F. Disputes

#### 1. ALTERNATIVE DISPUTE RESOLUTION

**ADR Options**

All disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, shall be submitted to an alternative dispute resolution (ADR) process as provided in this clause. The **Named Entity** may elect the type of ADR process discussed below; provided, however, that absent a timely election, the **Insurer** may elect the type of ADR. In that case, the **Named Entity** shall have the right to reject the **Insurer's** choice of the type of ADR process at any time prior to its commencement, after which, the **Insured's** choice of ADR shall control.

**Mediation**

In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 90 days shall have elapsed from the date of the termination of the mediation.

**Arbitration**

In the event of arbitration, the decision of the arbitrator(s) shall be final, binding and provided to both parties, and the arbitration award shall not include attorney's fees or other costs.

**ADR Process**

*Selection of Arbitrator(s) or Mediator*: The **Insurer** and the **Named Entity** shall mutually consent to: (i) in the case of arbitration, an odd number of arbitrators which shall constitute the arbitration panel, or (ii) in the case of mediation, a single mediator. The arbitrator, arbitration panel members or mediator must be disinterested and have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. In the absence of agreement, the **Insurer** and the **Named Entity** each shall select one arbitrator, the two arbitrators shall select a third arbitrator, and the panel shall then determine applicable procedural rules.

*ADR Rules*: In considering the construction or interpretation of the provisions of this policy, the mediator or arbitrator(s) must give due consideration to the general principles of the law of the **State of Formation** of the **Named Entity**. Each party shall share equally the expenses of the process elected. At the election of the **Named Entity**, either choice of ADR process shall be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state reflected in the **Named Entity Address**. The **Named Entity** shall act on behalf of each and every **Insured** under this *Alternative Dispute Resolution Clause*. In all other respects, the **Insurer** and the **Named Entity** shall mutually agree to the procedural rules for the mediation or arbitration. In the absence of such an agreement, after reasonable diligence, the arbitrator(s) or mediator shall specify commercially reasonable rules.

© All rights reserved.

Exhibit 15-21

AW000759

Executive Edge



### 2. ACTION AGAINST INSURER

Except as provided in Clause 12.F.1. *Alternative Dispute Resolution*, no action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, or until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against such **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Insurer**.

Any **Insured** or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against any **Insured** or **Organization** to determine the **Insured's** liability, nor shall the **Insurer** be impleaded by any **Insured Person**, his or her spouse or legally recognized domestic partner, any **Organization** or any legal representative of the foregoing.

### G. Spousal, Domestic Partner And Legal Representative Extension

If a **Claim** against an **Insured Person** includes a **Claim** against: (i) the lawful spouse or legally recognized domestic partner of such **Insured Person**; or (ii) a property interest of such spouse or domestic partner, and such **Claim** arises from any actual or alleged **Wrongful Act** of such **Insured Person**, this policy shall pay covered **Loss** arising from the **Claim** made against such spouse or domestic partner or the property of such spouse or domestic partner to the extent that such **Loss** does not arise from a **Claim** for any actual or alleged act, error or omission of such spouse or domestic partner.  This policy shall pay covered **Loss** arising from a **Claim** made against the estates, heirs, or legal representatives of any deceased **Insured Person**, and the legal representatives of any **Insured Person** in the event of incompetence, insolvency or bankruptcy, who was an **Insured Person** at the time the **Wrongful Acts** upon which such **Claim** is based were alleged to have been committed.

### H. Conformance To Law

In the event that there is an inconsistency between: (i) any period of limitation in this policy relating to the giving of notice of cancellation or discovery/extended reporting election, and (ii) the minimum or maximum period required by applicable law, where such law allows, the **Insurer** will resolve the inconsistency by applying the notice period that is more favorable to the **Insureds**.  Otherwise, the notice period is hereby amended to the extent necessary to conform to applicable law.

Coverage under this policy shall not be provided to the extent prohibited by any law.

### I. Headings

The descriptions in the headings and the Guide of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

© All rights reserved.

Exhibit 15-22

AW000760

Executive Edge



## 13. DEFINITIONS

Terms with **"Bold"** typeface are used in this policy with the meanings and values ascribed to them below and/or in the Declarations:

**Application**  means:

(1) the written statements and representations made by an **Insured** and provided to the **Insurer** during the negotiation of this policy, or contained in any application or other materials or information provided to the **Insurer** in connection with the underwriting of this policy;

(2) all warranties executed by or on behalf of an **Insured** and provided to the **Insurer** in connection with the underwriting of this policy or the underwriting of any other directors and officers (or equivalent) liability policy issued by the **Insurer**, or any of its affiliates, of which this policy is a renewal, replacement or which it succeeds in time; and

(3) each and every public filing by or on behalf of an **Organization** made with the SEC, including but not limited to the **Organization's** Annual Report(s), 10Ks, 10Qs, 8Ks and proxy statements, any financial information in such filings, and any certifications relating to the accuracy of the foregoing, provided that such public filing was filed during the 12 month period immediately preceding the inception of the **Policy Period**.

**Asset Protection Costs**  means reasonable and necessary fees, costs and expenses consented to by the **Insurer** incurred by an **Executive** of an **Organization** to oppose any efforts by an **Enforcement Body** to seize or otherwise enjoin the personal assets or real property of such **Executive** or to obtain the discharge or revocation of a court order entered during the **Policy Period** in any way impairing the use thereof.

**Claim**  means:

(1) a written demand for monetary, non-monetary or injunctive relief, including, but not limited to, any demand for mediation, arbitration or any other alternative dispute resolution process;

(2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a complaint or similar pleading; (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges;

(3) an **Insured Person Investigation**;

(4) a **Derivative Demand**;

(5) an official request for **Extradition** of any **Insured Person**, or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**.

"**Claim**" shall include any **Securities Claim** and any **Employment Practices Claim**.

**Crisis**  has the meaning as defined in the CrisisFund® Appendix attached to this policy.

**CrisisFund®**  means in the case of all **Crisis Loss**, including **Delisting Crisis Loss**, $100,000 for all **Crisis Loss** in the aggregate for all **Crises** first occurring during the **Policy Period** or any applicable **Discovery Period**.

Exhibit 15-23

AW000761

Executive Edge



| | |
|---|---|
| **Crisis Loss** | has the meaning as defined in the CrisisFund® Appendix attached to this policy. **"Delisting Crisis Loss"** means a **Crisis Loss** resulting solely from a **Delisting Crisis** (as defined in the CrisisFund ® Appendix). |
| **Defense Costs** | means reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including the cost of **E-Discovery Consultant Services** and premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond) resulting solely from: |

(1) the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**; or

(2) an **Insured Person** lawfully: (i) opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Insured Person**; or (ii) appealing any order or other grant of **Extradition** of that **Insured Person.**

**Defense Costs** shall not include: (i) **Derivative Investigation Costs,** (ii) **Pre-Claim Inquiry Costs**, or (iii) the compensation of any **Insured Person.**

| | |
|---|---|
| **Derivative Demand** | means a written demand by any shareholder of an **Organization** upon the board of directors (or equivalent management body) of such **Organization** to commence a civil action on behalf of the **Organization** against any **Executive** of the **Organization** for any actual or alleged wrongdoing on the part of such **Executive**. |
| **Derivative Investigation** | means, after receipt by any **Insured** of a **Claim** that is either a **Derivative Suit** or a **Derivative Demand**, any investigation conducted by the **Organization**, or on behalf of the **Organization** by its board of directors (or the equivalent management body) or any committee of the board of directors (or equivalent management body), as to how the **Organization** should respond. |
| **Derivative Investigation Costs** | means reasonable and necessary costs, charges, fees and expenses consented to by the **Insurer** and incurred by the **Organization**, or on behalf of the **Organization** by its board of directors (or the equivalent management body) or any committee of the board of directors (or equivalent management body), in connection with a **Derivative Investigation. Derivative Investigation Costs** shall not include the compensation of any **Insured Person.** |
| **Derivative Suit** | means a lawsuit purportedly brought derivatively on behalf of an **Organization** by a shareholder of such **Organization** against an **Executive** of the **Organization**. |
| **E-Discovery Consultant Services** | means solely the following services performed by an **E-Consultant Firm:** |

(1) assisting the **Insured** with managing and minimizing the internal and external costs associated with the development, collection, storage, organization, cataloging, preservation and/or production of electronically stored information (**"E-Discovery"**);

© All rights reserved.

Exhibit 15-24

AW000762

Executive Edge



(2) assisting the **Insured** in developing or formulating an **E-Discovery** strategy which shall include interviewing qualified and cost effective **E-Discovery** vendors;

(3) serving as project manager, advisor and/or consultant to the **Insured**, defense counsel and the **Insurer** in executing and monitoring the **E-Discovery** strategy; and

(4) such other services provided by the **E-Consultant Firm** that the **Insured**, **Insurer** and **E-Consultant Firm** agree are reasonable and necessary given the circumstances of the **Securities Claim**.

**Employee**  means any past, present or future employee, other than an **Executive** of an **Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary employee.

**Employment Practices Claim**  means a Claim alleging any:

(1) **Employment Practices Violation**; or

(2) **Third-Party EPL Violation**.

**Employment Practices Retention**  means the Retention applicable to **Loss** that arises out of an **Employment Practices Claim**.

**Employment Practices Violation**  means any actual or alleged:

(1) wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(2) harassment (including workplace bullying, sexual harassment whether "quid pro quo", hostile work environment or otherwise);

(3) discrimination (including, but not limited to, discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);

(4) **Retaliation**;

(5) employment-related misrepresentation(s) to an **Employee** of the **Organization**;

(6) employment-related libel, slander, humiliation, defamation or invasion of privacy;

(7) wrongful failure to employ or promote;

(8) wrongful deprivation of career opportunity with the **Organization**, wrongful demotion or negligent **Employee** evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(9) wrongful discipline;

(10) failure to grant tenure; or

  © All rights reserved.

Exhibit 15-25

AW000763

Executive Edge



(11) with respect to any of the foregoing items (1) through (10) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress or mental anguish, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights;

but only if the **Employment Practices Violation** relates to an **Employee** of an **Organization** or an **Outside Entity**, or an applicant for employment with an **Organization** or an **Outside Entity**, whether committed directly, indirectly, intentionally or unintentionally.

**Enforcement Body**    means: (i) any federal, state, local or foreign law enforcement authority or other governmental investigative authority (including, but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission and any attorney general), or (ii) the enforcement unit of any securities or commodities exchange or other self-regulatory organization.

**Executive**    means any:

(1) past, present and future duly elected or appointed director, officer, trustee or governor of a corporation, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position);

(2) past, present and future person in a duly elected or appointed position in an entity organized and operated in a **Foreign Jurisdiction** that is equivalent to an executive position listed in subparagraph (1) above, or a member of the senior-most executive body (including, but not limited to, a supervisory board); and

(3) past, present and future General Counsel and Risk Manager (or equivalent position) of the **Named Entity**.

**Extradition**    means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

**Extradition Costs**    means **Defense Costs** incurred by an **Insured** in lawfully opposing any effort to obtain the **Extradition** of an **Insured Person**.

**Foreign Jurisdiction**    means any jurisdiction, other than the United States of America or any of its territories or possessions.

**Foreign Policy**    means the standard executive managerial liability policy (including all mandatory endorsements, if any) approved by the **Insurer** or any of its affiliates to be sold within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded under this policy. If more than one such policy exists, then **"Foreign Policy"** means the standard basic policy form most recently offered for sale for comparable risks by the **Insurer** or any of its affiliates in that **Foreign Jurisdiction**. The term **"Foreign Policy"** shall not include any partnership managerial, pension trust or professional liability coverage.

**Insured**    means any:

(1) **Insured Person**; or

(2) **Organization.**

          © All rights reserved.

Exhibit 15-26

AW000764

## Executive Edge



| | |
|---|---|
| **Insured Person** | means any: |
| | (1) **Executive** of an **Organization**; |
| | (2) **Employee** of an **Organization**; or |
| | (3) **Outside Entity Executive**. |

**Insured Person Investigation**   means any civil, criminal, administrative or regulatory investigation of an **Insured Person**:

(1) once the **Insured Person** is identified in writing by an **Enforcement Body** as a target of an investigation that may lead to a criminal, civil, administrative, regulatory or other enforcement proceeding;

(2) in the case of an investigation by the SEC or any state, local or foreign body with similar regulation or enforcement authority, after the service of a subpoena (or in a **Foreign Jurisdiction**, the equivalent legal process) upon the **Insured Person**; or

(3) commenced by the arrest and detainment or incarceration for more than 24 hours of an **Insured Person** by any law enforcement authority in a **Foreign Jurisdiction**.

Writings which may identify an **Insured Person** as a target can include a target or "Wells" letter, whether or not labeled as such.

**Liberty Protection Costs**   means:

(1) reasonable and necessary fees, costs and expenses consented to by the **Insurer** and incurred by an **Insured Person** in order for an **Insured Person** to lawfully seek the release of the **Insured Person** from any pre-**Claim** arrest or confinement to a (i) specified residence or (ii) secure custodial premises operated by or on behalf of any law enforcement authority; or

(2) reasonable and necessary premiums (but not collateral) consented to by the **Insurer** and incurred by an **Insured Person** for a bond or other financial instrument to guarantee the contingent obligation of the **Insured Person** for a specified amount required by a court that are incurred or required outside the United States of America during the **Policy Period**, if such premiums: (i) arise out of an actual or alleged **Wrongful Act**, or (ii) are incurred solely by reason of such **Insured Person's** status as an **Executive** or **Employee** of an **Organization**; and, in either case, no **Claim** has been made and no **Pre-Claim Inquiry** is known.

**Loss**   means damages, settlements, judgments (including pre/post-judgment interest on a covered judgment), **Defense Costs**, **Crisis Loss**, **Derivative Investigation Costs**, **Liberty Protection Costs** and **Pre-Claim Inquiry Costs**; however, **"Loss"** (other than **Defense Costs**) shall not include: (1) civil or criminal fines or penalties; (2) taxes; (3) punitive or exemplary damages; (4) the multiplied portion of multiplied damages; (5) cleanup costs relating to hazardous materials, pollution or product defects; (6) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**; and (7) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. Notwithstanding the foregoing subparagraph (7), the **Insurer** shall not assert that, in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities  Act  of

104123 (04/10)   21   © All rights reserved.

Exhibit 15-27

AW000765

Executive Edge



1933, as amended, the portion of any amounts incurred by **Insureds** which is attributable to such violations constitutes uninsurable loss, and, unless precluded from doing so in a court order, shall treat that portion of all such settlements, judgments and **Defense Costs** as constituting **Loss** under this policy.

Notwithstanding the foregoing paragraph, **Loss** shall specifically include (subject to this policy's other terms, conditions and limitations, including but not limited to the Conduct Exclusion): (1) civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B); and (2) solely with respect to **Claims** other than **Employment Practices Claims**, punitive, exemplary and multiplied damages. Enforceability of this paragraph shall be governed by such applicable law that most favors coverage for such penalties and punitive, exemplary and multiple damages.

In the event of a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, **Loss** with respect to such **Claim** shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; provided, however, that this paragraph shall not apply to **Defense Costs** or to any **Non-Indemnifiable Loss** in connection therewith.

| | |
|---|---|
| **Management Control** | means: |
| | (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; or the members of the management board of a limited liability company; or |
| | (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of an **Organization**, to elect, appoint or designate a majority of: the Board of Directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company. |
| **Non-Indemnifiable Loss** | means **Loss** for which an **Organization** has neither indemnified nor is permitted or required to indemnify an **Insured Person** pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an **Organization**. |
| **Organization** | means: |
| | (1) the **Named Entity**; |
| | (2) each **Subsidiary**; and |
| | (3) in the event a bankruptcy proceeding shall be instituted by or against any of the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States of America), if any. |

 © All rights reserved.

Exhibit 15-28

AW000766

Executive Edge



| | |
|---|---|
| **Outside Entity** | means any: (1) not-for-profit entity; or (2) other entity listed as an **"Outside Entity"** in an endorsement attached to this policy. |
| **Outside Entity Executive** | means any: (1) **Executive** of an **Organization** who is or was acting at the specific request or direction of an **Organization** as an **Executive** of an **Outside Entity**; or (2) any other person listed as an **Outside Entity Executive** in an endorsement attached to this policy. |

In the event of a disagreement between the **Organization** and an **Outside Entity Executive** as to whether such **Insured** was acting "at the specific request or direction of the **Organization**," this policy shall abide by the determination of the **Organization** on this issue and such determination shall be made by written notice to the **Insurer** within ninety (90) days after the **Claim** against such **Outside Entity Executive** is made. In the event no notice of any such determination is given to the **Insurer** within such period, this policy shall apply as if the **Organization** determined that such **Outside Entity Executive** was not acting at the **Organization's** specific request or direction.

| | |
|---|---|
| **Personal Reputation Crisis** | means any negative statement that is included in any press release or published by any print or electronic media outlet regarding an **Executive** of an **Organization** made during the **Policy Period** by any individual authorized to speak on behalf of an **Enforcement Body**. |
| **Personal Reputation Expenses** | means reasonable and necessary fees, costs and expenses of a **Crisis Firm** (as defined in the CrisisFund® Appendix attached to this policy) retained within 30 days of a **Personal Reputation Crisis** solely and exclusively by an **Executive** to mitigate the adverse effects specifically to such **Executive's** reputation from a **Personal Reputation Crisis**. **"Personal Reputation Expenses"** shall not include any fees, costs or expenses of any **Crisis Firm** incurred by an **Executive** if such **Crisis Firm** is also retained by or on behalf of an **Organization**. |
| **Policy Period** | means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in such Item 2 or the effective date of cancellation of this policy. |
| **Pre-Claim Inquiry** | means any pre-**Claim**: |

(1) verifiable request for an **Insured Person** of any **Organization**: (a) to appear at a meeting or interview; or (b) produce documents that, in either case, concerns the business of that **Organization** or that **Insured Person's** insured capacities, but only if the request came from any:

    (i)  **Enforcement Body**; or

    (ii)  **Organization**, or, on behalf of an **Organization**, by its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body):

        (A)  arising out of an inquiry or investigation by an **Enforcement Body** concerning the business of that **Organization** or that **Insured Person's** insured capacities; or

        (B)  as part of its **Derivative Investigation**; and

© All rights reserved.

Exhibit 15-29

AW000767

Executive Edge



(2) arrest or confinement of an **Executive** of an **Organization** to a: (a) specified residence; or (b) secure custodial premises operated by or on behalf of an **Enforcement Body**, in connection with the business of any **Organization** or an **Insured Person's** capacity as an **Executive** or **Employee** of an **Organization**.

"**Pre-Claim Inquiry**" shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production or audit, including any request for mandatory information from a regulated entity, conducted in an **Organization's** and/or **Enforcement Body's** normal review or compliance process.

| | |
|---|---|
| **Pre-Claim Inquiry Costs** | means the reasonable and necessary pre-**Claim** fees, costs and expenses consented to by the **Insurer** and incurred by an **Insured Person** solely in connection with his/her preparation for and response to a **Pre-Claim Inquiry** directed to such **Insured Person**, including attendance at an interview or meeting requested by an **Enforcement Body**, but excluding (i) any compensation of any **Insured Person**; and (ii) the costs of complying with any formal or informal discovery or other request seeking documents, records or electronic information in the possession or control of an **Organization**, the requestor or any other third party . |
| **Related Claim** | means a **Claim** alleging, arising out of, based upon or attributable to any facts or **Wrongful Acts** that are the same as or related to those that were either: (i) alleged in another **Claim** made against an **Insured**; or (ii) the subject of a **Pre-Claim Inquiry** received by an **Insured Person**. |
| **Related Pre-Claim Inquiry** | means a **Pre-Claim Inquiry** involving, arising out of, based upon or attributable to any facts or **Wrongful Acts** that are the same as or related to those that were either: (i) alleged in a **Claim** made against an **Insured**; or (ii) the subject of another **Pre-Claim Inquiry** received by an **Insured Person**. |
| **Retaliation** | means a retaliatory act of an **Insured** alleged to be in response to any of the following activities: (i) the disclosure or threat of disclosure by an **Employee** of the **Organization** or an **Outside Entity** to a superior or to any governmental agency of any act by an **Insured** which act is alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder; (ii) the actual or attempted exercise by an **Employee** of the **Organization** or an **Outside Entity** of any right that such **Employee** has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights; (iii) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle-blower" law; or (iv) strikes of an **Employee** of the **Organization** or an **Outside Entity**. |

© All rights reserved.

Exhibit 15-30

AW000768

Executive Edge



| | |
|---|---|
| **Securities Claim** | means a **Claim**, other than an administrative or regulatory proceeding against, or investigation of an **Organization**, made against any **Insured**: |

(1) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:

   (i) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Organization**; or

   (ii) brought by a security holder of an **Organization** with respect to such security holder's interest in securities of such **Organization**; or

(2) which is a **Derivative Suit**.

Notwithstanding the foregoing, the term **"Securities Claim"** shall include an administrative or regulatory proceeding against an **Organization** that meets the requirements of subparagraph (1) above, but only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**.

| | |
|---|---|
| **Securities Retention** | means the Retention applicable to **Loss** (including **Pre-Claim Inquiry Costs**) that arises out of (i) a **Securities Claim**, or (ii) **Pre-Claim Inquiry Costs** incurred in response to: (a) a **Pre-Claim Inquiry** by an **Enforcement Body** charged with the regulation of securities, or (b) a **Derivative Investigation**. |
| **SOX 304 Costs** | means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including the premium or origination fee for a loan or bond) and incurred by the chief executive officer or chief financial officer of the **Named Entity** solely to facilitate the return of amounts required to be repaid by such **Executive** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002.  **SOX 304 Costs** do not include the payment, return, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid by such **Executive** pursuant to Section 304(a). |
| **Subsidiary** | means: |

(1) any for-profit entity that is not formed as a partnership of which the **Named Entity** has or had **Management Control** on or before the inception of the **Policy Period** either directly or indirectly through one or more of its other **Subsidiaries**; and

(2) any not-for-profit entity sponsored exclusively by an **Organization**.

A for-profit entity ceases to be a **Subsidiary** when the **Named Entity** no longer maintains **Management Control** of such entity either directly or indirectly through one or more of its **Subsidiaries**.  A not-for-profit entity ceases to be a **Subsidiary** when such entity is no longer sponsored exclusively by an **Organization**.

© All rights reserved.

Exhibit 15-31

AW000769

Executive Edge



| | |
|---|---|
| **Third-Party EPL Violation** | means any actual or alleged harassment or unlawful discrimination, as described in subparagraphs (2) and (3) of the definition of **Employment Practices Violation**, or the violation of the civil rights of a person relating to such harassment or discrimination, when such acts are alleged to be committed against anyone other than an **Insured Person** or applicant for employment with the **Organization** or an **Outside Entity**, including, but not limited to, students, patients, members, customers, vendors and suppliers. |

**Transaction** means:

(1) the **Named Entity** consolidating with or merging into another entity such that the **Named Entity** is not the surviving entity, or selling all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert;

(2) any person or entity or group of persons or entities acting in concert acquiring **Management Control** of the **Named Entity**; or

(3) the appointment by any **Enforcement Body** of, or where any **Enforcement Body** assumes the role of, a trustee, receiver, conservator, rehabilitator, liquidator or similar official to take control of, supervise or oversee the **Named Entity**, or to liquidate or sell all or substantially all of the assets of the **Named Entity**.

**UK Corporate Manslaughter Act Defense Costs** means **Defense Costs** incurred by an **Insured Person** that result solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Organization** for violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute in any jurisdiction.

**Wrongful Act** means:

(1) any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act or any actual or alleged **Employment Practices Violation** or **Third-Party EPL Violation**:

(i) with respect to any **Executive** of an **Organization**, by such **Executive** in his or her capacity as such or any matter claimed against such **Executive** solely by reason of his or her status as such;

(ii) with respect to any **Employee** of an **Organization**, by such **Employee** in his or her capacity as such, but solely in regard to any: (a) **Securities Claim**; or (b) other **Claim** so long as such other **Claim** is also made and continuously maintained against an **Executive** of an **Organization**; or

(iii) with respect to any **Outside Entity Executive**, by such **Outside Entity Executive** in his or her capacity as such or any matter claimed against such **Outside Entity Executive** solely by reason of his or her status as such; or

(2) with respect to an **Organization**, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Organization**, but solely in regard to a **Securities Claim**.

© All rights reserved.

Exhibit 15-32

AW000770

## CRISISFUND ® APPENDIX

### I.  DEFINITIONS

(a)  "**Crisis**" means:

(1) a **Delisting Crisis**; or

(2) one of the following events which, in the good faith opinion of the Chief Financial Officer of an **Organization** did cause or is reasonably likely to cause a "**Material Effect on an Organization's Common Stock Price**":

(i) *Negative earning or sales announcement*
The public announcement of an **Organization's** past or future earnings or sales, which is substantially less favorable than any of the following: (i) an **Organization's** prior year's earnings or sales for the same period; (ii) an **Organization's** prior public statements or projections regarding earnings or sales for such period; or (iii) an outside securities analyst's published estimate of an **Organization's** earnings or sales.

(ii) *Loss of a patent, trademark or copyright or major customer or contract*
The public announcement of an unforeseen loss of: (i) an **Organization's** intellectual property rights for a patent, trademark or copyright, other than by expiration; (ii) a major customer or client of an **Organization**; or (iii) a major contract with an **Organization**.

(iii) *Product recall or delay*
The public announcement of the recall of a major product of an **Organization** or the unforeseen delay in the production of a major product of an **Organization**.

(iv) *Mass tort*
The public announcement or accusation that an **Organization** has caused the bodily injury, sickness, disease, death or emotional distress of a group of persons, or damage to or destruction of any tangible group of properties, including the loss of use thereof.

(v) *Employee layoffs or loss of key executive officer(s)*
The public announcement of layoffs of **Employees** of an **Organization**. The death or resignation of one or more key **Executives** of the **Named Entity**.

(vi) *Elimination or suspension of dividend*
The public announcement of the elimination or suspension of a regularly scheduled dividend previously being paid by an **Organization**.

(vii) *Write-off of assets*
The public announcement that an **Organization** intends to write off a material amount of its assets.

(viii) *Debt restructuring or default*
The public announcement that an **Organization** has defaulted or intends to default on its debt or intends to engage in a debt restructuring.

(ix) *Bankruptcy*
The public announcement that an **Organization** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of an **Organization**; or that bankruptcy proceedings are imminent, whether voluntary or involuntary.

(x) *Governmental or regulatory litigation*
The public announcement of the commencement or threat of commencement of litigation or governmental or regulatory proceedings against an **Organization**.

Exhibit 15-33

AW000771

(xi) _Unsolicited takeover bid_

An unsolicited written offer or bid by any person or entity other than an **Insured** or any affiliate of any **Insured**, whether publicly announced or privately made to an **Executive** of an **Organization**, to effect a **Transaction** of the **Named Entity**.

A **Crisis** shall first commence when an **Organization** or any of its **Executives** shall first become aware of such **Crisis**. A **Crisis** shall conclude once a **Crisis Firm** advises an **Organization** that such **Crisis** no longer exists or when the **CrisisFund** has been exhausted.

(b) "**Crisis Firm**" means any public relations firm, crisis management firm or law firm on the list of approved firms that is accessible through the online directory at http://www.chartisinsurance.com/panelcounseldirectory under the "CrisisFund®" link. Solely for **Delisting Crises**, "**Crisis Firm**" shall also include any **Panel Counsel** (as defined in Clause 9.B. of the policy) approved to handle **Securities Claims**. Any "**Crisis Firm**" may be hired by an **Organization** to perform **Crisis Services** without further approval by the **Insurer**.

(c) "**Crisis Loss**" means the following amounts incurred during the pendency of a **Crisis** for which an **Organization** is legally liable:

(1) the reasonable and necessary fees and expenses incurred by a **Crisis Firm** in the performance of **Crisis Services** for an **Organization**;

(2) the reasonable and necessary fees and expenses incurred in the printing, advertising or mailing of materials; and

(3) travel costs incurred by **Executives**, employees or agents of an **Organization** or of the **Crisis Firm**, arising from or in connection with the **Crisis**.

(d) "**Crisis Services**" means those services performed by a **Crisis Firm** in advising an **Insured** or any **Employee** of an **Organization** on minimizing potential harm to an **Organization** from the **Crisis** (including but not limited to maintaining and restoring investor confidence in an **Organization**), and solely with respect to **Delisting Crisis Loss**, any legal services performed by a **Crisis Firm** in responding to a **Delisting Crisis**.

(e) "**Delisting Crisis**" means written notice to an **Organization** that such **Organization's** securities will be or have been delisted from an **Exchange** at the initiation of such **Exchange**.

(f) "**Exchange**" means NASDAQ, the American Stock Exchange, the New York Stock Exchange and the Singapore Exchange.

(g) "**Material Effect on an Organization's Common Stock Price**" means, within a period of 24 hours, that the price per share of an **Organization's** common stock shall decrease by the greater of $2.00, or 15% net of the percentage change in the Standard & Poor's Composite Index.

## II. **EXCLUSIONS**

The term **Crisis** shall not include any event relating to any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time.

Exhibit 15-34

AW000772

**ENDORSEMENT#** *1*

This endorsement, effective *12.01am*        *August 20, 2013*        forms a part of
policy number    *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
          *14000 CARLSON PKWY*
          *MINNEAPOLIS, MN 55441-5300*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### MINNESOTA AMENDATORY ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Named Corporation, Named Organization, Named Sponsor, Named Insured, Named Entity or Insured stated in the Declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

The following is added and supersedes any provision to the contrary:

A.  No Insurer may cancel a policy of commercial liability and/or property insurance that has been in effect for ninety (90) days or more, except for one or more of the following reasons:

    (1)  nonpayment of premium;

    (2)  misrepresentation or fraud made by or with the knowledge of the Insured or Other Insured(s) in obtaining the policy or in pursuing a claim under the policy;

    (3)  actions by the Insured or Other Insured(s) that have substantially increased or substantially changed the risk insured;

    (4)  refusal of the Insured or Other Insured(s) to eliminate known conditions that increase the potential for loss after notification by the Insurer that the condition must be removed;

    (5)  substantial change in the risk assumed, except to the extent that the Insurer should reasonably have foreseen the change or contemplated the risk in writing the contract;

    (6)  loss of reinsurance by the Insurer which provided coverage to the Insurer for a significant amount of the underlying risk insured. A notice of cancellation under this clause shall advise the Insured that the Insured has ten (10) days from the date of receipt of the notice to appeal the cancellation to the commissioner of commerce and that the commissioner will render a decision as to whether the cancellation is justified because of the loss of reinsurance within thirty (30) business days after receipt of the appeal;

    (7)  a determination by the commissioner that the continuation of the policy could place the Insurer in violation of the insurance laws of this state; or

    (8)  nonpayment of dues to an association or organization, other than an insurance association or organization, where payment of dues is a prerequisite to obtaining or continuing the insurance. This provision for

© All rights reserved.

*END 001*

Exhibit 15-35

AW000773

**ENDORSEMENT#** *1*   (continued)

> cancellation for failure to pay dues does not apply to persons who are retired at 62 years of age or older or who are disabled according to social security standards.

B.   Cancellation for the reasons identified in paragraphs A.(2) through A.(8), above, shall not be effective before sixty (60) days after notice to the Insured.  The notice of cancellation shall contain a specific reason for cancellation.

A policy shall not be cancelled for nonpayment of premium pursuant to paragraph A.(1), above, unless the Insurer, at least ten (10) days before the effective cancellation date, has given notice to the Insured of the amount of premium due and the due date.  The notice shall state the effect of nonpayment by the due date.  No cancellation for nonpayment of premium shall be effective if payment of the amount due is made before the effective date in the notice.

C.   NEW POLICIES - The provisions of paragraphs A., and B., above, do not apply to any insurance policy that has not been previously renewed if the policy has been in effect less than ninety (90) days at the time the notice of cancellation is mailed or delivered.  No cancellation under this paragraph C.  is effective until at least ten (10) days after the written notice to the Insured.

D.   LONGER TERM POLICIES - A policy may be issued for a term longer than one year or for an indefinite term with a clause providing for cancellation by the Insurer for the reasons stated in paragraph A., above, by giving notice as required by paragraph B., at least sixty (60) days before any anniversary.  A new policy will be issued at least once every five (5) years.

E.   NONRENEWAL (NOTICE REQUIRED) - At least sixty (60) days before the date of expiration provided in the policy, a notice of intention not to renew the policy beyond the agreed expiration date must be made to the Insured by the Insurer.  If the notice is not given at least sixty (60) days before the date of expiration provided in the policy, the policy shall continue in force until sixty (60) days after a notice of intent not to renew is received by the Insured.

F.   EXCEPTIONS - Paragraph E., above, does not apply if the Insured has insured elsewhere, has accepted replacement coverage, or has requested or agreed to nonrenewal.

G.   The notice of cancellation or nonrenewal will be mailed or delivered to the Insured at the last mailing address known to the Insurer and will contain the reason for cancellation or nonrenewal.  Unless otherwise specifically required, proof of mailing of any notice shall be sufficient proof of notice.

All other terms, conditions and exclusions of this policy shall remain the same.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 001*

76587 (9/09)                    Page 2 of 2

Exhibit 15-36

AW000774

ENDORSEMENT# *2*

This endorsement, effective *12.01am*        *August 20, 2013*           forms a part of
policy number  *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
          *14000 CARLSON PKWY*
          *MINNEAPOLIS, MN 55441-5300*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### MINNESOTA CLAIMS MADE DISCLOSURE
### (PLEASE READ CAREFULLY)

This notice is required by the Minnesota Department of Commerce.

THIS POLICY PROVIDES COVERAGE ON A CLAIMS-MADE BASIS.

This means that only claims actually made during the policy period are covered unless coverage for an extended reporting period is purchased.  If an extended reporting period is **NOT** made available to you, you risk having gaps in coverage when switching from one company to another. Moreover, even is such a reporting period is made available to you, you may still be personally liable for claims reported after the period expires.

Claims-made policies do **NOT** provide coverage for Wrongful acts committed before a fixed retroactive date.

Rates for claims-made policies are discounted in the early years of a policy, but increase steadily over time.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 002*

52635 (10/91)                    Page 1 of 1                         PT284

Exhibit 15-37

AW000775

ENDORSEMENT# *3*

This endorsement, effective *12.01am*     *August 20, 2013*          forms a part of
policy number   *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
         *14000 CARLSON PKWY*
         *MINNEAPOLIS, MN 55441-5300*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**COVERAGE TERRITORY ENDORSEMENT**

Payment of loss under this policy shall only be made in full compliance with all United
States of America economic or trade sanction laws or regulations, including, but not
limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury
Department's Office of Foreign Assets Control ("OFAC").

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 003*

89644 (7/05)                          Page 1 of 1

Exhibit 15-38

AW000776

**ENDORSEMENT# *4***

This endorsement, effective *12.01am*       *August 20, 2013*       forms a part of
policy number   *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
        *14000 CARLSON PKWY*
        *MINNEAPOLIS, MN 55441-5300*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**BROAD FORM MANAGEMENT LIABILITY INSURANCE POLICY**

**AMENDATORY ENDORSEMENT**

**MINNESOTA**

The policy is amended as follows:

1.  The Claims-Made Notice is deleted and replaced with the following:

    THIS NOTICE IS REQUIRED BY THE MINNESOTA DEPARTMENT OF COMMERCE WITH
    RESPECT TO THE LIABILITY COVERAGE PROVIDED UNDER THIS POLICY.

    THIS POLICY PROVIDES COVERAGE ON A CLAIMS-MADE BASIS.  THIS MEANS
    THAT ONLY CLAIMS ACTUALLY MADE, INQUIRIES FIRST RECEIVED AND CRISES
    FIRST OCCURING, IN EACH CASE, DURING THE POLICY PERIOD ARE COVERED
    UNLESS COVERAGE FOR A DISCOVERY PERIOD IS PURCHASED.  IF A DISCOVERY
    PERIOD IS NOT MADE AVAILABLE TO YOU, YOU RISK HAVING GAPS IN COVERAGE
    WHEN SWITCHING FROM ONE COMPANY TO ANOTHER.  MOREOVER, EVEN IN
    SUCH A REPORTING PERIOD IS MADE AVAILABLE TO YOU, YOU MAY STILL BE
    PERSONALLY LIABLE FOR CLAIMS REPORTED AFTER THE PERIOD EXPIRES.
    CLAIMS-MADE POLICIES DO NOT PROVIDE COVERAGE FOR WRONGFUL ACTS
    COMMITTED BEFORE A FIXED CONTINUITY DATE.  RATES FOR CLAIMS-MADE
    POLICIES ARE DISCOUNTED IN THE EARLY YEARS OF A POLICY, BUT INCREASE
    STEADILY OVER TIME.

2.  Clause 13. **DEFINITIONS**, **"Loss"** is modified to the extent necessary to provide the
    following:

    To the extent coverage is provided for punitive, exemplary and multiple damages, such
    coverage shall be limited to those instances where the laws of the State of Minnesota
    do not govern the **Claim**.

3.  Clause 6.  **LIMIT OF LIABILITY**, is amended to include the following paragraph:

    If the claimant or his/her attorney makes a settlement offer resolving the **Claim** against
    the **Insured** and the **Insurer**, (the principal amount of which is within the applicable
    policy limits) and the **Insured** and the claimant or his/her attorney agree to their portion

© All rights reserved.

***END 004***

105237 (4/10)                              1

Exhibit 15-39

AW000777

<u>**ENDORSEMENT# *4***</u>     (continued)

of such settlement offer, but the **Insurer** rejects its portion of the settlement offer, then, in the event a judgment is entered against the **Insured**, (the principal amount of which is within the applicable policy limits), the **Insurer** shall be liable for all interest due on said judgment entered against the **Insured**, even if the payment of the judgment, plus such interest thereon, totals a sum in excess of the policy's **Limits of Liability**. If the **Insured** rejects settlement offer made by a claimant or his/her attorney, and the **Insurer** consented to the settlement, then the **Insurer** shall not be liable for any interest due on any subsequent judgment.

4.  Clause 8. ***DISCOVERY***, is deleted in its entirety and replaced with the following:

*8. DISCOVERY*

For the purposes of this Clause 8 only, the following definition shall apply:

"**Termination of Coverage***"* means, whether made by the **Insurer** or the **Named Entity** at any time:

(1)   cancellation or nonrenewal of this policy for any reason except non-payment of premium;

In the event of **Termination of Coverage**, the **Named Entity** shall have the right to a period of either one, two or three years following the effective date of such **Termination of Coverage** (the "**Discovery Period**") upon payment of the respective "**Additional Premium Amount**" described below in which to give to the **Insurer** written notice pursuant to Clause 7(a) and 7(c) of the policy of: (i) **Claims** first made against an **Insured**; (ii) **Pre-Claim Inquiries** first received by an **Insured Person;** and (iii) circumstances of which an **Organization** or an **Insured** shall become aware, in either case during said **Discovery Period** and solely with respect to a **Wrongful Act that occurs prior to the end of the Policy Period**.

The **Additional Premium Amount** for: (1) one year shall be no more than 125% of the **Full Annual Premium**; (2) two to six years shall be an amount to be determined by the **Insurer**. As used herein, "**Full Annual Premium**" means the premium level in effect immediately prior to the end of the  **Policy Period**.

In the event of a **Transaction**, the **Named Entity** shall have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**). The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged is non-refundable in whole or in part. This *Discovery Clause* shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this *Discovery Clause* shall terminate unless written notice by any  **Insured** of election of

© All rights reserved.

*END 004*

105237 (4/10)                            2

Exhibit 15-40

AW000778

ENDORSEMENT# *4*     (continued)

a **Discovery Period**, together with the additional premium due, is received by the **Insurer** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **Transaction**.

The **Named Entity** shall have the right to claim and occurrence information for a period of one (1) year without cost after **Termination of Coverage**.  Upon written request, the **Insurer** shall mail or deliver, within thirty (30) days of receiving such request, claim and occurrence information pertaining to the two previous policy periods in addition to the current period.

5. Clause 12.A.3. *SUBROGATION*, is amended as follows:

The following paragraphs are added:

The **Insurer** may not proceed against the **Insured** in a subrogation action where the **Loss** is caused by the unintentional acts of the  **Insured**.

The **Insurer** also may not subrogate itself to the rights of the **Insured** to proceed against another person if that other person is insured for the same **Loss** by the **Insurer**.  This only applies if the **Loss** was caused by an unintentional act.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS SHALL REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 004*

Exhibit 15-41

AW000779

ENDORSEMENT# *5*

This endorsement, effective *12.01am*       *August 20, 2013*        forms a part of
policy number   *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
          *14000 CARLSON PKWY*
          *MINNEAPOLIS, MN 55441-5300*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT**
**WITH EXCEPTION FOR NON-INDEMNIFIABLE LOSS**

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

A.   alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**, including but not limited to:

    (1)   **Nuclear Material** located at any **Nuclear Facility** owned by, or operated by or on behalf of, the **Organization**, or discharged or dispersed therefrom;

    (2)   **Nuclear Material** contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the **Organization**;

    (3)   the furnishing by an **Insured** or the **Organization** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **Nuclear Facility**; or

    (4)   **Claims** for damage or other injury to the **Organization** or its shareholders which allege, arise from, are based upon, are attributed to or in any way involve, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**; or

B.   (1)   which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its limit of liability; or

    (2)   with respect to which: (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

Notwithstanding the foregoing, this exclusion shall not apply to **Non-Indemnifiable Loss**, other than **Non-Indemnifiable Loss** constituting **Cleanup Costs**.

As used in this endorsement:

"**Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**, **Hazardous Properties** and **Waste**.

© All rights reserved.
*END 005*

Exhibit 15-42

AW000780

ENDORSEMENT# *5*   (continued)

"**Hazardous Properties**" include radioactive, toxic or explosive properties.

"**Nuclear facility**" means:

    (a)    any nuclear reactor;

    (b)    any equipment or device designed or used for:
        (1)   separating the isotopes of uranium or plutonium,
        (2)   processing or utilizing spent fuel, or
        (3)   handling, processing or packaging wastes;

    (c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; and

    (d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"**Nuclear Material**" means source material, special nuclear material or byproduct material.

"**Nuclear Reactor**" means any apparatus designed or used to sustain nuclear fission in a self- supporting chain reaction or to contain a critical mass of fissionable material.

"**Source Material**," "**Special Nuclear Material**," and "**Byproduct Material**" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"**Spent Fuel**" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

"**Waste**" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any **Nuclear Facility** included within the definition of nuclear facility under paragraph (a) or (b) thereof.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

 

 

 

_Robert M Yellen_

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 005*

Exhibit 15-43

AW000781

ENDORSEMENT# *6*

This endorsement, effective *12.01am     August 20, 2013*     forms a part of
policy number  *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
       *14000 CARLSON PKWY*
       *MINNEAPOLIS, MN 55441-5300*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## ENTITY V. INSURED EXCLUSION AMENDED
## WHISTLEBLOWER CARVEBACK

In consideration of the premium charged, it is hereby understood and agreed that Clause
4.B.(5) *Entity v. Insured Exclusion* is amended by adding the following to the end thereof:

> With respect to this *Entity v. Insured Exclusion*, the term "materially assisted" shall
> not be triggered by any **Insured Person** engaging in protected "whistleblower"
> activity.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 006*

106824 (9/10)                    1

Exhibit 15-44

AW000782

**ENDORSEMENT#** *7*

This endorsement, effective *12.01am*      *August 20, 2013*      forms a part of
policy number  *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
        *14000 CARLSON PKWY*
        *MINNEAPOLIS, MN 55441-5300*
by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

**CLAIM DEFINITION AMENDED**
**REQUESTS TO TOLL STATUTE OF LIMITATIONS**

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1. In Clause 13. DEFINITIONS, the definition of **"Claim"** shall be amended by adding the following subparagraph (6) as follows:

   (6)   the receipt by an **Insured** of any written request to toll a period or statute of limitations which may be applicable to any **Claim** that may be made for any **Wrongful Act** of any **Insured**.

2. In Clause 7. NOTICE AND REPORTING, the last sentence of subparagraph (c), entitled *"Relation Back to Reported Circumstances Which May Give Rise to a Claim,"* is deleted and replaced with the following:

   In order to be effective, notification of circumstances must specify the facts, circumstances, nature of the alleged Wrongful Act anticipated and reasons for anticipating such Claim, with full particulars as to dates, persons and entities involved.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 007*

106013 (7/10)                    1

Exhibit 15-45

AW000783

## ENDORSEMENT# *8*

This endorsement, effective *12.01am*        *August 20, 2013*        forms a part of
policy number  *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
        *14000 CARLSON PKWY*
        *MINNEAPOLIS, MN 55441-5300*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### RETENTION EROSION THROUGH SIDE-A INSURANCE FILL-IN

In consideration of the premium charged, it is hereby understood and agreed as follows:

1.  The following paragraph is added to the end of Clause 5. RETENTION:

    If an **Organization** fails or refuses to advance, pay or indemnify covered **Indemnifiable Loss** of an **Insured Person** within an applicable Retention, then solely to the extent an insurer agrees to pay or pays such **Loss** pursuant to the terms and conditions of a Side A-Excess DIC Insurance Policy, the **Insurer** shall recognize that the **Side A-Excess DIC Insurance Policy** payments erode (contribute to and reduce) the applicable Retention amount.

2.  As a precondition to such recognition of the erosion of the Retention amount, an **Insured** shall provide the **Insurer** with written proof, to the **Insurer's** satisfaction, of the payment of such **Loss** under the **Side A-Excess DIC Insurance Policy**.

3.  Advancement, payment or indemnification of an **Insured Person** by an **Organization** is deemed "failed" if it has been requested by an **Insured Person** in writing and has not been provided by, agreed to be provided by or acknowledged as an obligation by an **Organization** within 60 days of such request; and advancement, payment or indemnification by an **Organization** is deemed "refused" if an **Organization** gives a written notice of the refusal to the **Insured Person**. Advancement, payment or indemnification of an **Insured Person** by an **Organization** shall only be deemed "failed" or "refused" to the extent such advancement, payment or indemnification is not provided, or agreed to be provided, or acknowledged by and collectible from an **Organization**.

4.  "**Side A-Excess DIC Insurance Policy**" means any insurance policy written specifically as excess over this policy that provides "Side A" (non-indemnifiable or non-indemnified loss) coverage with difference-in-conditions features.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
### *END 008*

Exhibit 15-46

AW000784

ENDORSEMENT# *9*

This endorsement, effective *12.01am     August 20, 2013*     forms a part of
policy number   *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
           *14000 CARLSON PKWY*
           *MINNEAPOLIS, MN 55441-5300*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## CONDUCT EXCLUSIONS AMENDED
## FINAL, NON-APPEALABLE ADJUDICATION IN ANY UNDERLYING PROCEEDING

In consideration of the premium charged, it is hereby understood and agreed that Clause 4.B.(1) *Conduct Exclusion* is deleted in its entirety and replaced with the following:

   (1)  *Conduct*  arising out of, based upon or attributable to any:

      (a) remuneration, profit or other advantage to which the **Insured** was not legally entitled; or

      (b) deliberate criminal or deliberate fraudulent act by the **Insured**;

      if established by any final, non-appealable adjudication in any underlying proceeding;

      provided, however:

      (i) Conduct Exclusion (a), above, shall not apply in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, to the portion of any **Loss** attributable to such violations; and

      (ii) with respect to Conduct Exclusion (b), for acts or omissions which are treated as a criminal violation in a **Foreign Jurisdiction** that are not treated as a criminal violation in the United States of America, the imposition of a criminal fine or other criminal sanction in such **Foreign Jurisdiction** will not, by itself, be conclusive proof that a deliberate criminal or deliberate fraudulent act occurred;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 009*

107034 (10/10)                          1

Exhibit 15-47

AW000785

**ENDORSEMENT#** *10*

This endorsement, effective *12.01am*     *August 20, 2013*     forms a part of
policy number   *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
          *14000 CARLSON PKWY*
          *MINNEAPOLIS, MN 55441-5300*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PRIOR ACTS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured** alleging any **Wrongful Act** occurring prior to *August 20, 2012* or after the end of the **Policy Period**.  This policy only provides coverage for **Wrongful Acts** occurring on or after *August 20, 2012* and prior to the end of the **Policy Period** and otherwise covered by this policy.  **Loss** arising out of the same or related **Wrongful Act** shall be deemed to arise from the first  such same or related **Wrongful Act**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 010*

104139 (4/10)                    1

Exhibit 15-48

AW000786

ENDORSEMENT# *11*

This endorsement, effective *12.01am*      *August 20, 2013*      forms a part of
policy number   *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
         *14000 CARLSON PKWY*
         *MINNEAPOLIS, MN 55441-5300*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## SECURITIES CLAIM DEFINITION - COMMON LAW

In consideration of the premium charged, it is hereby understood and agreed that the policy's definition of "**Securities Claim**," is deleted in its entirety and replaced with the following:

"**Securities Claim**" means a **Claim**, other than an administrative or regulatory proceeding against, or investigation of an **Organization**, made against any **Insured**:

(1)   alleging a violation of any law, rule or regulation, whether statutory or common law (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities), which is:

    (a)   brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Organization**; or

    (b)   brought by a security holder or purchaser or seller of securities of an **Organization** with respect to such security holder's, purchaser's or seller's interest in securities of such **Organization**; or

(2)   which is a **Derivative Suit**.

Notwithstanding the foregoing, the term "**Securities Claim**" shall:

(1)   include an administrative or regulatory proceeding against an **Organization** that meets the requirements of subparagraph (1) above, but only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**; and

(2)   not include any **Claim** brought by any **Executive** or **Employee** of an **Organization** alleging, arising out of, based upon or attributable to the loss of, or failure to receive or obtain, the benefit of stock, stock warrants, stock options or other securities of an **Organization**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 011*

Exhibit 15-49

AW000787

ENDORSEMENT# *12*

This endorsement, effective *12.01am*      *August 20, 2013*        forms a part of
policy number  *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
         *14000 CARLSON PKWY*
         *MINNEAPOLIS, MN 55441-5300*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## SEVERABILITY OF EXCLUSIONS AMENDED
## GC IMPUTATION EXCEPTION FOR TIMELY REMEDIAL ACTION

In consideration of the premium charged, it is hereby understood and agreed that Clause
4.A. *Full Severability of Exclusions For Insured Persons* is amended by adding the following
to the end thereof:

> Provided, however, that the **Wrongful Acts** of, any past, present or future General
> Counsel shall not be imputed to an **Organization** if the General Counsel took timely
> corrective and/or remedial action upon learning of the **Wrongful Acts** upon which
> said exclusions are predicated.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

### *END 012*

106823 (9/10)                    1

Exhibit 15-50

AW000788

## ENDORSEMENT# *13*

This endorsement, effective *12.01am*     *August 20, 2013*          forms a part of
policy number   *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
        *14000 CARLSON PKWY*
        *MINNEAPOLIS, MN 55441-5300*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### NOTICE AND REPORTING AMENDED
### 90-DAY POST POLICY REPORTING PERIOD

In consideration of the premium charged, it is hereby understood and agreed that Clause 7.(a) *Reporting a Claim, Pre-Claim Inquiry or Crisis* is amended by deleting the last sentence thereof and replacing it with the following:

> In all such events, notification must be provided no later than 90 days after the end of the **Policy Period** or the **Discovery Period** (if applicable).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

### *END 013*

108598 (4/11)                    1

Exhibit 15-51

AW000789

ENDORSEMENT# *14*

This endorsement, effective *12.01am*      *August 20, 2013*        forms a part of
policy number  *01-310-11-22*
issued to   *TILE SHOP HOLDINGS, INC*
            *14000 CARLSON PKWY*
            *MINNEAPOLIS, MN 55441-5300*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

**RUNOFF AUTO COVERAGE**
**(WITH ADDITIONAL PREMIUM)**

The rights contained in this endorsement shall not apply unless and until:

(i) there is a written notice by the **Named Entity** of an election to purchase runoff
coverage;

(ii) the **Named Entity** pays the additional premium charged for runoff coverage as set
forth in paragraph (2) of this endorsement; and

(iii) the **Named Entity** shall provide the **Insurer** with full particulars of the **Runoff
Transaction** and agree to the additional premium charged relating to such **Runoff
Transaction**.

In the event that all three conditions set forth above are satisfied, it is hereby understood
and agreed that as of the effective time of the " **Runoff Transaction**" (hereinafter " **Effective
Time**") this policy shall be amended as follows:

1. This policy shall continue in full force and effect as to **Wrongful Acts** occurring    prior
to the **Effective Time**, but there shall be no coverage afforded by any        provision of
this policy for any **Wrongful Act** occurring after the **Effective Time**.

2. Clause 8. **DISCOVERY CLAUSE** is deleted in its entirety and replaced with the following:

    8. DISCOVERY CLAUSE

    The **Named Entity** shall have the right to a period of 6 years following the **Effective
    Time** (" **Discovery Period**") in which to give written notice to the **Insurer** of **Claims**
    first made against the Insureds during said 6 year period for any **Wrongful
    Act** occurring on or prior to the **Effective Time** and otherwise covered by this policy.
    Provided that in all events the coverage as is afforded by the **Discovery Period** shall
    be conditioned upon the **Named Entity** paying when due any additional premium
    owed to the **Insurer**.

3. The additional premium for the election of the **Discovery Period** and to exercise this
endorsement shall be 200% of full annual Premium (" **Runoff Premium**") less any
**Remaining Pro-Rata Premium** of this policy. As used herein " **Remaining Pro-Rata
Premium**" shall be determined by multiplying the **Daily Premium** by the **Remaining Policy
Period**. The **Daily Premium** means the total **Policy Period premium** of this policy divided
by total number of days in the **Policy Period**. The **Remaining Policy Period** means the
number of days between the **Effective Time** and the expiration date of the **Policy Period**.
The **Insurer** hereby agrees that if the amount of the **Remaining Pro-Rata Premium**

**ENDORSEMENT# 14**   (Continued)

This endorsement, effective *12.01am*      *August 20, 2013*      forms a part of
policy number  *01-310-11-22*
issued to    *TILE SHOP HOLDINGS, INC*
                    *14000 CARLSON PKWY*
                    *MINNEAPOLIS, MN 55441-5300*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

exceeds the **Runoff Premium** then **the Insurer** shall return to the **Named Entity** that amount of the **Remaining Pro-Rata Premium** which exceeds the **Runoff Premium**.

CONDITIONS

4. The **Discovery Period** shall be subject to all the terms, conditions and limitations  of this policy.  The **Discovery Period** shall not provide coverage for any  **Wrongful Act(s)** occurring after the **Effective Time**.

5. The **Limit of Liability** for the **Discovery Period** shall be part of and not in addition to the remaining **Limit of Liability** of this policy as of the **Effective Time**. In no way shall the language of this endorsement be construed to reinstate, renewed or increased the    **Limit of Liability** for this policy or the **Discovery Period**.

6. Clause 12(B) of this policy (and any endorsement or amendatory amending such Clause) shall be amended to indicate that this policy may not be canceled,  provided that the **Insurer** shall have the right to cancel this policy for non-payment of premium, after fifteen (15) days notice. The premium for this policy, including this any additional premium charged for this endorsement, shall be deemed earned as of such time.

7. The term " **Runoff Transaction**" means a **Transaction** as defined.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED  REPRESENTATIVE

© All rights reserved.
*END 14*

MNSCPT

Exhibit 15-53

AW000791

**ENDORSEMENT# *15***

This endorsement, effective *12.01am   August 20, 2013*   forms a part of policy number *01-310-11-22*
issued to   *TILE SHOP HOLDINGS, INC*
*14000 CARLSON PKWY*
*MINNEAPOLIS, MN 55441-5300*
by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

**SEVERABILITY OF THE APPLICATION AMENDED**
**(NON-RESCINDABLE)**

In consideration of the premium charged, it is hereby understood and agreed that Clause 11. APPLICATION AND UNDERWRITING is amended by deleting paragraphs C and D thereof and replacing them with the following:

*C. Non-Rescindable*

Under no circumstances shall the coverage provided by this policy be deemed void, whether by rescission or otherwise, once the premium has been paid.

*D. Severability Of The Application*

The **Application** shall be construed as a separate application for coverage by each **Insured Person**. With respect to the **Application**, no knowledge possessed by any **Organization** or any **Insured Person** shall be imputed to any other **Insured Person**.

However, in the event that any of the statements, warranties or representations are not accurately and completely disclosed in the **Application** and such inaccurate or incomplete disclosure either (i) is made with the intent to deceive, or (ii) materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, no coverage shall be afforded for any **Claim** alleging, arising out of, based upon, attributable to or in consequence of the subject matter of any incomplete or inaccurate statements, warranties or representations under:

1. Insuring Agreement A. *Insured Person Coverage*, with respect to any **Insured Person** who knew of such inaccurate or incomplete statements, warranties or representations;

2. Insuring Agreement B. *Indemnification Of Insured Person Coverage,* with respect to the indemnification of any **Insured Person** who knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed; and

3. Insuring Agreement C. *Organization Coverage,* with respect to any **Organization** if any past or present chief executive officer or chief financial officer of the **Named Entity** knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed.

The foregoing applies even if the **Insured Person** did not know that such incomplete or inaccurate disclosure had been provided to the **Insurer** or included within the **Application**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

MNSCPT   ***END 15***

Exhibit 15-54

AW000792

ENDORSEMENT# *16*

This endorsement, effective *12.01am    August 20, 2013*        forms a part of
policy number  *01-310-11-22*
issued to    *TILE SHOP HOLDINGS, INC*
             *14000 CARLSON PKWY*
             *MINNEAPOLIS, MN 55441-5300*
by       *National Union Fire Insurance Company of Pittsburgh, Pa.*

### STATE AMENDATORY INCONSISTENT

In consideration of the premium charged, it is hereby understood and agreed as follows:

1. In the event that there is an inconsistency between any: (a) state amendatory attached to this policy, or any other wording attached to this policy to comply with applicable law; and (b) any other term, condition or limitation of this policy; then, to the extent permitted by law, subject to the limitations below, the Insurer will resolve the inconsistency by applying the terms, conditions or limitations that are more favorable to the policyholder.

2. This endorsement shall not apply to the extent that: (a) any state amendatory or other wording expressly limits coverage in order to comply with applicable law, or (b) any such amendatory or other compliance wording amends language applicable to premium. In such events, the state amendatory or other compliance wording will govern over any other term, condition or limitation of the policy.

3. "Policyholder" means the first Named Entity, Named Organization, Named Corporation, Named Sponsor, Named Insured or other policyholder designated in Item 1 of the Declarations of this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 16*

MNSCPT

Exhibit 15-55

AW000793

ENDORSEMENT# *17*

This endorsement, effective *12.01am*    *August 20, 2013*    forms a part of
policy number  *01-310-11-22*
issued to    *TILE SHOP HOLDINGS, INC*
             *14000 CARLSON PKWY*
             *MINNEAPOLIS, MN 55441-5300*
by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### ENTITY V. INSURED EXCLUSION AMENDED
### AMEND CARVEBACK C FOR BANKRUPTCY CONSTITUENCIES

In consideration of the premium charged, it is hereby understood and agreed that Clause
4.B.(5) *Entity v. Insured Exclusion* is amended by deleting subparagraph (c) in its entirety
and replacing it with the following:

> (c) if the **Organization** or **Outside Entity** is the subject of a bankruptcy case (or the
> equivalent in a **Foreign Jurisdiction**), any **Claim** brought by the examiner, trustee,
> receiver, liquidator, rehabilitator, creditors committee, bondholder committee,
> equity committee or any other creditor or group of creditors on behalf of or in
> the right of such **Organization** or **Outside Entity** (or the resulting
> debtor-in-possession);

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

107187 (11/10)                    *END 17*

Exhibit 15-56

AW000794

**ENDORSEMENT# 18**

This endorsement, effective *12.01am     August 20, 2013*       forms a part of
policy number *01-310-11-22*
issued to    *TILE SHOP HOLDINGS, INC*
             *14000 CARLSON PKWY*
             *MINNEAPOLIS, MN 55441-5300*
by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## DISPUTES CLAUSE AMENDED
### (ADR OPTIONS - PRIOR TO COMMENCEMENT REPLACED WITH 14 DAYS)

In consideration of the premium charged, it is hereby understood and agreed that Clause 12.F *Disputes* is amended by deleting the section entitled *ADR Options* in its entirety and replacing it with the following:

| | |
|---|---|
| *ADR Options* | All disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, shall be submitted to an alternative dispute resolution (ADR) process as provided in this clause. The **Named Entity** may elect the type of ADR process discussed below; provided, however, that absent a timely election, the **Insurer** may elect the type of ADR. In that case, the **Named Entity** shall have the right to reject the **Insurer's** choice of the type of ADR process within fourteen days of receiving notice of the **Insurer's** choice, after which, the **Insured's** choice of ADR shall control. |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

MNSCPT                                   *END 18*

Exhibit 15-57

ENDORSEMENT# *19*

This endorsement, effective *12.01am*      *August 20, 2013*      forms a part of
policy number   *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
          *14000 CARLSON PKWY*
          *MINNEAPOLIS, MN 55441-5300*
by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### ALTERNATIVE DISPUTE RESOLUTION CLAUSE
### (WAITING PERIOD AMENDED)

In consideration of the premium charged, it is hereby understood and agreed that Clause 12.F.1. *ALTERNATIVE DISPUTE RESOLUTION* is amended by deleting the paragraph entitled, *Mediation*, in its entirety and replacing it with the following:

*Mediation*          In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least   (   *0*) days shall have elapsed from the date of the termination of the mediation.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 019*

104124 (4/10)                    1

Exhibit 15-58

AW000796

**ENDORSEMENT#** *20*

This endorsement, effective *12.01am*   *August 20, 2013*   forms a part of
policy number   *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
        *14000 CARLSON PKWY*
        *MINNEAPOLIS, MN 55441-5300*
by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## TERRORISM EXCLUSION - CERTIFIED ACTS

This insurance does not apply to loss, injury, damage, claim or suit, arising directly or indirectly as a result of an "act of terrorism", which is defined in the Terrorism Risk Insurance Act of 2002, as amended by the Terrorism Risk Insurance Program Reauthorization Act of 2007 (collectively, "TRIA") as follows:

(1)   ACT OF TERRORISM. -
    (A)   CERTIFICATION. - The term "act of terrorism" means any act that is certified by the Secretary [of the Treasury], in concurrence with the Secretary of State, and the Attorney General of the United States -
        (i)   to be an act of terrorism;
        (ii)   to be a violent act or an act that is dangerous to -
            (I)   human life;
            (II)   property; or
            (III)   infrastructure;
        (iii)   to have resulted in damage within the United States, or outside of the United States in the case of -
            (I)   an air carrier or vessel [described in TRIA]; or
            (II)   the premises of a United States mission; and
        (iv)   to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.
    (B)   LIMITATION. -   No act shall be certified by the Secretary as an act of terrorism if -
        (i)   the act is committed as part of the course of a war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or
        (ii)   property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000.
    (C)   DETERMINATIONS FINAL. - Any certification of, or determination not to certify, an act as an act of terrorism under this paragraph shall be final, and shall not be subject to judicial review.
    (D)   NONDELEGATION. - The Secretary may not delegate or designate to any other officer, employee, or person, any determination under this paragraph of whether, during the effective period of the Program, an act of terrorism has occurred.

The following applies solely to commercial property policies:

Where required by state law, if an act of terrorism results in fire, the Insurer will pay for the direct loss or damage to Covered Property, as this term is defined in the commercial property policy, caused by that fire.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 020*

96557 (2/08)                    Page 1 of 1

Exhibit 15-59

AW000797

ENDORSEMENT# *21*

This endorsement, effective *12.01am*    *August 20, 2013*          forms a part of
policy number  *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
         *14000 CARLSON PKWY*
         *MINNEAPOLIS, MN 55441-5300*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 104122 | 04/10 | D&O ADMITTED DEC |
| 81285 | 01/03 | TRIA DEC DISCLOSURE FORM |
| 104123 | 04/10 | D&O ADMITTED GUTS |
| 104870 | 04/10 | CRISISFUND APPENDIX |
| 76587 | 09/09 | MINNESOTA CANCELLATION-NONRENEWAL AMENDATORY ENDORSEMENT |
| 52635 | 10/91 | MN CLAIMS MADE DISCLOSURE |
| 89644 | 07/05 | COVERAGE TERRITORY ENDORSEMENT (OFAC) |
| 105237 | 04/10 | MINNESOTA AMENDATORY ENDORSEMENT |
| 104948 | 04/10 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT WITH EXCEPTION FOR NON-INDEMNIFIABLE LOSS |
| 106824 | 09/10 | ENTITY V INSURED EXCLUSION AMENDED WHISTLEBLOWER CARVEBACK |
| 106013 | 07/10 | CLAIM DEFINITION AMENDED - REQUESTS TO TOLL STATUTE OF LIMITATIONS |
| 104959 | 04/10 | RETENTION EROSION THROUGH SIDE-A INSURANCE FILL-IN |
| 107034 | 10/10 | CONDUCT EXCLUSIONS AMENDED FINAL NON-APPEALABLE ADJUDICATION IN ANY UNDERLYING PROCEEDING |
| 104139 | 04/10 | PRIOR ACTS EXCLUSION |
| 104962 | 04/10 | SECURITIES CLAIM DEFINITION - COMMON LAW |
| 106823 | 09/10 | SEVERABILITY OF EXCLUSIONS AMENDED GC IMPUTATION EXCEPTION FOR TIMELY REMEDIAL ACTION |
| 108598 | 04/11 | NOTICE AND REPORTING AMENDED 90-DAY POST POLICY REPORTING PERIOD |
| MNSCPT | | RUNOFF AUTO COVERAGE |
| MNSCPT | | SEVERABILITY OF THE APPLICATION AMENDED |
| MNSCPT | | STATE AMENDATORY INCONSISTENT |
| 107187 | 11/10 | ENTITY V. INSURED EXCLUSION AMENDED |

*END 021*

AW000798

ENDORSEMENT# *21*

This endorsement, effective *12.01am*     *August 20, 2013*          forms a part of
policy number   *01-310-11-22*
issued to *TILE SHOP HOLDINGS, INC*
         *14000 CARLSON PKWY*
         *MINNEAPOLIS, MN 55441-5300*
by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| MNSCPT | | DISPUTES CLAUSE AMENDED |
| 104124 | 04/10 | ALTERNATIVE DISPUTE RESOLUTION PROCESS (WAITING PERIOD AMENDED) |
| 96557 | 02/08 | TERRORISM EXCLUSION - CERTIFIED ACTS |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |
| 79176 | 08/10 | MN GUARANTY ASSOCIATION ADDENDUM |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*END 021*

AW000799

**MINNESOTA ADDENDUM TO THE APPLICATION**

**NOTICE CONCERNING POLICYHOLDER RIGHTS IN AN INSOLVENCY UNDER THE MINNESOTA INSURANCE GUARANTY ASSOCIATION LAW**

The financial strength of your insurer is one of the most important things for you to consider when determining from whom to purchase a property or liability insurance policy. It is your best assurance that you will receive the protection for which you purchased the policy. If your insurer becomes insolvent, you may have protection from the Minnesota Insurance Guaranty Association as described below but to the extent that your policy is not protected by the Minnesota Insurance Guaranty Association or if it exceeds the guaranty association's limits, you will only have the assets, if any, of the insolvent insurer to satisfy your claim.

Residents of Minnesota who purchase property and casualty or liability insurance from insurance companies licensed to do business in Minnesota are protected, SUBJECT TO LIMITS AND EXCLUSIONS, in the event the insurer becomes insolvent. This protection is provided by the Minnesota Insurance Guaranty Association.

Minnesota Insurance Guaranty Association
4640 West 77th Street
Edina, Minnesota 55435
(952) 831- 1908

The maximum account that the Minnesota Insurance Guaranty Association will pay in regard to a claim under all policies issued by the same insurer is limited to $300,000. This limit does not apply to workers' compensation insurance. Protection by the guaranty association is subject to other substantial limitations and exclusions. If your claim exceeds the guaranty association's limits, you may still recover a part or all of that amount from the proceeds from the liquidation of the insolvent insurer, if any exist. Funds to pay claims may not be immediately available. The guaranty association assesses insurers licensed to sell property and casualty or liability insurance in Minnesota after the insolvency occurs. Claims are paid from the assessment.

THE PROTECTION PROVIDED BY THE GUARANTY ASSOCIATION IS NOT A SUBSTITUTE FOR USING CARE IN SELECTING INSURANCE COMPANIES THAT ARE WELL MANAGED AND FINANCIALLY STABLE. IN SELECTING AN INSURANCE COMPANY OR POLICY, YOU SHOULD NOT RELY ON PROTECTION BY THE GUARANTY ASSOCIATION.

THIS NOTICE IS REQUIRED BY MINNESOTA STATE LAW TO ADVISE POLICYHOLDERS OF PROPERTY AND CASUALTY INSURANCE POLICIES OF THEIR RIGHTS IN THE EVENT THEIR INSURANCE CARRIER BECOMES INSOLVENT. THIS NOTICE IN NO WAY IMPLIES THAT THE COMPANY CURRENTLY HAS ANY TYPE OF FINANCIAL PROBLEMS. ALL PROPERTY AND CASUALTY INSURANCE POLICIES ARE REQUIRED TO PROVIDE THIS NOTICE.

© All rights reserved.

79176 (8/ 10)                              Page 1 of 1

Exhibit 15-62

AW000800



# CLAIM REPORTING FORM

Issuing Company: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Reported under Policy/Bond Number:  *01-310-11-22*          Date: _____

Type of Coverage: D&O _____   E&O _____   Fidelity _____   (complete the Fidelity Supplemental on the next page)

Insured's Name, as given on Policy Declarations (Face Page):

*TILE SHOP HOLDINGS, INC*

*14000 CARLSON PKWY*

*MINNEAPOLIS, MN 55441-5300*

Contact Person: _____

Title: _____

Phone: _(_____)_____-_____Ext _____

eMail: _____ @ _____

Case or Claimant Name: _____

_____

If the party involved is different from "Insured" Name (as given on Policy Declarations) state relationship:

_____

Insurance Broker/Agent: *MARSH & MCLENNAN AGENCY LLC*

Address: *7225 NORTHLAND DRIVE NORTH, SUITE 300*

Address: *MINNEAPOLIS, MN 55428*

Contact: *DAN HANSON*                    Phone: _____

eMail: *hansond@rjfagencies.com*

Send Notice of Claims to:     AIG               Phone: (888) 602-5246
                              Financial Lines Claims   Fax:   (866) 227-1750
                              P.O. Box 25947           Email: c-Claim@AIG.com
                              Shawnee Mission, KS 66225

Exhibit 15-63

AW000801



# CLAIM REPORTING FORM
# FIDELITY SUPPLEMENTAL
### (Only complete this supplemental if the Claim is being reported under Fidelity Coverage)

Issuing Company: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Reported under Policy/Bond Number:  *01-310-11-22*

Date of Discovery: _____     Estimated Amount of loss: _____

Cause of Loss:    Employee Dishonesty  _____      Computer Fraud      _____

Funds Transfer      _____      Robbery/Burglary    _____

ID Theft            _____      Forgery             _____

Client Property     _____      In Transit          _____

ERISA               _____      Credit Card Forgery _____

Other               _____      if Other, describe: _____

Send Notice Of Claims To:    AIG                     Phone:  (888) 602- 5246
                             Financial Lines Claims  Fax:    (866) 227- 1750
                             P.O. Box 25947          Email:  c- Claim@AIG.com
                             Shawnee Mission, KS 66225

*centralized Customer Link and Information Management*

Exhibit 15-64

AW000802