UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Tile Shop Holdings, Inc.,

          Plaintiff,

   v.

Allied World National Assurance
Company,

          Defendant.

Court File No.  17-cv-00776-ADM-TNL

## TILE SHOP HOLDINGS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

FREDRIKSON & BYRON, P.A

Matthew T. Boos (#0237310)
Richard D. Snyder (#191292)
Emily A. Unger (#0393459)
Jonathan P. Baker (#0397302)
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

COUNTERSTATEMENT OF FACTS .......................................................................... 2

ARGUMENT ................................................................................................................ 3

I.     AWAC'S PRIOR ACTS EXCLUSION DOES NOT BAR COVERAGE .............. 3

     A.     AWAC Has Not Carried its Burden to Prove the Settlement in the
Securities Action, and the Judgment in the Derivative Actions Arose
Out of Pre-August 20, 2012 Wrongful Acts. .................................................. 4

          1.     AWAC Carries the Burden of Proof. .................................................. 4

          2.     Indemnity is Determined by Facts, not Pleadings .............................. 4

          3.     AWAC Has Not Even Tried to Meet its Burden of Proving
that the Settlement and Judgment Arose Out of Pre-August
20, 2012 Wrongful Acts. .................................................................... 6

          4.     The Undisputed Evidence Establishes that the Settlement and
Judgment Arose Out of *Post*-August 20, 2012 Acts. ......................... 7

          5.     AWAC's Expansive Interpretation of the Prior Acts
Exclusion Is Unsupported. ................................................................ 10

     B.     Even If the Court Were to Look Beyond the Settlement, AWAC's
Prior Acts Exclusion Does Not Bar Coverage of the Securities
Action Settlement and Defense Costs. .......................................................... 14

          1.     The Events Described by AWAC Are Not "Wrongful Acts." ......... 14

          2.     Many of the "Wrongful Acts" Described by AWAC are
Alleged to Have Occurred After August 20, 2012 ........................... 18

          3.     The Securities Action Claims and the Settlement Did Not
"Arise Out of" Purported Wrongful Acts Identified by
AWAC ............................................................................................... 20

          4.     TSH's Loss Did Not Arise Out of Pre-August 20, 2012 SEC
Filings. .............................................................................................. 25

# TABLE OF CONTENTS

5. The Class Certification Order Did *Not* Find that the Securities Action Plaintiffs Relied on TSH's Pre-August 20, 2012 Filings. ............................................................................... 28

C. AWAC's Prior Act Exclusion Does Not Bar Coverage for the Derivative Actions Judgment and Defense Costs. .................................... 29

II. NATIONAL UNION'S PRIOR ACTS EXCLUSION DOES NOT BAR COVERAGE. ............................................................................................... 31

A. The Prior Acts Exclusion in the AIG Primary Policy Is Inapplicable Because AWAC's Policy Does Not Follow Form to It. ............................ 31

B. In Any Event, the Prior Acts Exclusion in the National Union Policy Does Not Bar Coverage. .............................................................. 34

III. NO ALLOCATION OF THE SETTLEMENT WAS REQUIRED. ...................... 34

IV. THE INVESTIGATION COSTS ARE COVERED "DEFENSE COSTS" UNDER THE POLICY. ........................................................................... 38

V. AWAC IS NOT ENTITLED TO A REDUCTION IN DAMAGES. ................... 39

VI. SPERLING & SLATER FEES ARE COVERED DEFENSE COSTS. ............... 40

CONCLUSION ........................................................................................ 41

# INTRODUCTION

AWAC's motion should be denied for at least three independent reasons: (1) AWAC improperly ignores Minnesota law requiring that indemnity of settlements is determined not by the allegations in initial pleadings, but by how the settling parties viewed the relative merits of the claims at the time of settlement; (2) even if initial allegations were relevant to the indemnity question, AWAC fails to meet its burden of proving the plaintiffs in the underlying litigations alleged pre-August 20, 2012 "Wrongful Acts" as defined in the policy; and (3) AWAC fails to meet its burden of proving TSH's loss "arose out of" any purported prior wrongful acts.

The extensive summary judgment record establishes that the alleged "Wrongful Acts" giving rise to TSH's loss (the Securities Action settlement and the Derivative Actions judgment) were solely TSH's admitted omissions of related-party transactions in filings and press releases made "*during the Class Period*," i.e., *after* August 20, 2012. The Securities Action plaintiffs did not allege that any pre-August 20, 2012 Wrongful Act caused their claimed injuries, and there is no evidence that any portion of TSH's loss arose out of acts occurring before August 20, 2012. Instead, TSH settled the Securities Action solely to resolve its potential liability for omissions occurring after August 20, 2012, once TSH was a publicly-traded company with duties to report and disclose certain information, including related-party transactions. This puts TSH's settlement squarely within the coverage period of National Union's Primary Policy and AWAC's follow-form Excess Policy. National Union acknowledged that the settlement presented a covered loss and honored its duty to indemnify TSH. AWAC has refused to do the same.

## <u>COUNTERSTATEMENT OF FACTS</u>[1]

In its Statement of Facts and throughout its Memorandum, AWAC misstates the allegations of the underlying Securities Action and Derivative Actions by omitting critical details such as:

- Which SEC filings and public statements the Securities Action plaintiffs alleged contained material omissions (only *post*-August 20, 2012 press releases and filings) (*see* Dkt.151 Ex. A, pp. i-ii & ¶¶123-158);

- Which allegations were *not* advanced by the Securities Action plaintiffs and are instead advanced only by AWAC (such as allegations related to the pre-August 20, 2012 Form S-4 filing) (*see generally* Dkt.151 Ex. A);

- Which allegations actually gave rise to potential liability for TSH (the ten alleged omissions outlined on pages i-ii and described at ¶¶123-158 of the CAC) (*see* Dkt.151 ¶¶15-16 & Ex. A);

- Which allegations were not material or were dismissed or abandoned by the plaintiffs (such as allegations related to manipulated financials, kickbacks, or violations of ethics policies) (*compare* Dkt.73 at 17 *with* Dkt.151 ¶¶12-14);

- When certain critical events occurred (such as the *Lagendyk* class action complaint being filed just one day after the short-seller Gotham City Research issued its report and before Dorsey was retained to investigate) (*compare* Dkt.73 at 6 *with* Dkt.151 Ex. A);

- When the Securities Action plaintiffs alleged certain acts occurred (such as the plaintiffs' allegation that TSH violated an ethics policy. The plaintiffs' focused on TSH's ethics policy, not TSLLC's. TSH's Code of Business Conduct and Ethics policy was adopted *after* the August 21, 2012 Business Combination, not in 2005 as AWAC asserts) (*compare* Dkt.73 at 3 *with* Dkt.151 Ex. JJ p.13 ("*After the Business Combination*, Tile Shop Adopts Policies and Procedures It Fails to Follow . . ." (emphasis added)) *and* Dkt.145 ¶12); and

---

[1] "CAC" refers to the Consolidated Amended Complaint for Violations of the Federal Securities Laws filed May 23, 2014, in the Securities Action. All terms not otherwise defined herein use the abbreviations provided in TSH's Memorandum in Support of Summary Judgment.

- When certain individuals and entities qualified as "insureds" under the Excess Policy (such as Nishi and TSLLC, which only became insureds beginning August 21, 2012) (*compare* Dkt.73 at 7 *with* Dkt. ¶10 & Ex. A, p. 25; Dkt.149 ¶7.)

In several instances, AWAC's facts are simply wrong. For example, AWAC claims its Policy "follows form" to the Primary Policy's prior acts exclusion. (Dkt. 73 at 2, 14-15, 33-35.) In fact, AWAC's underwriter admitted that AWAC's policy does *not* follow form to the Primary Policy's prior acts exclusion. (Dkt.191 Ex. H 170:23–171:1.) Similarly, AWAC claims that "TSHoldings' shareholders alleged in the securities action" that TSHoldings made "SEC filings—*which occurred in June, July*, November, and December of 2012—artificially inflating its stock value" and cites to the CAC in support of that statement. (Dkt.73 at 4 (emphasis added).) In fact, the cited paragraphs contain no reference to filings during June or July 2012. Nor does the rest of the CAC. The earliest public statement referenced in the CAC is an August 21, 2012 press release by TSH. (Dkt.151 Ex. C ¶123.) The Court should not rely on AWAC's selective recitation of facts.

## ARGUMENT

## I. AWAC'S PRIOR ACTS EXCLUSION DOES NOT BAR COVERAGE.

This is an indemnity case. The "Loss" for which TSH seeks indemnity is the settlement reached in the Securities Action, the judgment entered in the Derivative Actions, and Defense Costs. The question presented is whether AWAC has met its burden to prove that alleged "Wrongful Acts" occurring before August 20, 2012, led to the settlement and judgment. It has not.

**A. AWAC Has Not Carried its Burden to Prove the Settlement in the Securities Action, and the Judgment in the Derivative Actions Arose Out of Pre-August 20, 2012 Wrongful Acts.**

**1. AWAC Carries the Burden of Proof.**

Under Minnesota law, an insured does not need to prove that policy exclusions are inapplicable. Instead, the insurer always "has the burden of proving that a policy exclusion applies." *Henning Nelson Const. Co. v. Fireman's Fund Ins. Co*., 383 N.W.2d 645, 652 (Minn. 1986). *See Chicago Title Ins. Co. v. Resolution Trust Corp.*, 53 F.3d 899, 905 (8th Cir. 1995). To carry its burden of proof, AWAC must present admissible evidence about the actual cause of the loss. It is not sufficient for an insurer merely to present theories or speculation.

**2. Indemnity is Determined by Facts, not Pleadings.**

In contrast to the duty to defend, which is based on allegations in the complaint, the duty to indemnify is based on the facts developed during the case. An insurer's indemnity obligation for judgments is governed by the claims actually proven in the underlying case. *See Econ. Fire & Cas. Co. v. Iverson*, 445 N.W.2d 824 (Minn. 1989) (insurer's duty to indemnify is based on "facts developed at trial") (overruled on other grounds by *Am. Standard Ins. Co. v. Le*, 551 N.W.2d 923 (Minn. 1996)); *Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co.*, 819 N.W.2d 602, 616 (Minn. 2012).

An insurer's indemnity obligation for settlements is similarly based on actual facts existing at the time of the settlement, not on pleadings. *Netherlands Ins. Co. v. Main Street Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) ("Liability need not be

in the form of a verdict – a settlement can trigger the duty to indemnify").  The relevant inquiry is: *Why was the money paid*?

> Following a settlement as to which the insurer denies coverage, the existence of coverage should depend on what claims were settled; that is, it should depend on why the money was paid.  …  ***The only question should be how the parties to the settlement viewed the relative merits of the plaintiff's claims at the time of the settlement*** and whether, if the insured settled without the carrier's approval, the settlement amount was reasonable.  Neither the insurer nor the insured should be allowed to try the plaintiff's claim in the coverage suit.

1 Windt, INSURANCE CLAIMS AND DISPUTES § 6.31 (emphasis added).  This approach is followed by courts in Minnesota and elsewhere.  *See Gulf Ins. Co. v. Skyline Displays, Inc.*, 361 F. Supp. 2d 986, 990 (D. Minn. 2005) (looking to court orders in underlying case to determine what claims, if not compromised, would have been submitted to the jury); *St. Paul Fire and Marine Ins. Co. v. National Chiropractic Mut. Ins. Co.*, 496 N.W.2d 411, 415–16 (Minn. App. 1993) (indemnity for settlement governed by "what claims were to be submitted to the jury"); *Zurich Reinsurance (UK) Limited v. Canadian Pacific Ltd.*, 613 N.W.2d 760, 764-65 (Minn. App. 2000), *rev. denied* (Minn. 2000) ("This court considers the circumstances and events resulting in the settlement to determine what claims were actually settled."); *Convent of the Visitation Sch. v. Cont'l Cas. Co.*, 707 F. Supp. 412, 416-17 (D. Minn. 1989) (examining evidence contemporaneous with the settlement); *In re Feature Realty Litigation*, 468 F. Supp. 2d 1287, 1297 (E.D. Wash. 2006) (considering pleadings, expert reports and the settlement agreement in the underlying case to determine coverage); *Travelers Indemn. Co. of Illinois v. Royal Oak Enterprises, Inc.,* 344 F. Supp. 2d 1358, 1366 (M.D. Fla. 2004) (an

"insurer's duty to indemnify a settlement obligation must be measured by the facts 'inherent in the settlement' or, in other words, the facts extant at the time the settlement was reached."); *Piper Jaffray v. Nat'l Union Fire Ins. Co.*, 38 F. Supp. 2d 771, 777 (D. Minn. 1999) (explaining coverage for a settlement was not affected by a claim that "was not among the claims upon which the . . . settlement was based.").

The approach of determining indemnity based on what claims were actually settled is also required by the policy language. The Insuring Clause provides that AWAC "shall pay the individuals and entities insured under the Primary Policy … for Loss after exhaustion by payments of all applicable underlying limits[.]" "Exhaustion" of the underlying limits requires payment of "Loss," *i.e.*, payment of a settlement or judgment. The question for an excess insurer is whether the settlement or judgment that exhausted the underlying policy limits is covered by the excess policy. The focus necessarily is on the settlement or judgment, not on the initial pleadings.

### 3. AWAC Has Not Even Tried to Meet its Burden of Proving that the Settlement and Judgment Arose Out of Pre-August 20, 2012 Wrongful Acts.

Here, AWAC offers no evidence to prove that the Securities Action settlement and Derivative Actions judgment arose out of, were based upon, or were attributable to "Wrongful Acts" occurring before August 20, 2012. Instead, AWAC ignores the settlement and judgment, and instead discusses tangential background matters referenced by the complaints in the underlying actions, such as Nishi's alleged "kickbacks" or his violation of a TSLLC ethics policy, even though those allegations were not asserted as the bases for liability and were not the reason TSH settled the underlying litigations.

(Dkt.73 pp. 16-20, 22-24.)  AWAC even goes so far as to focus on other events that were never mentioned in the complaints in the underlying actions, such as TSH's securities filings in June and July 2012.  AWAC's approach is improper as a matter of law.  *See Zurich Reinsurance*, 613 N.W.2d at 764 (in determining coverage, courts "refuse to consider 'hypothetical claims that might have been made in the underlying suit'").  AWAC ignores the essential fact it has the burden of proving:  that TSH settled potential liability for conduct excluded by the policy.

### 4. The Undisputed Evidence Establishes that the Settlement and Judgment Arose Out of *Post*-August 20, 2012 Acts.

AWAC is unable to refute the overwhelming evidence in the record that the settlement and judgment did *not* arise out of any actual or alleged "Wrongful Acts" occurring before August 20, 2012.  *All* evidence in the summary judgment record demonstrates that TSH settled the Securities Action to resolve the plaintiffs' claims that TSH had not properly disclosed related-party transactions in press releases and securities filings *after* August 20, 2012.  The case settled through mediation in December 2016.  By that time, the plaintiffs had abandoned all financial-fraud claims, including any claim that related-party transactions affected TSH's gross margins, financial performance, or cost of goods sold.  (Dkt.151 ¶¶14, 59 & Exs. G, U, CC pp. 100:1-18, 103:16–104:5.)  That development was not surprising, given that Dorsey and PwC had investigated allegations of financial fraud and found no such evidence, and given that three public auditors had reviewed TSH's publicly-filed financial statements and the Nishi related-party activities

and had concluded that a restatement of TSH's financials was unnecessary. (Dkt.151 ¶14; Dkt.178 ¶14.)

The narrowing of the Securities Action claims was apparent from plaintiffs' motion for partial summary judgment, where they explained that their claims were "*all* predicated upon Defendants' failure to disclose Tile Shop's related-party transactions" and asserted that Defendants "failed to disclose [the transactions] in Tile Shop's filings with the Securities and Exchange Commission ... between August 22, 2012 and January 28, 2014 (the 'Class Period')" despite TSH's "legal duty to disclose [them] under SEC regulations." (Dkt.151 ¶16 & Ex. II, pp. 1-2, 4-5 & 7.)

By the December 2016 mediation, defense counsel had concluded that TSH's exposure in the case boiled down to a single claim: that TSH failed to disclose in post-August 20, 2012 filings and press releases that BP was owned by Nishi, and that Nishi's relationship to the CEO made TSH's dealings with BP "related-person" transactions under the regulation. (Dkt.151 ¶¶15, 21; Dkt.178 ¶¶15, 21.) It was solely this 1934 Act claim that motivated the settlement. (Dkt. 151 ¶¶23-24; Dkt. 182 ¶24; Dkt. 178 ¶¶23-24.)

Importantly, defense counsel did not value for settlement purposes *any* of the background allegations in the CAC concerning pre-August 20, 2012 events or conduct – the very allegations AWAC now argues preclude coverage for the settlement. (Dkt.178 ¶¶26-27; Dkt.151 ¶¶26-27; Dkt.182 ¶¶29-31.) None of the following allegations had any settlement value or were among the risks that influenced the settlement of the Securities Action:

- Whether Nishi received "kickbacks" from Chinese vendors or whether such payments would violate TSLLC's policies in effect at the time (prior to the Business Combination);

- Whether the related-party transactions themselves violated TSLLC's Ethics Code;

- Whether Nishi violated TSLLC's Ethics Code by failing to disclose his interest in BP;

- Whether, prior to the close of the Business Combination, TSLLC had adequate controls to manage and monitor its supplier relationships; or

- Any other actions occurring prior to the August 21, 2012 closing of the Business Combination.

(Dkt. 182 ¶31; Dkt. 178 ¶27; Dkt. 151 ¶27.).

Defense counsel believed that the Securities Action settlement reflected only the perceived risk of going to trial on the 1934 Act claims, despite good defenses that existed. (Dkt. 178 ¶24; Dkt. 151 ¶24; Dkt. 182 ¶29.) A plaintiff class had been certified to pursue the 1934 Act claims and plaintiffs' damages expert opined that class-wide damages could be, in the aggregate, over $180,000,000. (Dkt.178 ¶23; Dkt.151 ¶23.)

Similarly, TSH's decision to settle the Derivative Actions was not due to any allegations concerning pre-August 20, 2012 events. In the spring of 2018, the parties reached a settlement under which TSH agreed to certain changes to its governance and oversight functions. The changes were to address perceived deficiencies occurring after TSH first began operations as a public company on August 21, 2012, and had nothing to do with TSLLC's prior operations as a privately-held LLC before August 20, 2012. (Dkt.182 ¶42; Dkt.151 ¶37 & Ex. MM, pp. 17-22; Dkt.178 ¶37.) TSH agreed to adopt a written job description for the Compliance Officer function, revise its Code of Business

Conduct and Ethics, and revise its insider trading and its related-person transactions policies – all of which had been put into place after August 20, 2012. (Dkt.151 Ex.MM.) The judgment entered by the Chancery Court was for the plaintiff's attorney fees incurred to achieve the governance changes. (Dkt.151 ¶39 & Ex. O; Dkt. 178 ¶39.) Like the settlement on which it was based, the judgment was motivated only by post-August 20, 2012 events.

Against these undisputed facts, AWAC has offered no evidence that the settlement and judgment arose out of pre-August 20, 2012 Wrongful Acts. For this reason alone, AWAC's motion for summary judgment should be denied and TSH's motion granted.

### 5. AWAC's Expansive Interpretation of the Prior Acts Exclusion Is Unsupported.

Contrary to the rule that "exclusions are narrowly interpreted against the insurer," AWAC asks the Court to give its exclusion an extremely broad scope. *SCSC Corp. v. Allied Mut. Ins. Co*, 536 N.W.2d 305, 314 (Minn. 1995), *overruled on other grounds by* 766 N.W.2d 910 (Minn. 2009). AWAC asserts that its exclusion "comprehensively" bars coverage for *all* liability if even just one allegation exists of a Wrongful Act occurring before August 20, 2012—even if all other Wrongful Acts, actual or alleged, occurred after that date. (Dkt. 73 at 15.) Its argument is misplaced for several reasons.

#### a) AWAC's Position that Indemnity is Determined Based on Allegations is Unsupported.

As discussed above, the law is well-settled that indemnity is determined based on facts remaining at the time of settlement, not allegations in pleadings. AWAC does not cite the controlling law, but instead appears to assert that the word "alleged" in its

exclusion is sufficient to circumvent it.  However, AWAC cites no authority for that proposition, and none exists.  The word "alleged" frequently appears in policy exclusions and does not change the rule that indemnification is evaluated based on the facts and allegations developed in the case, not the initial pleadings.  It simply means that an insurer does not have to indemnify an insured for that portion of a settlement which is based on alleged prior wrongful acts.

> **b)** **AWAC's Argument that the Exclusion Bars Coverage for the Entire Lawsuit is Unsupported.**

AWAC's interpretation of the language in the exclusion is also unreasonable because it conflates the term "claim" with "civil action."  (Dkt. 73 at 15.)  However, the exclusion refers to claims, not civil actions.  A "claim" is equivalent to a cause of action, not to the suit itself.  *See AT&T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104, 1108-09 (Del. 2007) ("each cause of action in the [underlying] lawsuits may constitute a separate 'Claim' within the meaning of the policies"); *Zucker v U.S. Specialty Ins. Co.*, 2015 WL 11216710 (S.D. Fla. 2015) ("simply because Count IV was brought in the same lawsuit with other claims based on wrongful acts predating the USSIC policy's inception, it is not, for that reason, barred by the Prior Acts Exclusion"); *Pereira v. Nat'l Union Fire Ins. Co.*, 525 F. Supp. 2d 370, 377 n. 11 ("a single lawsuit may contain several 'claims'"); *Checkrite Ltd. v. Illinois Nat. Ins. Co.*, 95 F. Supp. 2d 180, 191 (S.D.N.Y. 2000); *Home Ins. Co. of Illinois v. Spectrum Infor. Tech., Inc.*, 930 F. Supp. 825, 846 (E.D.N.Y. 1996) (rejecting insurer's attempt to "equate 'claim' and 'suit'" and finding that "because the

concepts are distinct, a 'suit' may contain several discrete 'claims'"); *Opus Bank v. Liberty Ins. Underwriters, Inc.,* 621 Fed.Appx. 405 (9th Cir. 2015).[2]

When the term "claim" is thought of as a cause of action, a portion of a suit, or a divisible set of wrongful acts, the Prior Acts Exclusion applies to claims involving prior acts, but not to an entire lawsuit that involves later acts. AWAC's extreme view of the scope of the Prior Acts Exclusion, if accepted by the Court, would lead to absurd results. Coverage for an entire lawsuit could be thrown out based on a single, peripheral allegation of a prior act, even if the substance of the claims and lawsuit centered on wrongful acts taking place during the policy period (as here). Coverage for a settlement should hinge on the legal theories and evidence that led to the settlement, not the happenstance of whether the plaintiff included a stray allegation of a prior act in its initial pleading.

        c)        **AWAC Improperly Ignores the Exclusion's Second Sentence.**

AWAC's expansive interpretation focuses only on the first sentence of the Prior Acts Exclusion, ignoring entirely the second sentence:

> This Policy shall not cover any Loss in connection with any claim alleging, arising out of, based upon, or attributable to any wrongful act(s) committed, attempted, or allegedly committed or attempted prior to August 20, 2012. *This Policy shall provide coverage only with respect to wrongful acts occurring on or after August 20, 2012* and prior to the end of the Policy Period and otherwise covered under the terms and conditions of this Policy.

---

[2] *Jerry's Enterprises, Inc. v. U.S. Specialty Ins.*, 845 F.3d 883 (8th Cir. 2017) does not state otherwise. In that case three plaintiffs joined together in asserting identical causes of action against the insured. Because the policy excluded claims brought by an insured person, and an insured person had brought all claims in the case, no cause of action was covered.

(Dkt. 123 Ex. B, endorsement 2.)  Because language in an exclusion "must be construed within the context of the exclusion as a whole and cannot be artificially separated from the other language," *Henning Nelson*, 383 N.W.2d at 653, both sentences must be read together and both must be given meaning.  Read together, the exclusion means that in situations where "Loss" is attributable to wrongful acts occurring both before and during the policy period, only the portion of "Loss" attributable to prior wrongful acts is excluded, while the portion of "Loss" attributable to wrongful acts occurring during the policy period is covered.

This is the only reasonable interpretation of the language in the exclusion because it is the only interpretation that, in a case involving mixed causation, gives meaning to both sentences.[3]  Under the first sentence, Loss that "aris[es] out of" a prior wrongful act is excluded.  Under the second sentence, Loss that arises out of a wrongful act occurring after the prior acts date is covered.  If the first sentence were extended to *also* exclude coverage for "Loss" attributable to wrongful acts taking place *after* the prior acts date, it would conflict with and improperly negate the exclusion's second sentence.  This interpretation is consistent with (i) the language of the exclusion, (ii) case law holding that indemnity should be evaluated in reference to what was settled, not pleaded; and (iii) black-letter law requiring that exclusions be narrowly construed against the insurer and in favor of coverage.

---

[3]  Even if this language were susceptible to more than one reasonable interpretation, that would simply mean that the exclusion is ambiguous and must be interpreted in favor of the insured.  *SCSC*, 536 N.W.2d at 316.

Here, because the Securities Action settlement was motivated *solely* by the failure to disclose related-party transactions in securities filings made after August 20, 2012, no part of the settlement is attributable to any "Wrongful Act" occurring before that date. TSH is entitled to full indemnification.

**B.    Even If the Court Were to Look Beyond the Settlement, AWAC's Prior Acts Exclusion Does Not Bar Coverage of the Securities Action Settlement and Defense Costs.**

AWAC argues that certain background events described in the CAC, and other events that are not even mentioned in the CAC, constitute Wrongful Acts that preclude coverage. As discussed above, the facts actually developed in the case, not merely the allegations initially pleaded, control indemnity, and therefore AWAC's argument misses the mark entirely. Beyond that deficiency, AWAC's argument fails for three additional reasons: (1) the events it describes are not "Wrongful Acts"; (2) the events did not occur before August 20, 2012; and (3) the claims and settlement, as a matter of law, could not "arise out of" the events.

**1.    The Events Described by AWAC Are Not "Wrongful Acts."**

At pages 16-19 of its brief, AWAC lists fifteen bullet points it claims are "Wrongful Acts" alleged in the CAC occurring before August 20, 2012. To be a "Wrongful Act" as that term is defined, a number of elements have to be established. (*See* Dkt. 122 at 29-33.) AWAC, despite having the burden of proof, makes no effort to establish these elements. Its motion fails for this reason as well.

By way of example, AWAC's first three bullet points concern Nishi, who was an employee of TSLLC. The definition of "Wrongful Act" as it pertains to employees

requires: (1) an "actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act"; (2) by an "Employee of an Organization"; (3) "in his or her capacity as such"; and (4) "solely in regard to any Securities Claim." (Dkt.123 Ex. A p.26.) Nishi was not an "Employee of an Organization" at the time the acts occurred. That is because "Organization" means TSH or its Subsidiary.[4] Before August 20, 2012, Nishi's employer, TSLLC, was not a "Subsidiary" of TSH. Therefore, any alleged acts committed by Nishi before August 20, 2012 were not taken as an "Employee of an Organization" so requirement (2) is not met.[5] Requirement (3) is also not met. Any allegation that Nishi received kickbacks or owned separate businesses could not, as a matter of law, have been actions taken by Nishi in his capacity of as an employee of

---

[4] The term "Subsidiary" means an entity of which the Named Entity (TSH) has or had Management Control on or before the inception of the Policy Period. (Dkt.123 Ex. A, p.25.) TSH obtained "Management Control" over TSLLC upon the close of the August 21, 2012 Business Combination. Before then, TSLLC was not a Subsidiary. (Dkt.148 ¶7.)

[5] AWAC states that "Nishi qualifies as an 'Employee' as a former TSLLC and TSHoldings employee." (Dkt. 73 at 13.) While that is true (with respect to TSLLC) for the period *after* August 21, 2012, at which point TSLLC became a Subsidiary of TSH, it is not true for the period *before* August 21, 2012. AWAC may attempt to argue that the distinction does not matter, and that as long as an individual at some point meets the definition of an Employee, any acts he committed before becoming an "Employee of an Organization" nevertheless constitute "Wrongful Acts." That is incorrect. Section 10.D. of the Policy provides:

> *Scope of Subsidiary Coverage*
>
> Coverage as is afforded under this policy with respect to a Claim made against any Subsidiary and/or Insured Person thereof shall only apply for Wrongful Acts committed or allegedly committed *during the time that such Subsidiary and such Insured Person meet the respective definitions of Subsidiary and Insured Person* set forth in this policy.

(Dkt.123 Ex. B at 11 (emphasis added).)

TSLLC. Finally, requirement (4) is not met. Allegations of Nishi receiving kickbacks, owning suppliers, and breaching a code of ethics are not allegations of a "violation of any law, rule, or regulation" governing "the purchase or sale … [of] any securities of an Organization," which is how the policy defines "Securities Action." (Dkt.123 Ex. A endorsement 11 at p. 50 of 83).) Thus, Nishi's conduct was not "solely in regard to any Securities Claim." *See Kollman v. Nat'l Union Fire Ins. Co.*, 2007 WL 2344825, at *2 (D. Or. 2007) (holding that although a scheme to deprive the plaintiff of control of a company involved stock transactions, those acts were not "solely in regard to a Securities Claim" and therefore were not "Wrongful Acts.").

The ninth through eleventh bullet points concern TSLLC. The definition of Wrongful Acts as it pertains to corporate entities requires: (1) an "actual or alleged breach of duty neglect, error, misstatement, misleading statement, omission or act"; (2) "by such Organization" and (3) "solely in regard to any Securities Claim." Requirement (2) is not established. As discussed above, before August 20, 2012, TSLLC was not an "Organization" because at that time it was not a Subsidiary of TSH. Accordingly, as a matter of law, the alleged acts of TSLLC before August 20, 2012 were not "Wrongful Acts" because they were not committed "by such Organization." In addition, requirement (3) is not met. Allegations that TSLLC purchased products from companies owned by Nishi and lacked adequate controls are not "solely in regard to any Securities Claim" because they do not allege a "violation of any law, rule, or regulation" governing "the purchase or sale … [of] any securities of an Organization."

The bullet points in AWAC's brief addressing alleged acts of TSH also do not meet the definition of Wrongful Acts. TSH did not exist, even on paper, before June 21, 2012.[6] Between that date and August 21, 2012, TSH conducted no business and was not the yet parent company of TSLLC. (Dkt.148 ¶7.) All business was conducted by TSLLC. Thus, requirement (2) is not met. Allegations that "TSH purchased products from BP at or near cost," "did business with BP since 2009," and "had not previously established adequate controls" are not acts "by such Organization" before August 20, 2012, because TSH became the parent company of TSLLC as of August 21, 2012. (*Id.*) Requirement (3) of the definition of Wrongful Acts is also not met as to TSH because the allegations involving TSH are not "solely in regard to any Securities Claim." The only claims made against TSH "solely in regard to any Securities Claim" are the claims that it failed to disclose related-party transactions in public filings and disclosures "*during the Class Period,*" *i.e., not* before August 20, 2012. *See, e.g.*, Dkt. 151, Ex. C, (CAC) ¶¶131, 158. These allegations all occurred after, not before, the August 20, 2012 prior acts date.

Several bullet points refer to Robert Rucker but do not point to "Wrongful Acts." An example is bullet point ten, saying Rucker's relatives owned BP and it is implausible Rucker was "oblivious" to this relationship. The cited paragraph 171 from the CAC merely says that Tile Shop has done business with BP since 2009 or 2011. That is not an

---

[6] TSH was incorporated as a holding company on June 21, 2012 in anticipation of a business combination that it hoped to later consummate. (Dkt.148 ¶6.) Had the combination not happened, TSH would not be a public company. The CAC makes *no allegations* of any wrongful conduct occurring in the period between June 21, 2012 and August 20, 2012.

"actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act," nor is it an act by an Organization, an Employee of an Organization, or an Executive of an Organization as required under the applicable definition of Wrongful Act.

AWAC points to other acts that it—not the CAC—asserts are "Wrongful Acts." (Dkt.73 pp. 22-25) They also do not meet the definition of "Wrongful Acts." For example:

- *TSLLC Ethics Policy*. Nishi's purported failure to comply with TSLLC's ethics policy is not a "Wrongful Act" because Nishi was not an "Employee of an Organization" and did not breach any ethics policy in the capacity as an Employee of an Organization. In addition, a purported breach of an ethics policy is not "solely in regard to" a Securities Claim.

- *June 8, 2012 Questionnaire*. Rucker's purported failure to properly answer question 19 of the questionnaire is not a Wrongful Act. The questionnaire asked Rucker to provide information in his capacity as an executive of "The Tile Shop, LLC." (Dkt. 83 at 1.) Accordingly, he was not providing information in the capacity of an "Executive of an Organization" because The Tile Shop LLC was not a Subsidiary of TSH at the time, and TSH had not been incorporated at the time. In addition, a purported failure to answer question 19 is not "solely in regard" to a Securities Claim.

- *June 27, 2012 merger agreement*. As AWAC acknowledges, this agreement was "between TSLLC and JWC." (Dkt. 73 at 24.) TSLLC was not an "Organization," as defined, at that time. Accordingly, any acts or omissions in connection with that agreement were not committed "by such Organization." In addition, any act or omission concerning that agreement was not "solely in regard to" a Securities Claim.

### 2. Many of the "Wrongful Acts" Described by AWAC are Alleged to Have Occurred After August 20, 2012.

Several allegations in the CAC that AWAC characterizes as prior "Wrongful Acts" describe events that occurred during the Class Period, not before August 20, 2012. For example, AWAC argues that the CAC ¶132 alleged a "scheme" that existed

"involving the use of undisclosed, familial business partners to achieve favorable financial results." However, it is clear from the context of that allegation that the plaintiffs were alleging a "scheme" in the post-August 20, 2012 period because this allegation is within a section of the CAC entitled, "Misrepresentations and Omissions in [its] November 9, 2012 Form 10-Q." (Dkt. 151 Ex. C (CAC), p. 38.) Moreover, the Securities Action plaintiffs asserted that the "scheme" "presented trends, uncertainties or risks that had a materially adverse impact on net sales or revenues or income from Tile Shop's continuing operations" and therefore "violated Item 303." Item 303 of Regulation S-K, 17 C.F.R. §229.303, applies to public companies making public securities filings. In other words, this is an allegation of an act that occurred while TSH was a public company after August 20, 2012. *See also* CAC ¶ 121 (making the same allegation of a failure to disclose the "known trends" in connection with the December 2012 Form S-1 Registration Statement).

Additionally, allegations relied on by AWAC that TSH "failed to disclose related-party transactions," engaged in a "scheme" to use "familial business partners to achieve favorable financial results," "purchased product from BP at or near cost," failed to have adequate controls, and engaged in other acts (Dkt. 73 pp. 17-19), necessarily could not have occurred before August 20, 2012, because TSH had no business activities at that time.

### 3. The Securities Action Claims and the Settlement Did Not "Arise Out of" Purported Wrongful Acts Identified by AWAC.

AWAC's exclusion also does not apply because AWAC has not met its burden to prove that TSH's "Loss" "ar[ose] out of" the purported wrongful acts upon which it relies.[7]

When used in insurance policies, "arising out of" contemplates a causal connection between two things. *See Nat'l Hydro Sys. v. M.A. Mortenson Co.*, 529 N.W.2d 690, 693 (Minn. 1995) ("arises out of" contemplates a "temporal, geographical, or causal nexus"); *W3i Mobile, LLC v. Westchester Fire Ins. Co.,* 2009 WL 3379198, *3 (D. Minn. 2009) ("The 'arising out of' language is satisfied if there is a causal connection between the [conduct] identified in the exclusion and the injuries for which compensation is being sought."), *aff'd,* 632 F.3d 432 (8th Cir. 2011).

"The term 'arising out of' has often been construed, yet has no precise meaning." *Piper Jaffray Cos. v Nat'l Union Fire Ins. Co.*, 967 F. Supp. 1148, 1160 (D. Minn. 1997). The Minnesota Supreme Court has defined "arising out of" as "originating from," "growing out of," "having its origin in" or "flowing from." *Rausch v. Beech Aircraft Corp.*, 277 N.W.2d 645, 647 (Minn. 1979). However, "these terms likewise do not yield answers through mechanical application to particular facts." *Piper Jaffray* at 1160.

Under the "arising out of" standard, "[a] sufficient causal connection is established if 'the injury is a natural and reasonable incident or consequence.'" *Midwest Fam. Mut.*

---

[7] The exclusion also uses the phrase "based upon or attributable to." AWAC's witness could not explain the distinction between these phrases and treated them interchangeably. (Dkt. 191 Ex. T 80-83.) Accordingly, TSH follows suit.

*Ins. Co. v. Justkyle, Inc.,* 2018 WL 3475486, at *7 (D. Minn. 2018) (quoting *Dougherty v. State Farm Mut. Ins. Co.*, 699 N.W.2d 741, 743 (Minn. 2005)). The "natural and reasonable incident or consequence" standard requires more than simply "but-for" causation. *Piper Jaffray*, 967 F. Supp. at 1160. In evaluating the sufficiency of the causal connection, "the appropriate focus must be on the liability-creating conduct." *Zimmerman v. Safeco Ins. Co. of Am.*, 605 N.W.2d 727, 731 (Minn. 2000); *see also Justkyle,* 2018 WL 3475486, *7 (examining the "liability-creating conduct" alleged against the defendant). Stated another way, a loss does not "arise out of" an excluded activity if the activity is "a mere instrument, receptacle or situs of the acts giving rise to liability." *Piper Jaffray,* 967 F. Supp. at 1160 (quoting *Rausch*, 277 N.W.2d at 647).

Under the "arising out of" standard, "a causal link may be broken by 'an act of independent significance.'" *Justkyle,* 2018 WL 3475486, *7. In *Justkyle*, the insured building contractor sought coverage as a third-party defendant in a case alleging property damage. The insurer relied on an asbestos exclusion for property damage "arising in whole or in part, out of the … existence of, or presence of, asbestos." *Id.* at *3. The fact that the contractor would not have been liable but-for the existence of asbestos did not provide a sufficient causal connection under the "arising out of" standard. Without more, the mere presence of asbestos would not create liability. It was the contractor's concealment of the asbestos, an "act of independent significance," that broke any causal connection between the presence of asbestos and the injury:

> The liability-creating conduct alleged [in the underlying complaint] … is that M.A. Peterson disturbed and concealed the asbestos. . . . *Concealment … is an act of independent significance. The underlying claim could have*

> *omitted details about the asbestos and still alleged that M.A. Peterson's concealment of a hazardous material was negligent, fraudulent, and in breach of two contracts.* At least with regard to the alleged concealment, Midwest Family arguably "stretches the 'arising out of' language too far."

*Justkyle*, 2018 WL 3475486, *7 (quoting *W3i Mobile,* *3) (emphasis added).

In *W3i Mobile,* the court similarly focused on the liability-creating activity to conclude that the "arising out of" causation standard was not met. There, a provider of "mobile content" for cell phones was sued for allegedly causing wireless carriers to bill customers for unauthorized mobile content. The insurance policy contained a "Products Exclusion" excluding "Loss" "on account of any Claim … alleging, based upon, arising out of, attributable to … any goods or products" produced or sold by the insured. Similar to AWAC's argument here, the insurer argued that the unauthorized billing claims "arose out of" the sale of the insured's products and therefore the exclusion applied. Judge Erickson disagreed that the "arising out of" language in the exclusion applied to acts that were not the liability-creating event:

> Westchester's argument stretches the "arising out of" language too far. It is true that absent the mobile content there would have been no charges, and without charges, there would have been no unauthorized charges. The Underlying Claims, however, *could have omitted details about the mobile content and still alleged that W3i's billing for unauthorized charges violated the law. Thus, the Underlying Claims did not originate from, grow out of, or flow from the mobile content.* Rather, the genesis of the Underlying Claims was W3i's alleged failure to procure proper authorization for the provision of mobile content before billing for that content.

2009 WL 3379198, *3 (emphasis added).

Judge Tunheim applied the same reasoning in *Piper Jaffray* to an insurer's arguments that coverage for securities claims alleging misrepresentations in filings about

the safety of the insured's investment strategies "arose out of" its improper investments and therefore was excluded:

> No doubt, the *McDaid* plaintiffs will present evidence concerning *why* Piper's statements or omissions to the market regarding its prospects were misleading … The shareholders of Piper were not injured by these events. Their injuries flowed instead from the drop in Piper's stock value in the securities market—a decline which allegedly would not have occurred if Piper had been honest about its investment strategies, *whatever they were.*

967 F. Supp. at 1161 (emphasis in original).

Here, AWAC is attempting to "stretch the 'arising out of' language too far." There is not a sufficient causal connection between the prior acts AWAC identifies[8] and the losses claimed by the plaintiffs in the Securities Action to meet the "arising out of" standard. Their claims arose out of the failure to *disclose* related-party transactions. Whether or not the transactions themselves were wrongful in any way is irrelevant, just as it was irrelevant in *Piper Jaffray* whether the insured's underlying investment activities were improper. The liability-creating activity in this case and in *Piper Jaffray* was the insured's failure to disclose. That is an "act of independent significance" that breaks any causal connection because if TSH *had* disclosed the related-party transactions in the ten press releases and filings specified in the CAC, there would be no liability. As in *Piper Jaffray*, the plaintiffs' injuries flowed from the drop in TSH's stock price – a

---

[8]  The prior acts relied upon by AWAC are (i) Nishi's pre-August 20, 2012 violation of TSLLC's ethics code; (ii) the pre-August 20, 2012 lack of knowledge of Nishi's ownership of BP or Nanyang; (iii) the omission in the pre-August 20, 2012 S-4 and amendments thereto; (iv) Rucker's completion of a June 8, 2012 questionnaire in connection with the Business Combination; and (v) the statement in the June 27, 2012 merger agreement between JWC and TSLLC that TSLLC would not omit material facts in information supplied for purposes of SEC filings.

drop that would not have occurred if TSH made appropriate disclosures. As in *Wi3 Mobile* and *Justkyle*, the Securities Action plaintiffs "could have omitted details about" the prior acts and still would have a claim for damages against TSH based on its failure to disclose the transactions in the post-August 20, 2012 press releases and securities filing. [9]

AWAC could have included language in the Prior Acts exclusion to create a broader causal connection that might have excluded TSH's liability in the Securities Action, but it chose not to do so. In *W3i Mobile*, the insurer significantly broadened the scope of its exclusion by adding language excluding coverage for any claim "in any way involving" the insured's products. The court held that "in any way involving" is significantly broader than "arising out of," and extended the Products Exclusion to the underlying plaintiffs' unauthorized charges claim because those charges involved "in any way" the insured's products. On appeal, the Eighth Circuit agreed that the inclusion of the phrase "in any way involving" in the exclusion substantially broadened its scope.

_____

[9] Focusing on the "liability-creating" conduct and "acts of independent" significance when analyzing causation is consistent with Minnesota's concurrent-causation doctrine. That doctrine "directs that '[a]n insured is entitled to recover from an insurer when cause of the loss is not excluded under the policy. This is true even though an excluded cause may also have contributed to the loss.'" *State Bank of Bellingham v. BancInsure, Inc.*, 823 F.3d 456, 459 (8th Cir. 2016) (quoting *Campbell v. Ins. Serv. Agency*, 424 N.W.2d 785, 789 (Minn. Ct. App. 1988)) (citing *Henning Nelson*, 383 N.W.2d at 653). To meet its burden, an insurer must prove that the excluded cause was the "overriding cause" of the loss. *Henning Nelson*, 383 N.W.2d at 653. AWAC cannot do so. Here, the overwhelming, uncontradicted evidence is that a direct cause of TSH's Loss was the settlement paid to resolve the 1934 Act allegations that TSH omitted the related-party transactions in the post-August 20, 2012 press releases and SEC filings specified in the CAC, which are covered by AWAC's Policy. *See Campbell*, 424 N.W.2d at 789 (damages resulting from concurrent causes are covered so long as the covered cause is a direct cause of the damage).

*W3i Mobile, LLC v. Westchester Fire Ins. Co*., 632 F.3d 432, 436 (8th Cir. 2011). That same broad language appears in *Foster v. Summit Med. Sys., Inc*., 610 N.W.2d 350, 353–54 (Minn. App. 2000), a case AWAC relies on. AWAC incorrectly asserts that *Foster* contains "similar" language to its exclusion. (Dkt. 73 at 21.) Instead, the language at issue in *Foster* excluded coverage for claims "based upon, arising out of, directly or indirectly resulting from or in consequence of, *or in any way involving* any Wrongful Act actually or allegedly committed prior to June 21, 1995." *Id.* at 353 (emphasis added). The court specifically relied on the broader "in any way involving" language to conclude that the prior wrongful act need not "be key to finding liability" in order for the exclusion to apply in that case. *Foster*, 610 N.W.2d at 354. Here, AWAC chose *not* to include broadening language such as "in any way involving" in its Prior Acts Exclusion. It cannot now ask the Court to read such language into its exclusion or to rely on cases where insurers *did* include such broadening language.

In sum, even if AWAC could establish that the Securities Action plaintiffs alleged prior "Wrongful Acts" as defined in the Policy, neither the settled securities claims nor any other claims asserted in the Securities Action "arose out of" those acts. Because AWAC cannot prove a sufficient causal connection, its Motion should be denied.

### 4. TSH's Loss Did Not Arise Out of Pre-August 20, 2012 SEC Filings.

AWAC's attempt to use pre-August 20, 2012 SEC filings to exclude coverage (Dkt. 73 at 23-29) fails because each SEC filing is an independent act involving

independent due diligence.  TSH's later filings do not rely on or arise out of earlier filings.  (2d Clayton Decl. ¶¶2-8.)

TSH had a duty to ensure that the information in each public filing was correct as of the date of that filing.  For example, TSH completed due diligence in connection with its December 2012 secondary public offering that specifically addressed related-party transactions and that was separate from the due diligence completed for earlier filings, such as the Form S-4.  (*See* Dkt.103 266:17-269:24 (lead underwriter describing the due diligence done regarding related-party transactions in preparation for the December 2012 offering: "We did accounting. We did legal. We did business. We did bring-down. We did a very broad and thorough due diligence of this company; accounting, business, legal, auditing, et cetera, et cetera."); 2d Clayton ¶¶2-8; Dkt. 75 Ex. 8, 34:2–37:11, 56:16-60:24, 62:2-13 (testifying that the June 8, 2012 Questionnaire was in connection with the business combination filings such as the S-4, and that TSH would "go through various independent processes to make sure the information is accurate" in the later filings, and did not just rely on information from earlier filings), 70:21-72:20 (testifying that D&O questionnaires were updated in connection with the December 2012 offering to ensure accuracy of filings); Unger Decl. Ex. BB 184:11–185:3, 199:1-6, 202:6–203:11, 212:20–213:25, 213:22–214:7, 232:2–233:25, 254:12–256:3, 266:10-24; 267:16–268:9; Exs. H-Q.) The due diligence performed in connection with TSH's post-August 20, 2012 filings constitutes "acts of independent significance" that sever the "straight line connection" AWAC attempts to draw between omissions in the Form S-4 (filed before the Business

Combination) and omissions in certain SEC filings cited by the plaintiffs (filed after the Business Combination).

Perhaps recognizing that the Form S-4 and related documents on which AWAC now relies were not the subject of any claim in the Underlying Litigations and were not referenced in the CAC or the Derivative Action complaints, AWAC stops short of asserting TSH's Loss actually arose out of them. Instead, AWAC asserts only that "Nishi's 'Wrongful Acts' were connected to Rucker's and TSLLC's 'Wrongful Acts,' which led to TSHoldings' 'Wrongful Acts.'" (Dkt. 73 at 29.) This daisy-chain of causation stretches the exclusion too far. AWAC must show TSH's Loss arose out of pre-August 20, 2012 Wrongful Acts—not that TSH's Loss arose out of covered Wrongful Acts which, in turn, arose out of pre-August 20, 2012 Wrongful Acts.

Finally, AWAC's argument regarding the earlier filings is relevant only to the Securities Plaintiffs' 1933 Act claims concerning the December 2012 Secondary Offering. These 1933 Act claims amounted to no more than $500,000 of damages, which was roughly 0.003 percent of TSH's potential exposure at the time it settled the Securities Action, and the plaintiffs' damages expert did not even bother to value potential damages for these claims. (Dkt.151 ¶24.) Thus, it hardly warrants the ink spilled negating AWAC's hypothesis that "linking" later SEC filings to the Form S-4 equates to one "arising out of" the other.

**5.    The Class Certification Order Did *Not* Find that the Securities Action Plaintiffs Relied on TSH's Pre-August 20, 2012 Filings.**

AWAC mistakenly asserts that the Court's Class Certification order "highlights the importance of the pre-August 20, 2012 nondisclosures." (Dkt. 73 at 27-29.) AWAC misunderstands the Court's class certification analysis. Contrary to AWAC's argument, plaintiffs did not have "to establish that TSHoldings stock purchasers starting August 22, 2012 presumptively relied on omissions occurring up to August 22, 2012." (Def. Mem. 28.) Class certification decisions do not adjudicate the merits or likely merits of the parties' claims. They instead determine whether there are theories and evidence that, *if proven*, would allow the case to be adjudicated on a classwide basis. This Court concluded that plaintiffs had shown two alternative presumptions that would allow them to establish reliance for the entire class: (1) the fraud-on-the-market presumption, and (2) the *Affiliated Ute* presumption. They are separate presumptions, despite AWAC muddling them together.

At the class certification stage, all that plaintiffs had to show to invoke the fraud-on-the-market presumption is that TSH stock traded in an efficient market during the Class Period, which the Court found plaintiffs had done through their expert. (Dkt.151 Ex. I at 9, 16-22; Unger Decl. Ex. S at 10-15.) The fraud-on-the-market theory presumes that investors rely upon the market price, not that investors rely upon any particular information. The notion is that the market price reflects all available information, but that is not the same thing as a finding that investors rely upon any specific filing or any misrepresentation or omission.

In order to invoke the *Affiliated Ute* presumption at the class certification stage, plaintiffs had to demonstrate that their claim rested on a pure omission – not on a mixture of misrepresentations and omissions. (Unger Decl. Ex. S at 17-18.) *Affiliated Ute* holds that in cases involving pure omissions, the law presumes reliance. The applicability of the presumption does not depend on whether the market is efficient, it depends on whether the case involves only a pure omission. This Court held that because plaintiffs' case rested upon a pure omission theory (omission of the related-party transactions), the plaintiffs could invoke the *Affiliated Ute* presumption to meet the reliance element and that the presumption would be available to all class members. (Dkt.151 Ex. I at 13-16.) Contrary to AWAC's argument, the Court's Class Certification Order did *not* determine that the class plaintiffs relied on TSH's Form S-4. The plaintiffs' class certification motion did not address the S-4 or any other pre-August 20, 2012 filings. The arguments, analysis, and outcome of the class certification motion would have been the same even if the pre-August 20, 2012 Form S-4 never existed.

### C. AWAC's Prior Act Exclusion Does Not Bar Coverage for the Derivative Actions Judgment and Defense Costs.

AWAC's Derivative Actions arguments suffer the same deficiencies as its Securities Action arguments. *First*, AWAC addresses only allegations in pleadings, ignoring the rule that indemnity for a judgement is based on the facts surrounding the judgment. As discussed above, the judgment was for attorney fees incurred in achieving the Derivative Actions settlement, under which TSH agreed to make certain changes to governance and board oversight.

*Second*, for the same reasons discussed above, AWAC has not demonstrated that the allegations it identifies meet the Policy's governing definition of "Wrongful Acts." For example, whether TSLLC "failed to implement sufficient controls" when it was a private LLC is not an act "by [an] Organization." Rucker's questionnaire answers were in his capacity with TSLLC, not in his capacity as an "Executive of an Organization." TSLLC did not meet the definition of "Organization" until August 21, 2012.

*Third*, the allegations that AWAC identifies do not involve the pre-August 20, 2012 period. Allegations that TSH and its directors breached fiduciary duties and failed to implement sufficient controls necessarily involve the period *after* TSH became a public company and installed its board on August 21, 2012. (Dkt.151 Ex. J ¶1 ("This is a shareholder derivative action that seeks to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law that occurred *as early as August 22, 2012*." (emphasis added)).

*Finally*, the claims in the Derivative Actions, as a matter of law, cannot "arise out of" any pre-August 20, 2012 acts. The liability-creating events in any derivative action are the actions and conduct of the public company and its board. Directors only owe fiduciary duties to the company once they become directors, not before, and therefore can be liable only for acts occurring while they are directors. Those are "acts of independent significance" that break any causal connection between prior acts and the claim or Loss.

## II. NATIONAL UNION'S PRIOR ACTS EXCLUSION DOES NOT BAR COVERAGE.

AWAC's argument that National Union's Prior Acts Exclusion precludes coverage under AWAC's Policy is nonsensical.

*First*, National Union **accepted** coverage and paid $9,500,000 for the settlement and defense costs in the Securities Action and Derivative Actions. AWAC's argument would require the Court to conclude that AIG, which handles claims on behalf of National Union, voluntarily paid TSH $9.5 million without any legal obligation to do so.

*Second*, **all** of AWAC's witnesses testified that National Union's Prior Acts Exclusion is *narrower* in scope than the Prior Acts Exclusion in AWAC's Policy – a view also shared by AWAC's prior coverage counsel. (*See* Dkt. 191 Ex. Q 89-92 ("It appears to me that the Allied World exclusion would be broader" than the AIG exclusion); Ex. T 86-87 ("Allied World's prior acts exclusion is broader than the prior acts exclusion in the AIG policy"); Ex. S 101-102 (same); Ex. U ("Allied World's prior acts exclusion is broader than the prior acts exclusion in the AIG policy.").) If AWAC's exclusion does not preclude coverage, then National Union's narrower exclusion certainly does not.

AWAC's argument lacks merit for the following additional reasons as well.

### A. The Prior Acts Exclusion in the AIG Primary Policy Is Inapplicable Because AWAC's Policy Does Not Follow Form to It.

AWAC's excess policy follows form to the provisions in the underlying National Union policy *except* where AWAC's policy differs:

> This Policy, *except as herein stated*, is subject to all terms, conditions, agreements and limitations of the Primary Policy in all respects as in effect on the date hereof.

(Dkt.123 Ex. B) (emphasis added). The purpose of the "except as herein stated" language is to inform policyholders to consult the excess policy, not the underlying policy, in situations where different terms appear. *Smith v. Hughes Aircraft Co. Corp.*, 783 F. Supp. 1222, 1229 (D. Ariz. 1991), *aff'd in part, rev'd in part on other grounds*, 22 F.3d 1432 (9th Cir. 1993). *See also UnitedHealth Group Inc. v. Columbia Cas. Co.,* 941 F. Supp.2d 1029, 1053 (D. Minn. 2013) (endorsement in underlying policy is "trumped" by conflicting provision in excess policy.).

Here, the Prior Acts Exclusions in the primary policy and AWAC's excess policy differ and are inconsistent. AWAC's corporate designee and other witnesses admitted that National Union's exclusion is "narrower" in scope than the exclusion in AWAC's Policy. Given that inconsistency, the "except as herein stated" provision in the follow-form section of AWAC's policy applies, and the exclusion in the excess policy controls over the exclusion in the primary policy.

Despite the "except as herein stated" provision in its policy, AWAC argues that both exclusions apply. AWAC does not cite any cases holding that inconsistent exclusions in a primary policy and in a follow-form excess policy can both be applied.[10] However, even if AWAC's interpretation of the policy language were plausible (which it

---

[10] AWAC cites *In re SRC Holding Corp.*, 545 F.3d 661, 670 (8th Cir. 2008) to argue that "there is nothing unusual about an insurer using two exclusions to ensure that coverage is precluded." (Dkt. 73 at 14.) However, that case involved the interpretation of separate provisions in the *same* policy. It did not interpret inconsistent exclusions on the same topic appearing in both a primary policy and an excess policy.

is not), an equally plausible interpretation of the "except as herein stated" provision is that the exclusion in AWAC's policy supersedes the exclusion in the National Union policy. That is not only a reasonable interpretation, it is the interpretation given to the language *by AWAC's own underwriter* who was responsible for putting the exclusion in AWAC's policy in the first place:

> Q.　… Allied's policy has its own prior act exclusion and does not follow form, correct?
>
> A.　Correct.

(Dkt. 191 Ex. H, 170:23-171:1.) That admission by AWAC's underwriter is fatal to AWAC's argument. At a bare minimum, the admission demonstrates that the policy language on this issue is susceptible to two reasonable interpretations and is ambiguous.[11] Therefore it must be construed against AWAC to conclude that AWAC's Policy does not follow form to the Prior Act Exclusion in the National Union policy.

---

[11]　Other provisions in AWAC's policy create more ambiguity. First, AWAC's policy affirmatively states that it *will* follow form to the Primary Policy with respect to a different exclusion, the "Pending or Prior Exclusion." (*See* Dkt. 123 Ex. B, AW002239 ("This Policy shall follow any exclusion in the Primary Policy regarding pending or prior litigation….").) If, as AWAC now argues, its policy *automatically* follows form to all of the exclusions in National Union policy, that provision would be unnecessary. Second, the follow-form language in AWAC's policy does not state that it will follow form to any "exclusions" in the primary policy at all. Instead it states that it will follow "all *terms*, *conditions*, *agreements* and *limitations* of the Primary Policy. (*Id*. at AW002240.) This is different than excess policies drafted by other insurers, which make clear that the policies follow form to exclusions in the underlying policy. *See e.g.*, *UnitedHealth Group Inc. v. Columbia Cas. Co.,* 941 F. Supp.2d 1029, 1053 (D. Minn. 2013) (discussing excess policy that more broadly followed form to the underlying policy "except for … any other provisions, including terms, conditions, *exclusions* and definitions which are inconsistent with the provisions of this policy." (Emphasis added.)).

### B. In Any Event, the Prior Acts Exclusion in the National Union Policy Does Not Bar Coverage.

Even if the Prior Acts Exclusion National Union Policy applied, it would not preclude AWAC's indemnity obligations. For the same reasons discussed above, the pre-August 20, 2012 conduct that AWAC relies on does not satisfy the definition of "Wrongful Acts" and many of the acts AWAC identifies actually occurred after August 20, 2012. The second sentence of the National Union exclusion affirmatively states that the policy "provides coverage for Wrongful Acts occurring *on or after August 20, 2012* and prior to the end of the Policy Period." The CAC alleged ten specific wrongful acts as the basis for its 1934 Act claims, *all* of which occurred "*on or after August 20, 2012.*" Also as described above, the sole motivation for the settlement – the reason the money was paid – was the potential liability from the undisputed fact that TSH's press releases and securities filings *after* August 20, 2012 failed to disclose the related-party transactions.

## III. NO ALLOCATION OF THE SETTLEMENT WAS REQUIRED.

Citing *UnitedHealthGrp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856 (8th Cir. 2017), AWAC argues that it is not required to indemnify TSH for the Securities Action settlement because TSH did not allocate the settlement among insured and non-insured defendants. Its argument incorrectly presumes that an allocation was necessary. In *UnitedHealthGrp*, an allocation presumptively was necessary because the settlement agreement pertained to two separate underlying lawsuits, one of which involved covered claims and the other uncovered claims. It was thus undisputed that the existence of the

uncovered lawsuit *did* increase the settlement amount paid by the defendant, and therefore the insured was required to allocate the settlement between the covered and uncovered claims. By contrast, in this case, it is undisputed that the existence of non-insured defendants in the Securities Action *did not* increase the settlement amount paid by TSH, and therefore no allocation of the settlement amount between insured and non-insured defendants was required.

Under the "larger settlement rule," losses are allocated between insured and non-insured defendants "only to the extent that overall losses incurred are higher by virtue of wrongful acts of uninsured parties." *Piper Jaffray*, 38 F. Supp. 2d at 774. In making that determination, the Court "considers only the claims actually settled as defined by the allegations in the complaint." *Id.* at 777 (citing *Nordstrom, Inc. v. Chubb & Sons, Inc.*, 54 F.3d 1424, 1433 (9th Cir. 1995)). Here, the presence of the non-insured defendants did not result in a higher settlement amount. TSH would have settled for the same amount even if the non-insured defendants had never been joined in the case.

The only claims asserted against the non-insured underwriter defendants were for alleged violations of the 1933 Act in connection with TSH's secondary public offerings. The 1933 Act claims involving the June 2013 offering had been dismissed by the Court in March 2015. Thus, the only claim remaining against the underwriter defendants at the time of the settlement was for alleged violation of the 1933 Act in connection with the December 2012 offering. (Dkt. 151 ¶20.) The 1933 Act claim had little financial value – estimated by defense counsel to be less than $500,000 on a classwide basis, which is a

tiny fraction of the potential $180,000,000 liability that TSH (but not the underwriters or other non-insured defendants) faced on the 1934 Act claims. (*Id*. ¶29.)

More important, the underwriter defendants had a strong statutory defense to any liability under the 1933 Act claim, which was not available to TSH. (*Id*.) Accordingly, there was *no possibility* that the underwriter defendants would be held liable on the remaining 1933 Act claim, but TSH would not be held liable. (*Id*.) Given that the underwriter defendants and other non-insureds were not subject to liability under the 1934 Act claims, and given that they could not be held liable under the 1933 Act claims without TSH *also* being held liable for the same limited damages possible under that claim, the presence of the non-insured defendants in the Securities Action did not increase the settlement value of the case, and did not increase the amount paid by TSH in the settlement. As defense counsel explains:

> TSH and AIG did not pay the Securities Action plaintiffs a penny more to include the non-Insured defendants in the Stipulation of Settlement. That's because the presence of the non-Insured defendants did not increase potential classwide damages, or impact the Insured Defendants' risk of liability.

(*Id*.; *see also* Dkt. 178 ¶28.) TSH thus paid to settle its *own* liability, and nothing about the presence of underwriter defendants or any other non-insureds in the action increased in any way the sum TSH and AIG paid to resolve the case. AWAC has offered no evidence that the presence of the non-insured defendants increased the amount of the settlement paid. Under the "larger settlement" rule, there is nothing to allocate.

Unable to show that the presence of non-insureds affected the settlement amount, AWAC instead argues that an allocation was required because of certain wording in the

Stipulation of Settlement. Its argument lacks any support in the case law and lacks support in the Stipulation itself. The Stipulation states that TSH and AIG will deposit $9,500,000 into an escrow account, and that sum, plus accrued interest, would be the Settlement Fund used to pay class counsel and claimants. (Dkt.151 Ex. K at p. 19, §IV(E)(1).) Paragraph IV(E)(1) of the Stipulation states that the payment "described in this ¶IV(E) is the only payment to be made by *or* on behalf of Defendants in connection with the settlement." (*Id.* (emphasis added).) The gist of this language is that the $9.5 million paid by TSH and AIG is "the only payment" that was going to be made "by" the defendants, or on their behalf (such as by an insurance company) and that, other than TSH and its insurer, no other defendants would be called upon to pay into the Settlement Fund. Ignoring the first part of the disjunctive phrase "by or on behalf of," AWAC makes a tortured argument focusing only on the second part of that phrase. The thrust of its argument is that the isolated second portion of the phrase "by or on behalf of" must mean that the non-insured defendants owed additional liability to the plaintiffs over and above TSH's liability, and that the additional liability of the non-insured defendants was satisfied by TSH's payment of money that it did not otherwise owe to the plaintiffs. That argument is based on pure speculation and is contrary to the actual facts in the record. (*See* Dkt. 151 ¶¶28-30; Dkt.178 ¶¶28-30.)

But even if an allocation were necessary (which it was not), it was appropriate to allocate $0 to the non-insured defendants. According to *UnitedHealthGrp*, "to prove allocation, parties can present testimony from attorneys involved in the underlying lawsuits, evidence from those lawsuits, expert testimony evaluating the lawsuits … or

other admissible evidence." 870 F.3d at 863. That is exactly what TSH has done. (*See* Dkt.151 ¶¶28-31; Dkt.178 ¶¶28-31; Dkt.182 ¶34.) This evidence demonstrates that any appropriate allocation of the settlement to non-insured defendants would be $0. (Dkt.151 ¶¶28-31; Dkt.178 ¶¶28-31; Dkt.182 ¶34.)

## IV. THE INVESTIGATION COSTS ARE COVERED "DEFENSE COSTS" UNDER THE POLICY.

The fees and costs TSH incurred in investigating the allegations of undisclosed related-party transactions and misstated financials are covered "Defense Costs" because they resulted solely from the investigation of covered claims against TSH. Both of AWAC's arguments regarding the investigation costs rely on a false dichotomy it constructs between the "Gotham Report" and the Securities Action. Dorsey, with the assistance of PwC, investigated allegations against TSH of undisclosed related-party transactions and misstated financials. (*See* Dkt. 148 ¶12; Carter ¶2; Dkt.203 106:15–107:5; Dkt.147, p.1 (Dorsey was retained to investigate "allegations identified by Gotham City" that TSH "failed to disclose that [BP] was a related company" and that TSH "used BP to overstate its inventories and understate its costs of goods sold" causing it to overstate earnings); Dkt.150 p.1.) These allegations were made by both short-sellers and by the plaintiffs in the Securities Action. (*Compare* Dkt.145 Ex. D *with* Dkt.151 Ex. C.) These allegations were published in the Gotham Report on November 14, 2013, and were pleaded in the *Lagendyk* complaint on November 15, 2013. (Dkt.145 Ex. D; Dkt.151 Ex. A .) Thus, AWAC's attempt to distinguish between the investigation of allegations in the Gotham Report and the Securities Action is unsupported by the record.

AWAC also cannot deny coverage for the investigation costs simply because TSH retained an independent firm to perform the investigation, rather than counsel of record in the Securities Action. This argument has no basis in the definition of covered "Defense Costs." To the extent AWAC's argument relies on the requirement of consent, this requirement has been met. Dorsey was one of the few law firms in the Twin Cities pre-approved by AIG for such work. (Dkt.123 Ex. A p.10; Carter ¶2; Dkt.203 7:25–8:8.) In addition, consent may not be unreasonably withheld. (Dkt.123 Ex. A p.9.)

It is undisputed that the investigation was instrumental to the defense of TSH. It is also undisputed that Faegre and Winthrop would have needed to complete a similar investigation as part of their defense if Dorsey had not already done so—in which case the investigation costs certainly would have been covered. (Dkt.151 ¶43; Dkt.178 ¶44; Dkt.191 Ex. S 90:20-24 (AWAC conceding it is necessary for the defense of a securities class action to investigate the merits of allegations).) As a result, AWAC has an obligation to indemnify TSH for Dorsey's and PwC's fees. *See generally Piper Jaffray*, 38 F. Supp. 2d at 780 (noting that costs and fees for items that were useful in defending a covered claim are recoverable from an insurer).

Because Dorsey and PwC investigated the allegations advanced by the Securities Action plaintiffs and the investigation formed the basis of TSH's defense in the Securities Action, the investigation costs are covered "Defense Costs."

## V. AWAC IS NOT ENTITLED TO A REDUCTION IN DAMAGES.

AWAC is not entitled to reduce TSH's damages by $200,000. "The law in Minnesota is clear that where an insured has not been fully compensated for a loss, his or

her insurance company will not be reimbursed for any payments made." *Stark Farmers Mut. Ins. Co. v. Rodriguez*, 1996 WL 344984, *1 (Minn. Ct. App. June 25, 1996) (citing *Westendorf by Westendorf v. Stasson*, 330 N.W.2d 699, 703 (Minn. 1983)).  Here, it is undisputed that even with full recovery against AWAC, TSH will not be made whole. TSH has incurred substantial uninsured losses, including paying a $500,000 retention, an additional $500,000 to resolve the Securities Action, and other uninsured costs.  (Dkt. 182 ¶46 & Exs. C-H, J-P.)  There is no chance of a windfall to TSH that would warrant a $200,000 reduction in TSH's damages.  AWAC, which wrongly denied coverage and has refused to make any payments to TSH, has no basis to assert that it should receive the benefit of the $200,000 TSH recovered from Nishi.

## VI.  SPERLING & SLATER FEES ARE COVERED DEFENSE COSTS.

After *Lagendyk* and *Puerta* were filed in the Southern District of New York, TSH retained the law firm of Sperling & Slater to defend it.  (2d Clayton Decl. ¶9.)  TSH requested and TSH's broker negotiated for AIG's approval of Sperling & Slater.  (*Id.*) On February 3, 2014, AIG issued its final decision not to approve Sperling & Slater and to require TSH to retain panel counsel instead.  (*Id.*)  During the intervening three months, Sperling & Slater appeared as defense counsel of record and defended TSH in the securities actions.  (*Id.*)  As Sperling & Slater's fees were incurred in defending the covered Securities Claims and TSH's defense also inures to the benefit of its insurers, AWAC should be required to indemnify Sperling & Slater's fees incurred before February 3, 2014.

## CONCLUSION

Because TSH has met its burden of proving its loss is covered by AWAC's Excess Policy and AWAC has failed to meet its burden to prove its exclusion applies, the Court should deny AWAC's motion for summary judgment.

Respectfully submitted,

Dated:  February 27, 2019

*s/ Matthew T. Boos*

Matthew T. Boos (#0237310)
Richard D. Snyder (#191292)
Emily A. Unger (#0393459)
Jonathan P. Baker (#0397302)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000
mboos@fredlaw.com
rsnyder@fredlaw.com
eunger@fredlaw.com
jbaker@fredlaw.com

*Attorneys for Plaintiff*