UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Tile Shop Holdings, Inc.,

      Plaintiff,

v.

**MEMORANDUM OPINION AND ORDER**
Civil No. 17-776 ADM/TNL

Allied World National Assurance Company,

      Defendant.

_____

Emily Unger, Esq., Jonathan Baker, Esq., Matthew T. Boos, Esq., and Richard D. Snyder, Esq., Fredrikson & Byron, PA, Minneapolis, MN, on behalf of Plaintiff.

Anthony J. Alt, Esq., Bradley M. Jones, Esq., and Jeffrey M. Thompson, Esq., Meagher & Geer, PLLP, Minneapolis, MN, on behalf of Defendant.

_____

## I. INTRODUCTION

On March 20, 2019, the undersigned United States District Judge heard oral argument on cross motions for summary judgment of Defendant Allied World National Assurance ("Allied") [Docket No. 71] and Plaintiff Tile Shop Holdings, Inc. ("Tile Shop" or "TSH") [Docket No. 120]. For the reasons set forth below, Allied's motion is granted and Tile Shop's motion is denied.

## II. BACKGROUND[1]

### A. The Insurance Policies

Tile Shop Holdings, Inc. was incorporated on June 21, 2012. Ex. 39.[2] In preparation for offering public stock and securities for the new entity, Tile Shop purchased primary and excess Directors and Officers ("D&O") insurance policies. Tile Shop purchased its primary coverage from a member company of American International Group, Inc. ("AIG") ("Primary Policy"), and an excess policy from Allied ("Excess Policy"). The effective date for both policies is August 20, 2012, for a term of one year. Both policies renewed for a second one-year period beginning August 20, 2013, with the same policy terms.

Both policies include prior act exclusion clauses. The Primary Policy's exclusion clause is found in Endorsement #10:

> In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured** alleging any **Wrongful Act** occurring prior to August 20, 2012 . . . . **Loss** arising out of the same or related **Wrongful Act** shall be deemed to arise from the first such same or related **Wrongful Act**.

Ex. 15-48 (emphasis in the original). Tile Shop paid $146,040 for the Primary Policy with the Prior Acts Exclusion clause. Without the exclusion clause, the price would have been $220,000. Exs. 28-3; 46-3.

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). As both parties have moved for summary judgment, any disputed facts are noted.

[2] Def.'s Mem. Supp. Summ. J. [Docket No. 73] cited to numbered exhibits, which are Docket Numbers 76-117. The court will cite to the exhibit numbers assigned by Allied, rather than the exhibit's Docket Number.

Allied's Excess Policy follows form, referencing the Primary Policy and that policy's $10 million dollar policy limit. Ex. 14-1. The Excess Policy's exclusion language is found in Clause II, Terms and Conditions, C., "Pending or Prior Exclusion," stating "This Policy shall follow any exclusion in the Primary Policy . . . ." Ex. 14-14. But, additional exclusion language is found in Endorsement #2 of the Excess Policy. Allied "amended by adding the following exclusion" terms:

> Prior Acts Exclusion
> This Policy shall not cover any Loss in connection with any claim alleging, arising out of, based upon, or attributable to any wrongful act(s) committed, attempted, or allegedly committed or attempted prior to August 20, 2012 . . . .

Ex. 14-4 (Endorsement #2). Tile Shop paid $90,500 for the Excess Policy with the Prior Act Exclusions language. Without the exclusion clause, the price would have been $135,000. Exs. 45-3; 47-2.

"Wrongful Act" is defined in the Primary Policy as:

> (1) any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act...:
>   (i) with respect to any Executive of an Organization, by such an Executive in his or her capacity as such or any matter claimed against such Executive solely by reason of his or her status as such;
> . . .
>
> (2) with respect to an Organization, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Organization, but solely in regard to a Securities Claim."

Ex. 15-32. In turn, Organization means: (1) the Named Entity [Tile Shop]; (2) each Subsidiary . . . . Ex. 15-28. Executive means any: (1) past, present and future duly elected or appointed director, officer, trustee . . . (or equivalent position). Ex. 15-26. Subsidiary means: (1) any for-

3

profit entity that is not formed as a partnership of which the Named Entity has or had Management Control on or before the inception of the Policy Period . . . . Ex. 15-31. And, finally, Management Control means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation . . . . Ex. 15-28.

**B. Formation of Tile Shop**

On June 29, and July 31, 2012, Tile Shop filed registration statements with the Securities and Exchange Commission ("SEC"). Exs 2-1, 6-1, 7-1. "Pursuant to the requirements of the Securities Act of 1933," the registration statements were signed,

>Tile Shop Holdings, Inc.,
>By: /s/ Robert A. Rucker
>    Name: Robert A. Rucker
>    Title: Director and Chief Executive Officer

Id. at 2-314, 6-22. Rucker "served as the sole member of the board of directors TS Holdings [Tile Shop] since TS Holdings' incorporation in June 2012." Id. at 2-149. In June, the registration statement omitted related-party transactions. Id. at 6-19. Tile Shop repeated these omissions in the July 23, 2012 S-4 Registration Amendment No. 1. Id. at 7-17. The July registration statement also included an invitation to JWC Aquisition Corp. Stockholders ("JWCAC") to a "special meeting" on August 16, 2012, where JWCAC stockholders would be asked to "vote upon a proposal to adopt a contribution and merger agreement providing for the business combination of JWCAC and the Tile Shop, LLC, which we refer to as 'The Tile Shop,' under a new holding company named Tile Shop Holdings, Inc., . . . ." Id. at 2-4. This vote would make Tile Shop, LLC ("TSLLC") a wholly owned subsidiary of Tile Shop.

**C. Advent of Claims**

In November 2013, Tile Shop's stock price fell after reports were issued "alleging, among other things, that TSH used undisclosed relationships between the CEO's brother-in-law Fumitake Nishi ("Nishi") and certain of TSH's Chinese exporting agents and suppliers to understate cost of goods sold and overstate earnings and profits; that TSH's products were contaminated by lead; and that TSH's stock was overvalued." Tile Shop's Mem. Supp. Summ. J. Mot. [Docket No. 122], at 4-5. Two lawsuits (the "Securities Actions") followed, both complaints of purchasers of Tile Shop stock, who bought stock between August 22, 2012 and November 13, 2013 (the "Class Period"). The complaints were filed November 15, 2013 (Lagendyk complaint) and November 21, 2012 (Puerta complaint). The purchasers' complaints alleged undisclosed related-party transactions and improper accounting. Id. at 5. Lagendyk alleged six misrepresentations/omissions in six public filings, all but one of which were alleged to have occurred after August 20, 2012. Puerta alleged seventeen misrepresentations/omissions, all of which were alleged to have occurred after August 20, 2012. Id.

The Securities Actions were consolidated under the caption Beaver County Employees' Retirement Fund, et al. v. Tile Shop Holdings, Inc., et al., Case No. 0:14-cv-00786-ADM-TNL. On May 23, 2014, the plaintiffs filed a Consolidated Amended Complaint (the "CAC") which superseded the Lagendyk and Puerta complaints. Ex. C [Docket No. 151-1] (the "Securities Action"). The CAC described the "Nature of the Action." Id. at 1-3. The Plaintiffs alleged that:

> 4. Notwithstanding Rucker's integral involvement in sourcing product and managing the Company's operations, Tile Shop failed to disclose several material, related-party relationships. These relationships involved Fumitake Nishi ("Nishi"), who is Rucker's brother-in-law and was a purchasing supervisor employed by Tile Shop, Jian Zhang, who is related to Rucker's wife (to whom Rucker has been married since 2003), and Pan Zhang, who is Jian's son and

Rucker's nephew (together, the "Zhangs").  Despite the fact that these individuals owned and/or controlled Beijing Pingxiu ("BP"), a Chinese export trading company that conducted millions of dollars in business with Tile Shop from at least fiscal years 2011 through 2013, the Company did not disclose these relationships.  Nor did the Company disclose that Nishi owned a majority interest in Nanyang Helin Stone Co. Ltd. ("Nanyang"), which also sold millions of dollars of stone accessory products to Tile Shop from at least fiscal years 2011 through 2013.  Furthermore, Nishi had an undisclosed, indirect relationship during that period with another supplier of Tile Shop, Best Cheer Stone Group LTD ("Best Cheer Stone").

5.   Tile Shop's failure to disclose these related-party transactions and relationships violated Item 404 of SEC Regulation S-K, Rule 4-08(k)(l) of Regulation S-X and applicable accounting rules, which required such disclosure.  The failure to disclose these relationships also violated Item 303 of SEC Regulation S-K, because the issues emanating from the relationships posed known trends, uncertainties and risks that could adversely affect Tile Shop's business. As such, the Registration Statements, which did not disclose these relationships as required by law, were negligently prepared by defendants.  Moreover, Tile Shop consciously or recklessly failed to disclose these relationships in other SEC filings, as alleged below. In fact, Tile Shop did not even reveal the full truth about these relationships in its January 27, 2014 press release, despite claiming to announce the results of its "independent investigation" into the issues. It was not until February 28, 2014, when Tile Shop filed its Form 10-K for the fiscal year ended December 31, 2013, that the Company confirmed information regarding the Zhangs and divulged Nishi's connection to Best Cheer Stone.

6.   On November 14, 2013, investment firm Gotham City Research ("Gotham") issued a report exposing Tile Shop's relationship and transactions with BP - a captive supplier and export agent - and Rucker's relationship with Nishi and the Zhangs.  Gotham reported that Tile Shop used BP to manipulate its costs and profit margins during the Class Period, by purchasing significant amounts of product from BP at artificially low prices.  This arrangement allowed the Company to capture higher profits for product that would have cost more to purchase from independent suppliers.

Id. at 2-3.

In 2015, two derivative actions were filed against Tile Shop and its officers and directors, and consolidated as In re Tile Shop Holdings, Inc. Stockholder Derivative Litigation (Del. Ch. Ct.).  Ex. 40 (the "Derivative Actions").  The Consolidated Derivative Action Complaint

included allegations similar to that of the CAC, highlighting undisclosed related-party transactions dating back to at least 2011. Id.

**D. Settlement**

Tile Shop settled both the Securities Action (January 2017) and the Derivative Actions (August 2018). Tile Shop described the settlements as reasonable "in light of the risks of going to trial, particularly where TSH had admitted violations of an SEC regulation requiring disclosure of related-party transactions." Tile Shop's Mem. Supp. Summ. J. Mot. at 14.

**E. Insurance Dispute**

AIG paid $9.5 million of its Primary Policy limit (which was $10 million) toward the settlement and defense costs. In a December 20, 2013 letter, AIG initially reserved its rights to assert its prior act exclusion. Ex. 52-5. In November 2016, AIG maintained the need for a "discount in respect of coverage issues remain[ing]." Ex. 53-1. Tile Shop agreed to pay the remaining $500,000 to exhaust the Primary Policy and trigger the Excess Policy.

Unlike AIG, Allied invoked its exclusion clause immediately and denied coverage before Tile Shop had reached its Primary Policy limit. Tile Shop here disputes Allied's denial of coverage and argues that the Excess Policy Prior Acts Exclusion clause does not justify denial of coverage of the outstanding settlement and defense costs paid by Tile Shop.

### III. DISCUSSION

**A. Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Insurance coverage cases are "particularly amenable to summary judgment" because "the interpretation and construction of insurance policies is a matter of law." John Deere Ins. Co. v. Shamrock Indus., 929 F.2d 413, 417 (8th Cir. 1991). As there is no genuine issue of material fact and the issue is one of law, the matter is ripe for summary disposition.

**B. Insurance Policy Interpretation**

Minnesota law governs the insurance policies, and the federal district court has a duty to "predict how the Supreme Court of Minnesota would rule if this issue came before it." Jerry's Enters. v. United States Specialty Ins. Co., 845 F.3d 883 (8th Cir. 2017) (cleaned up). "Under Minnesota law, the insured bears the initial burden of establishing that coverage exists, at which point the insurer then carries the burden of demonstrating that a policy exclusion applies." Friedberg v. Chubb & Son, Inc., 691 F.3d 948, 951 (8th Cir. 2012) (citing Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 894 (Minn. 2006)). If the insurer succeeds, the burden shifts back to the insured to show that an exception to the exclusion applies. Midwest Family Mut. Ins. Co. v. Wolters, 831 N.W.2d 628, 636 (Minn. 2013).

When interpreting an insurance policy, courts must ascertain and give effect to the intent of the parties as reflected in the insuring contract. See St. Paul Fire & Marine Ins. Co. v. Futura Coatings, 993 F. Supp. 1258, 1261 (D. Minn. 1998). The "insurance contract must be construed as a whole, with unambiguous language given its plain and ordinary meaning." Id. "Language in a policy is ambiguous if it is susceptible to two or more reasonable interpretations." Id. But

8

courts must not read ambiguity into the plain language of an insurance policy. "The courts must fastidiously guard against the invitation to create ambiguities where none exist." Oakdale Mall Assocs. v. Cincinnati Ins. Co., 702 F.3d 1119, 1122 (8th Cir. 2013).

The pivotal point of this case is whether admitted violations of an SEC regulation requiring disclosure of related-party transactions arose out of wrongful acts prior to the policy exclusion date of August 20, 2012.

The parties agree, absent the prior act exclusion clauses of the insurance policies, coverage would have attached to the Securities and Derivative Actions. Therefore, the Court next turns to the language of the exclusion clauses. Within the Primary Policy, the parties agreed that "the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured** alleging any **Wrongful Act** occurring prior to August 20, 2012." And, the agreement pegged the loss to the earliest occurrence of wrongdoing, stating "**Loss** arising out of the same or related **Wrongful Act** shall be deemed to arise from the first such same or related **Wrongful Act**." Bearing in mind "the phrase 'arising out of' has been given broad meaning by Minnesota courts," Bethel v. Darwin Select Ins. Co., 735 F.3d 1035, 1039 (8th Cir. 2013) (quoting Murray v. Greenwich Ins. Co., 533 F.3d 644, 649 (8th Cir. 2008)), this Court reads "from the first such same or related Wrongful Act" to mean the exclusion applies to an ongoing wrong, or wrongful conduct repeated, and is defined by the wrongful act's or acts' first instance, not by instances of the same wrongdoing which came later. See W3i Mobile, LLC v. Westchester Fire Ins. Co., No. 08-6370 (JNE/RLE), 2009 U.S. Dist. LEXIS 98061, at *8 (D. Minn. Oct. 20, 2009) ("The term 'arising out of' requires only a causal connection; it does not require proximate cause.").

9

The Excess Policy follows form, but "amended by adding" a broader exclusion, declining coverage of "any Loss in connection with any claim alleging, arising out of, based upon, or attributable to any wrongful act(s) committed, attempted, or allegedly committed or attempted prior to August 20, 2012." Following form, the Excess Policy also excludes wrongdoing "arising out of" the earliest "same or related Wrongful Act," but the Excess Policy also broadens the definition of "arising out of" by adding the language "based upon, or attributable to" and using the word any three times: any Loss, any claim, any wrongful act. Read as a whole, the Excess Policy exclusion is broader than the Primary Policy, adding terms "based upon, or attributable to" and "any" to weaken any direct liability causation requirement that may be read into "arising out of" and to emphasize that prior acts leading to claims within the policy period will not be covered. See Foster v. Summit Med. Sys., 610 N.W.2d 350, 353 (Minn. Ct. App. 2000) (finding the policies did not require Wrongful Acts to directly result in liability where the policy excludes claims that "indirectly result[] from" wrongful acts); see also Leonard v. Exec. Risk. Indem., Inc. (In re SRC Holding Corp.), 545 F.3d 661, 668 (8th Cir. 2008) ("The word 'any' when read naturally, has an expansive meaning.") (cleaned up).

Under the terms of the Excess Policy's prior acts exclusion, the post-August 20, 2012 omissions arose from the same nuclei of wrongful conduct as pre-August 20, 2012 omissions, and therefore the Tile Shop is not entitled to coverage. In this case, the "nature of the action" for both the Securities and Derivative Actions is the nuclei of wrongful conduct on which the cases were based and to which the wrongful acts were attributable. The claims arose out of related-party transactions which the consolidated complaints alleged stretched back to at least 2011. Tile Shop and its executives then omitted the related-family transactions from their disclosures

10

to the SEC while preparing to offer public securities. Tile Shop and its executives, particularly Rucker, omitted this required information in June and July of 2012 (at least the "first such same or related Wrongful Act"), before the August 20, 2012 exclusion date specified in the insurance policies. Tile Shop continued to omit the required information until after the Gotham Report in 2013, during the second term of the renewed insurance policies. Neither consolidated action asserted any claims that were not related to or attributable to the related-family transactions that were repeatedly omitted from filings. The plain reading of the Excess Policy's exclusion clause is unambiguous and outcome determinative in this case. Tile Shop is not entitled to coverage.

Tile Shop argues the definition of "wrongful acts" in the Primary Policy, the definition of which the Excess Policy follows form, prevents application of the exclusion because the CAC claims only "wrongful acts" occurring after August 20, 2012, and the settlement only covered these wrongful acts. Tile Shop argues that the related-party transactions were not "wrongful acts" until they became omissions or misrepresentations as reflected in the in the CAC. Ex. C, at 37-49. This overly narrow reading is not supported by the plain language of the policy, which defines "Wrongful Act" as: "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission . . . ." Under a plain reading of the Primary and Excess Policy language, the Court cannot ignore the "nature of the action," that is, the acts to which the post-August 20, 2012 omissions were related.

Tile Shop also argues that there are no pre-August 20 wrongful acts because Tile Shop was a new entity and could not, by policy definition, have prior wrongful acts before it was fully merged with TSLLC. That is, Tile Shop argues pre-August 20, 2012, all wrongful acts can only be attributed to TSLLC. Similarly, Tile Shop argues that its executives and officers could not be

11

connected to prior wrongful acts because only executives of Tile Shop, as opposed to TSLLC, can act wrongfully under the policy. This argument is belied by the pre-public offering and pre-full merger SEC filings by Tile Shop prior to August 20, 2012, which were signed by Rucker as Tile Shop's director and CEO. Rucker served as an executive of Tile Shop from June 2012, while still serving as an executive for TSLLC. Therefore, wrongful omissions attributable to Tile Shop and at least one of its executives occurred before August 20, 2012.

The policy definitions of Organization, Executive, and Subsidiary do not dictate otherwise under a plain language reading. Organization is defined as: (1) the Named Entity [Tile Shop]; (2) each Subsidiary; . . . ." Subsidiary means: (1) any for-profit entity that is not formed as a partnership of which the Named Entity has or had Management Control on or before the inception of the Policy Period . . . ." And, Executive means any: (1) past, present and future duly elected or appointed director, officer, trustee . . . ." Tile Shop and Rucker fall within the definition of Organization and Executive. Nevertheless, Tile Shop argues TSLLC did not become a Subsidiary until the official merger and the related-party transactions were attributable only to TSLLC and TSLLC executives. TSLLC was under Rucker's management control, and so, falls within the definition of Subsidiary under the policy language.

Furthermore, Tile Shop's position seems to confuse what entities and persons are insured with what wrongful acts, in this case wrongful omissions and underlying conduct, trigger the exclusion clause. Nothing about the definitions of Organization, Subsidiary, or Executive prevents exclusion of wrongful acts by entities and persons who later become the Insureds. TSLLC became a subsidiary days before Tile Shop became publicly created, but Tile Shop executive Rucker overlapped, signing documents as Tile Shop's sole director, before TSLCC

was officially merged. Tile Shop executives became responsible at least upon failure to disclose in June and July 2012. Tile Shop's wrongful omissions began prior to August 20, 2012 and were rooted in related-party transactions that dated back to at least 2011.

The plain language of the policies unambiguously excludes coverage of Tile Shop's Securities and Derivative Actions. Under the terms of the Excess Policy's prior acts exclusion, the court finds the post-August 20, 2012 omissions arose from the same nucleus as pre-August 20, 2012 omissions, and therefore, as a matter of law Tile Shop is not entitled to coverage. Nonetheless, Tile Shop makes one additional argument that warrants attention. Tile Shop argues that the duty to indemnify is "governed by the claims actually proven in the underlying case." Tile Shop's Mem. Opp'n Def.'s Mot. Summ. J. [Docket No. 217] at 4 (citing Econ. Fire & Cas. Co. v. Iverson, 445 N.W.2d 824, 826-27 (Minn. 1989)), and Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co., 819 N.W.2d 602, 616 (Minn. 2012)). Where a case is settled, Tile Shop argues, "the only question should be how the parties to the settlement viewed the relative merits of the plaintiff's claims at the time of the settlement . . ." Id. at 5 (citing 1 Windt, INSURANCE CLAIMS AND DISPUTES § 6.31). Tile Shop argues that Minnesota courts follow this approach, relying on five Minnesota cases. Gulf Ins. Co. v. Skyline Displays, Inc., 361 F. Supp. 2d 986, 990 (D. Minn. 2005); St. Paul Fire and Marine Ins. Co. v. National Chiropractic Mut. Ins. Co., 496 N.W.2d 411, 415–16 (Minn. App. 1993); Zurich Reinsurance (UK) Limited v. Canadian Pacific Ltd., 613 N.W.2d 760, 764-65 (Minn. App. 2000), rev. denied (Minn. 2000); Convent of the Visitation Sch. v. Cont'l Cas. Co., 707 F. Supp. 412, 416-17 (D. Minn. 1989); and, Piper Jaffray v. Nat'l Union Fire Ins. Co., 38 F. Supp. 2d 771, 777 (D. Minn. 1999). But, none of these cases require the court to ignore the nature of the action, or the plain language of

13

the insurance policies, in favor of speculating about how the parties to the lawsuits viewed the merits of the plaintiff's claims at the time of settlement. This Court does not believe the Minnesota Supreme Court would so hold, especially in light of the plain language of the Excess Policy's prior acts exclusion clause. Certainly, how the parties viewed the claims is relevant to the issue of coverage. But to credit Tile Shop's view of the settlement as only responding to the post-August 20, 2012 claims made in the CAC would ignore the substance and nucleus of the omissions and the nature of the action.

In many cases, settlement can make determining "the claims actually proven" difficult because the case is concluded without submitting the fact questions to a jury. Here, Tile Shop "had admitted violations of an SEC regulation requiring disclosure of related-party transactions." Tile Shop's Mem. Supp. Summ. J. Mot. at 14. There are pre-August 20, 2012 SEC filings with the same omissions as the post-August 20, 2012 filings. And, it also is undisputed that the related-party transactions that required disclosure were developed prior to August 20, 2012.

## IV. CONCLUSION

As a matter of law, the Excess Policy's prior act exclusion clause applies to admitted violations of SEC regulations requiring disclosure of related-party transactions, transactions that were omitted from pre-August 20, 2012 SEC filings and continued to be omitted until Tile Shop was sued in November 2013. Therefore, Tile Shop is not entitled to Allied's coverage of loss from any of the claims in the Securities or Derivative Actions, nor is Tile Shop entitled to recovery of defense or investigation costs.

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Allied's Motion for Summary Judgment [Docket No. 71] is **GRANTED**; and Tile Shop's Motion for Summary Judgment [Docket No. 120] is **DENIED. LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

     s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: June 4, 2019.